# IN THE SUPREME COURT OF TENNESSEE
## AT KNOXVILLE
### January 27, 2016 Session

## STATE OF TENNESSEE v. LEMARICUS DEVALL DAVIDSON

**Automatic Appeal from the Court of Criminal Appeals**
**Criminal Court for Knox County**
**No. 86216B     Walter C. Kurtz, Senior Judge[1]**

_____

**No. E2013-00394-SC-DDT-DD – Filed December 19, 2016**

_____

A jury imposed two sentences of death on the defendant after convicting him of multiple counts of first degree murder, especially aggravated robbery, especially aggravated kidnapping, aggravated rape, and facilitation of aggravated rape. The Court of Criminal Appeals affirmed the convictions and sentences. *State v. Davidson*, No. E2013-00394-CCA-R3-DD, 2015 WL 1087126, at *1 (Tenn. Crim. App. Mar. 10, 2015). We have carefully considered the defendant's claims of error and conducted the review mandated by Tennessee Code Annotated section 39-13-206. We hold that the trial court did not err by admitting evidence obtained during searches of the defendant's house and of his person; the trial court did not err by admitting the defendant's statement to law enforcement officers; the trial court did not abuse its discretion by allowing the victims' family members to wear buttons containing images of the victims; the trial court did not abuse its discretion by admitting into evidence post-mortem photographs of the victims; the trial court did not abuse its discretion by allowing the jury to view the defendant's video recorded statement in the courtroom during deliberations; the trial court did not abuse its discretion by admitting expert testimony regarding ballistics and fingerprint evidence; the defendant's convictions were supported by sufficient evidence; and the trial court properly effectuated merger of the convictions. We affirm the Court of Criminal Appeals on the remaining issues and include relevant portions of its opinion in the appendix. We hold the sentences of death were not imposed in an arbitrary fashion; the evidence fully supports the jury's findings of aggravating circumstances in Tennessee Code Annotated sections 39-13-204(i)(5), (6), (7), and (13); the evidence supports the

---

[1] Judge Richard Baumgartner was the trial judge in this case until he resigned in March 2011. This Court appointed Senior Judge Jon Kerry Blackwood and subsequently Senior Judge Walter C. Kurtz to preside over the case.

jury's finding that these aggravating circumstances outweighed the mitigating circumstances presented by the defendant; and the defendant's death sentences are neither excessive nor disproportionate to the penalty imposed in similar cases. We affirm the defendant's convictions and sentences of death and vacate the Court of Criminal Appeals' remand to the trial court for correction of the judgment documents.

**Tenn. Code Ann. § 39-13-206(a)(1) Automatic Appeal; Judgment of the Court of Criminal Appeals Affirmed in Part and Vacated in Part**

SHARON G. LEE, J., delivered the opinion of the Court, in which JEFFREY S. BIVINS, C.J., and CORNELIA A. CLARK and HOLLY KIRBY, JJ., joined.

David M. Eldridge, Douglas A. Trant, Loretta G. Cravens, and Troy S. Weston, Knoxville, Tennessee, for the appellant, Lemaricus Devall Davidson.

Herbert H. Slatery III, Attorney General and Reporter; Andrée S. Blumstein, Solicitor General; John H. Bledsoe, Senior Counsel; Randall E. Nichols, District Attorney General; and Leland Price and TaKisha Fitzgerald, Assistant District Attorneys General, for the appellee, State of Tennessee.

**OPINION**

**I.**

**Events of January 6–10, 2007**

This case arises from the January 2007 kidnapping, robbery, rape, and murder of Channon Christian and Christopher Newsom in Knoxville, Tennessee. On Saturday, January 6, 2007, Channon and Chris planned to have dinner together and then spend the evening at a party at a friend's home in the Halls community. Saturday afternoon, Channon went to her friend Kara Sowards's apartment at the Washington Ridge Apartments to get ready for the party. Around 8:00 p.m., Ms. Sowards went to the party, and Channon stayed behind waiting for Chris to arrive. At 8:47 p.m., Chris withdrew $100 from his bank account at an ATM machine in the Halls area. Around 9:00 p.m., Chris dropped off his friend, Josh Anderson, at the party, telling friends he and Channon were going out to eat and would join the party later. Ms. Sowards called Channon and told her Chris was on his way. It was about a ten-minute drive from the party to the Washington Ridge Apartments.

Around 10:00 p.m., when Chris and Channon had not arrived at the party, their friends called and texted them but received no reply. Around 11:00 p.m., two of Chris's

friends went to the Washington Ridge Apartments in search of him and discovered that his truck was in the parking lot and Channon's 2005 Toyota 4Runner was missing.

Chris and Channon never arrived at the party. Their friends never saw or spoke to them again. Channon was last seen wearing jeans, hot pink high heels, and a navy blue, hot pink, and white striped sweater and carrying a gray purse. Chris was last seen wearing jeans, black and silver size 9½ Nike Shox athletic shoes, a blue sweater with a white collar, and a baseball cap. Sometime between 9:10 p.m. and 11:00 p.m., Chris and Channon were abducted from the parking lot of the Washington Ridge Apartments and taken in Channon's vehicle to the home of Lemaricus Devall Davidson at 2316 Chipman Street in Knoxville.

On Sunday, January 7, around 12:30 a.m., Xavier Jenkins, an employee of Waste Connections on Chipman Street, arrived for work and waited in his car in the parking area outside the Waste Connections gated parking lot for a coworker to arrive. From where Mr. Jenkins was parked, he could see across the street to Mr. Davidson's house and noticed Channon's vehicle parked in front of it. The porch lights were on, and the house seemed to be "pretty busy" for that time of night. He had never seen Channon's vehicle before that evening. Mr. Jenkins briefly left to go to a nearby convenience store, and when he returned, he waited in his vehicle in the parking area across from Mr. Davidson's house. Around 12:50 a.m., he saw Channon's vehicle pull away from where it had been parked in front of Mr. Davidson's house and come in his direction. As the vehicle passed Mr. Jenkins, it slowed down, and he saw four African-American men in it. The driver, wearing a hoodie, looked at him "kind of strange" and "kind of mean-[mugged]" him.

On Sunday at 12:33 a.m., Channon called her father and told him she had changed her mind and would not be spending the night at the party but would be home between 2:00 a.m. and 3:00 a.m. Cellular records indicate this call came from the Cherry Street area in the general vicinity of Mr. Davidson's house.

On Sunday at 1:45 a.m., Jerome Arnold was watching television at his Chipman Street residence a block from Mr. Davidson's house when he heard "three fairly evenly spaced pops" coming from the direction of the train tracks.

On Sunday around 3:30 a.m., Ms. Sowards returned from the party and noticed that Chris's truck was in the parking lot and Channon's vehicle was gone. Ms. Sowards's apartment door was locked, and Channon's overnight bag was missing.

On Sunday at 6:30 a.m., when Mr. Jenkins returned to Waste Connections from running his route, he saw Channon's vehicle with an orange University of Tennessee "Power T" decal on the window parked facing the train tracks in front of Waste

Connections on Chipman Street. The vehicle appeared to be out of place, and when Mr. Jenkins looked in the vehicle, he saw no one in it.

On Sunday at 7:45 a.m., when Roy Thurman arrived for work at a sandblasting company in the Chipman Street area, he saw smoke rising from the direction of the train tracks.

On Sunday morning and afternoon, Ms. Sowards and Channon's mother repeatedly called Channon's cell phone, but there was no answer. On Sunday afternoon, Channon's mother's fears were confirmed when the manager of the Shoe Department where Channon worked called to check on Channon because she had not reported to work. Channon's mother called local hospitals, Chris's family, and Channon's friends trying to find her. When Channon still could not be located, Channon's mother notified the Knox County Sheriff's Department and filed a missing persons report. Meanwhile, Chris's family was also worried about him. They called the police, checked with local hospitals and Chris's friends, and filed a missing persons report.

On Sunday at 12:20 p.m., J.D. Ford, a Norfolk Southern Railroad employee, discovered Chris's severely burned body beside the train tracks not far from Mr. Davidson's house. Chris had been shot, his hands tied behind his back, his eyes covered with a bandana, a sock stuffed in his mouth, his head wrapped in a sweatshirt, and his bare feet bound together. The police were notified and responded to the scene.

When Channon's family requested help from law enforcement, they were told that the authorities would not search for their missing daughter and they would have to do it themselves. And they did. The Christians contacted their cellular phone company and learned that Channon's phone had last pinged off the Cherry Street phone tower. On Sunday night, some of Channon's and Chris's family and friends went to the Cherry Street area and searched street by street. This was a part of town that Channon and Chris did not visit.

Early Monday, January 8, between 1:30 a.m. and 2:00 a.m., the search party discovered Channon's vehicle at the corner of Chipman and Glider Streets. An orange University of Tennessee "Power T" decal and a "NorthFace" sticker had been removed from the back window. The police were called and responded to the scene. Bags of clothing, including a pair of GLO jeans, which Channon had planned to donate to charity, were missing from the back of the vehicle. Channon's overnight bag and its contents were also missing. The front seats of the vehicle were pushed all the way back, and the backseat floorboard was caked with mud. A crumpled pack of Newport cigarettes was in the back of the vehicle. Neither Channon nor Chris smoked Newport cigarettes. The vehicle was photographed, inventoried, and taken to the police impound lot. Sandra Kileen Bible, who lived in the house at the corner of Chipman and Glider Streets, said

she had not seen the vehicle there at midnight when she sat on the porch smoking a cigarette. She had never seen Channon's vehicle in the neighborhood before.

Dan Crenshaw, senior evidence technician with the Knoxville Police Department forensic unit and a certified fingerprint examiner, went to the scene and processed the vehicle for fingerprints. The outside of the vehicle, however, appeared to have been wiped clean, and he could not get any prints.

On Monday, January 8, at 11:00 p.m., when Mr. Crenshaw returned to work on the night shift, he retrieved a bank envelope from the back seat of the vehicle and began processing it.

On Tuesday, January 9, at 2:45 a.m., Mr. Crenshaw determined that the fingerprint on the bank envelope matched Mr. Davidson's fingerprint. Mr. Crenshaw then discovered that Mr. Davidson's address was on Chipman Street, close to where Channon's vehicle and Chris's body were found. At 2:52 a.m., Mr. Crenshaw emailed Knoxville Police Department Investigator Todd Childress and others informing them he had confirmed Mr. Davidson's fingerprint on the envelope and his Chipman Street address. At 7:00 a.m., the fingerprint match was verified by Tim Schade, another Knoxville Police Department evidence technician. Mr. Crenshaw was certain that Mr. Davidson was involved in the disappearance of Channon. Between 6:30 a.m. and 7:00 a.m., while waiting on the fingerprint verification, Mr. Crenshaw drove by Mr. Davidson's Chipman Street house hoping to see or hear something so he or someone else could take action. There were no signs of activity at the house.

On Tuesday morning, after the fingerprint match to Mr. Davidson was verified, Investigator Childress began to search for information regarding Mr. Davidson and discovered, among other things, an outstanding attachment for his arrest for failure to appear in court. Investigator Childress prepared an affidavit for a search warrant for Mr. Davidson's house. Investigator Childress hurriedly printed the affidavit and did not realize that he had printed it on letter-sized paper instead of legal-sized paper. As a result, the signature line on the affidavit was cut off. Sometime between 10:30 a.m. and noon, Investigator Childress appeared before Knox County General Sessions Judge Tony Stansberry to request the issuance of a search warrant. Investigator Childress did not sign the affidavit but instead signed the search warrant on the line marked "Officer To Whom Warrant Is Delivered For Execution." Judge Stansberry reviewed the affidavit but did not notice that Investigator Childress had failed to sign it. Investigator Childress raised his hand and swore to the truth of the contents of the affidavit before Judge Stansberry. On Tuesday, January 9, at 12:53 p.m., Judge Stansberry signed the search warrant.

At 1:39 p.m., officers entered Mr. Davidson's house to execute the search warrant. They quickly checked the house and found no one at home. At 1:42 p.m., Sergeant Keith

DeBow entered the kitchen and noticed an oddly shaped thirty-two-gallon plastic garbage can. Fearing someone was hiding in the garbage can, he drew his weapon, lifted the lid, and saw an arm partially covered with fabric. When he touched the arm, he knew he had discovered a dead body.

At 2:04 p.m., Dr. Darinka Mileusnic-Polchan, Knox County's Medical Examiner, arrived to supervise the removal of Channon's body. At approximately 3:10 p.m., the garbage can, with Channon's body still inside, wrapped in a tarp, and secured with plastic tie wires, was removed from the house. Officers discovered Channon's personalized iPod on top of a container in Mr. Davidson's bedroom. At 3:30 p.m., the officers left the house after Investigator Childress told them to "[h]old what you're doing" because the Knox County District Attorney General's Office had advised him that they were to secure the location and leave the scene. Everyone left except for several officers who stayed outside the home to ensure that no one entered the residence.

Investigator Childress prepared a second affidavit for a search warrant with additional information, including that Channon's body was found in Mr. Davidson's house. He signed the affidavit and presented it to Knox County General Sessions Court Judge Chuck Cerny. At 7:25 p.m., Judge Cerny issued the second warrant. At 7:55 p.m., the officers reentered Mr. Davidson's residence and collected evidence until about 1:30 a.m. on Wednesday. The search of the house produced numerous items that belonged to the victims, including clothing Channon had in her vehicle, photographs she kept in her vehicle, the gray purse she carried on Saturday night, her pink high heels, her iPod with the inscription "Channon Christian, Mom and Dad, we love you," two of Chris's baseball caps including the one he was last seen wearing, Channon's camera, Chris's driver's license, a pay stub from Channon's work, Channon's mother's Blockbuster card, a CD, and Channon's personal toiletry items.

### Mr. Davidson's Whereabouts January 6–11, 2007

As of January 6, 2007, Mr. Davidson was twenty-five years old and a convicted felon. He had no job and no vehicle. He supported himself by selling drugs. He snorted cocaine and smoked marijuana. He lived in a rental house at 2316 Chipman Street and had not paid the January rent. He owed money to Ethel Lynn Freeman for furniture he bought from her. His relationship with his girlfriend, Daphne Sutton, had soured. The day after Christmas 2006, Ms. Sutton moved her furniture out of the Chipman Street house.

In December 2006, Stacey Lawson of Lebanon, Kentucky, brought her boyfriend, George Thomas, Mr. Davidson's half-brother, Letalvis Cobbins, and his friend, Vanessa Coleman, from Kentucky to live with Mr. Davidson. None of them had vehicles or jobs. Ms. Lawson recalled seeing an assault rifle and two revolvers—a black one and a silver

one—at Mr. Davidson's house. Ms. Lawson had seen Mr. Thomas, Mr. Cobbins, and Ms. Coleman smoke Newport cigarettes.

Ms. Sutton occasionally returned to Mr. Davidson's house. On Friday, January 5, 2007, Ms. Sutton and Mr. Davidson argued. Ms. Sutton then walked to a gas station on Cherry Street and called her friend, Kassie Suttles, for a ride. Ms. Sutton's vehicle was not operable, and she left it parked on Chipman Street near Mr. Davidson's house. Ms. Suttles picked up Ms. Sutton and took her to the apartment that Ms. Suttles shared with Brandi Pressley.

Mr. Davidson met Ms. Freeman through a mutual friend. In December 2006, Mr. Davidson, Mr. Thomas, and Mr. Cobbins helped her move into her apartment at the Washington Ridge Apartments. Ms. Freeman gave Mr. Davidson a comforter, some bedding, pillow shams, and curtains and sold him some used furniture. He agreed to pay her between $75 and $100 every two weeks for the furniture. Mr. Davidson promised Ms. Freeman he would bring her a payment on Saturday night, January 6. She expected him to be at her Washington Ridge apartment between 10:00 p.m. and 10:30 p.m., but he never arrived. Ms. Freeman fell asleep, and when she woke up, she called Mr. Davidson on his cell phone. Phone records indicate she called him on Sunday at 3:51 a.m. She said he did not sound like himself; he sounded flustered and busy, his voice was different, and he seemed like he was doing something at a high pace. Mr. Davidson told her he did not come by because he had "got busy."

On Sunday, January 7, at 2:10 a.m., a call was placed from Chris's cell phone to Jason Mynatt. Mr. Mynatt did not know Mr. Davidson or any of his friends and frequently got wrong numbers on his cell phone. Mr. Mynatt's number was 865-237-4625. The phone number of Ms. Sutton's friend, Taylor Shadix, was 865-237-7625. Mr. Davidson repeatedly called Ms. Sutton's friend, Kayla Troutt, beginning around 2:30 a.m. Sunday morning. She did not take his calls during the night but spoke with him by phone between 3:00 p.m. and 4:00 p.m. on Sunday afternoon. Mr. Davidson was calling Ms. Troutt to try and reach Ms. Sutton because he had some clothes for her.

James Mitchell, who worked for Mr. Davidson's landlord, went to Mr. Davidson's house in early January on a Saturday to collect the rent. He spoke with Mr. Davidson, who told him to come back in a few days. When Mr. Mitchell returned a few days later, the police had the house taped off.

Darin Williams was one of Mr. Davidson's drug customers. One weekend after dark in January 2007, Mr. Williams was driving to Mr. Davidson's house to buy cocaine. While at a stop sign on Chipman Street, Mr. Williams saw an oncoming vehicle. The driver, who he later identified as Mr. Davidson, was blowing the horn, but Mr. Williams

did not recognize the vehicle and kept going. By the time he got to Mr. Davidson's house, the vehicle had circled around the block and stopped. Mr. Davidson, who was driving Channon's vehicle, got out of the vehicle, along with two other men. The two passengers, wearing black hoodies with the hoods pulled up, stood on each side of the vehicle. Mr. Davidson told Mr. Williams that he did not have any drugs for him. Mr. Williams went back, maybe the next afternoon, and Mr. Davidson came out of the house and asked him if he had seen the helicopters flying over that way and said, "[T]hey found a woman's body over here on the railroad tracks." On this second trip to Mr. Davidson's house, Mr. Williams saw Channon's vehicle parked in the parking area across the street from Mr. Davidson's house. Mr. Davidson told Mr. Williams he had bought the vehicle for $2,500. Mr. Williams knew that could not be true based on the value of the vehicle.

On Sunday around noon, Ms. Freeman drove to Mr. Davidson's house and parked in front of it. As she was getting out of her car, a neighbor, Rhonda Dukes, motioned her to come down the street and visit with her. After Ms. Freeman finished visiting with Ms. Dukes, she saw Mr. Thomas walk by in a dark hoodie. She left without seeing Mr. Davidson. She had to go home a different route because the road was closed due to the discovery of a burned body near the train tracks. Mr. Davidson called her after she returned home and said he had seen her at Ms. Dukes's house and planned to come down there, but Ms. Freeman had left before he could do so. He promised to come to her house around 3:00 p.m. to pay her for the furniture. He did not go to Ms. Freeman's residence to pay her and did not answer her telephone calls.

On Sunday, Ms. Sutton learned from friends that Mr. Davidson was trying to reach her. She talked to him on the phone a few times that day. Later Sunday evening, he told her he had some clothes for her. He asked her to come to his house and get the clothes but to wait thirty minutes before she came. Suspecting that Mr. Davidson had another woman in the house, Ms. Sutton and her friends immediately went to Mr. Davidson's house. When she arrived about five minutes after their phone conversation, Mr. Davidson was standing at the front door. She entered the house and saw Mr. Cobbins sitting in a chair next to the kitchen door and Mr. Thomas sitting in a chair in the living room. Ms. Sutton wanted to retrieve her makeup bag from the bathroom. She walked through the front bedroom to the bathroom, but the bathroom door was closed. Mr. Davidson told her that Ms. Coleman was in the bathroom. When Ms. Sutton tried to get to the bathroom by entering the kitchen, Mr. Davidson grabbed her and said, "What are you doing? This is my house." He walked her to the front door and handed her a Sears bag filled with clothes and tried to give her some money. She refused the money but took the bag of clothes. After Ms. Sutton returned to Ms. Suttles's apartment, she looked at the clothes and realized they were not new. She then called Mr. Davidson, and he explained he had bought the clothes at a used clothing store and thought she would like them. The bag contained items that included a red skirt, a pink blouse, a pair of GLO jeans, and a ring. Ms. Sutton gave the GLO jeans to Ms. Suttles and told Mr. Davidson to come and get the

rest of the clothes. When Mr. Davidson arrived at the apartment to retrieve the bag of clothes, he was driving Channon's vehicle, which had a Tennessee decal and a NorthFace sticker on the back window.

Late Sunday night or early Monday morning, Mr. Davidson called Ms. Sutton and asked her to come and get him. He claimed that he could not get into his house because it was locked and his brother had the keys. Ms. Sutton drove a friend's vehicle to pick up Mr. Davidson, who was waiting in Ms. Sutton's car that was parked on Chipman Street. They returned to Ms. Suttles's apartment and spent the night.

On Monday morning, Ms. Freeman returned to Mr. Davidson's house to collect her money. She decided not to leave him a note because the house looked vacant, the windows were "down," and it looked like a "ghost house." When she saw police officers down the street with flashlights, she knew something was going on and left.

Ms. Sutton and Mr. Davidson stayed together at Ms. Suttles's apartment on Sunday night and Monday night. On Tuesday afternoon, they were awakened by a call from Ms. Sutton's mother who told Ms. Sutton that a girl's body had been found in Mr. Davidson's house. When Mr. Davidson overheard this news, his eyes got really big, and he begged Ms. Sutton to believe that he did not do anything and "that it was on all his fam . . . his brother." Ms. Sutton told him he would have to leave, and he asked her if he could wait until after dark. After the phone call, Ms. Sutton found his house keys and a black revolver in his jacket pocket. Mr. Davidson was wearing a pair of black and silver Nike Shox athletic shoes that appeared to be too small for him. When she questioned him, he claimed he had bought the shoes. Ms. Sutton dropped him off beside Ridgebrook Apartments, close to Reynolds Avenue.

**Mr. Davidson's Arrest and Statement to Police**

On Thursday afternoon, January 11, 2007, the Knoxville Police Department Special Operations Team and other officers arrested Mr. Davidson in a vacant house at 1800 Reynolds Avenue. Among the items found in the house were Chris's size 9½ Nike Shox athletic shoes and a .22 caliber High Standard revolver.

Mr. Davidson was questioned by Tennessee Bureau of Alcohol, Tobacco, Firearms, and Explosives Agent Forrest Webb and Knoxville Police Department Investigator Ryan Flores. Before the interview, Mr. Davidson was advised of his *Miranda* rights, and he signed a waiver of rights form. During questioning, Mr. Davidson told more than five versions of what occurred January 6–8. First, he claimed he left his house on Friday and knew nothing about what may have happened there. Next, he said Mr. Cobbins showed up at his house with Channon's vehicle, but Mr. Davidson did not see the victims. Mr. Davidson drove Channon's vehicle while making his drug deliveries.

When he learned about the body found beside the train tracks, he went back and wiped the vehicle down to remove his fingerprints. As he returned to the house, Ms. Dukes called and said that the police were down at the end of the street, so he walked down the street to her house and sat on the porch until Ms. Sutton picked him up. He claimed all of this happened on Sunday night.

His next version of the story was that he was at home all day on Saturday and around 5:00 p.m. started selling drugs from his house. He went to bed and woke up Sunday around 4:00 p.m. or 5:00 p.m., when Ms. Sutton called to tell him about a dead body found near the train tracks. He had her come pick him up, but before she did, he wiped down Channon's vehicle. He stayed at Ms. Sutton's house on Monday and Tuesday. He said that he did not know Chris or Channon. He claimed that Mr. Cobbins indicated to him that Mr. Thomas killed Chris.

Next, he said Mr. Cobbins and Mr. Thomas had taken Chris and Channon from some apartments and brought them back to his house. They took Chris's wallet and his money. Then Mr. Davidson said that around 10:00 p.m. on Friday or Saturday night, Mr. Cobbins and Mr. Thomas arrived at Mr. Davidson's house saying they had carjacked some people and they were in the vehicle. Mr. Davidson saw Chris and Channon tied up in the back seat. Mr. Davidson did not want to be part of it, so he left and walked down the street and smoked some marijuana. When he returned about twenty minutes later, Channon was in his house. Channon told Mr. Davidson "she ain't want to die." Mr. Davidson said Chris was never in his house. Then Mr. Davidson added that after arriving with Chris and Channon, Mr. Cobbins and Mr. Thomas left for less than twenty minutes and returned with only Channon. When Channon came into Mr. Davidson's house, she was wearing a hoodie and her eyes were not covered. Mr. Davidson became concerned that she had seen him, so he left in her vehicle to sell some drugs. When Mr. Davidson returned, he parked the vehicle down the street, wiped it clean, and went into his house. He did not go beyond the living room and did not see Channon. Finally, he admitted that he saw Channon sitting on a bed in his house and she told him she did not want to die. Mr. Davidson denied having sex with her and did not know if anyone had sex with her. He said his DNA would not be found on her.

On January 11, 2007, Mr. Thomas, Mr. Cobbins, and Ms. Coleman were arrested at Natosha Hays's house in Lebanon, Kentucky. During the search of Ms. Hays's residence, the officers seized a computer on which Mr. Thomas and Mr. Cobbins had been viewing the Knoxville news coverage of the homicides and found a red purse that contained documents and other items belonging to Channon. Later, a .22 caliber Clerke revolver was recovered from Ms. Hays's house.

## Forensic and Scientific Evidence

Dr. Mileusnic-Polchan performed autopsies on Chris's and Channon's bodies and determined the injuries they suffered and the causes of their deaths. Neither Chris nor Channon had any defensive wounds. Their stomachs were empty; neither had eaten any food in the hours before their deaths.

Chris was anally penetrated one to two hours before he died. He had significant injuries to his anal/genital area with lacerations, tearing, and bruising around his anus. Chris was shot three times, each time with a small caliber bullet. One bullet was shot from at least two to three feet away and entered his body in the neck area between the back of the neck and the shoulder. The second shot was to his lower back, and the bullet traveled steeply upward, indicating he was bent over when the weapon was fired. This shot severely damaged Chris's spinal cord. The fatal shot was fired with the muzzle of the gun against his head above his right ear, severing his brain stem and causing instantaneous death. All three bullets were still lodged in Chris's body when it was found.

Chris had a hematoma on his right forehead, indicating that he was struck with an object or fell and hit his head on the ground, possibly when he was shot while bending over. When the fatal shot was fired, Chris's head was wrapped in a gray hooded sweatshirt, a blue bandana was tied around his eyes, and an ankle sock was rolled up, stuffed in his mouth, and secured with a shoelace. His leather belt and some floral fabric were wrapped around his ankles, securing them together. Some plant material was found in the bindings. His wrists were tied together behind his back with a shoelace and some nylon. He had on a shirt, a t-shirt, underwear, and no other clothing. His feet were bare and muddy, indicating that he had walked barefoot to the area where he was killed. He was placed on his back, a comforter was wrapped around his body, an accelerant was poured over him, and he was set on fire. His face, head, and upper body were burned the worst. Chris's anus had semen in it, but the high temperature of the fire destroyed the DNA in the semen. Soil samples taken where Chris's body was found indicated the presence of gasoline. A gasoline can was found in the kitchen of Mr. Davidson's house.

Channon's frenulum, the membrane that connects the lip to the gum, was torn. She had bruising and abrasions around her mouth. These injuries occurred hours before her death and were caused by an object, such as a penis, being forced into her mouth. One to two hours before Channon's death, her anal/genital area suffered tremendous damage. Her vaginal area had bruises, lacerations, contusions, and swelling, and a solid blood clot had formed under the entire area. The depth and extent of her injury was so grave, it was not caused by a "regular" rape but caused by a blunt object coming in contact with her genital area with sufficient force to inflict serious injury. She had bruises on the backs of both arms, bruising on both sides of the top of her head with extensive hemorrhaging, bruises on the front of her legs, deep bruising to her upper back close to her neck, and

carpet burns and scratches to her lower back and upper buttocks. She also had a cut to her right hand that occurred around the time of death.

Channon had been forced into a tight fetal position and then bound with her head, neck, and shoulder twisted and pressed against her bent knees. Her left cheek had been pressed tightly against her knee. A portion of a sheer curtain had been tied around her ankles and wrapped around her neck. A floral fabric, like the one used to bind Chris, had been tied around her thighs, bringing them tightly against her chest. A white plastic bag had been placed over her head, covering her mouth and nose, and knotted in the back to keep it in place. Her body had been put in five black plastic garbage bags, stuffed in a large garbage can, and partially covered with bedding, sheets, and other bags. She was dressed only in a camisole and a sweater. Because she could not breathe with the plastic bag tied tightly over her face and due to her positioning in the confined space, she suffocated to death. The time of her death was estimated to be sometime between Sunday afternoon and Monday afternoon. Based on the plastic bag that covered her face and her positioning inside the garbage can, the oxygen around her face would have been depleted within ten to thirty minutes after she was placed in the garbage can, and she would have died three to five minutes later.

Mr. Davidson's DNA from sperm was found in Channon's vagina, anus, and on her jeans. Mr. Cobbins's DNA from sperm was found in Channon's mouth and on her camisole, sweater, and jeans. A chlorine substance was found on Channon's camisole. A bottle of cleaning liquid with bleach was found in Mr. Davidson's kitchen.

The fabric found with Chris's body and the fabric used to bind Channon in the garbage bag were parts of the curtains and bedding that Ms. Freeman had given to Mr. Davidson.

Mr. Davidson's fingerprint was discovered on a bank envelope recovered from Channon's vehicle. His prints were also found on three of the five plastic garbage bags that contained Channon's body. His palm print was found on the outermost exterior garbage bag. This print was consistent with Mr. Davidson using his hand to lift the bag with weight in it. Mr. Davidson's right palm print and two left palm prints were on the next garbage bag. The third garbage bag bore his palm print. Mr. Davidson's fingerprints were also on items belonging to Channon and Chris found in his house, including a pay stub with Channon's name on it and photographs that had been in her vehicle. Mr. Davidson's prints were also on a box of Brawny garbage bags in the kitchen.

Ballistics testing revealed that two bullets removed from Chris's body were fired from the same gun. The third bullet was damaged, so the gun that had fired it could not be identified. The bullets could have been fired from the High Standard revolver that was

in Mr. Davidson's possession when he was arrested. The Clerke revolver associated with Mr. Cobbins was eliminated as the murder weapon.

## Presentment, Trial, and Convictions

On January 31, 2007, Mr. Davidson and his co-defendants, Mr. Thomas, Mr. Cobbins, and Ms. Coleman, were charged in a forty-six-count presentment issued by a Knox County Grand Jury. Mr. Davidson was tried separately, and this appeal only involves Mr. Davidson's case.[2] After the trial court merged a number of the charges, Mr. Davidson stood trial on sixteen counts of first degree felony murder, two counts of first degree premeditated murder, two counts of especially aggravated robbery, four counts of aggravated kidnapping, nine counts of aggravated rape of Channon, three counts of aggravated rape of Chris, one count of theft of property valued at $10,000 or more but less than $60,000, and one count of theft of property valued at $500 or less. The State sought the death penalty. Following an eight-day trial in October 2009, the jury found Mr. Davidson guilty of sixteen counts of first degree felony murder, two counts of first degree premeditated murder, two counts of especially aggravated robbery, four counts of aggravated kidnapping, nine counts of aggravated rape of Channon, three counts of facilitation of aggravated rape of Chris, one count of theft of property valued at $10,000 or more but less than $60,000, and one count of theft of property valued at $500 or less. The jury imposed two sentences of death on Mr. Davidson.

After the jury returned its verdict, the State dismissed two felony murder counts. The trial court merged the remaining murder counts into two counts of first degree premeditated murder; merged the two especially aggravated robbery counts and the two theft counts into two counts of especially aggravated robbery; merged the four especially aggravated kidnapping counts into two counts of especially aggravated kidnapping; merged the nine counts of aggravated rape of Channon into three counts of aggravated

---

[2] Mr. Thomas was convicted of first degree murder, especially aggravated robbery, especially aggravated kidnapping, and aggravated rape. *State v. Thomas*, No. E2013-01738-CCA-R3-CD, 2015 WL 513583, at *1 (Tenn. Crim. App. Feb. 5, 2015), *perm. app. denied* (Tenn. Aug. 12, 2015). He received two life sentences for the murder convictions plus twenty-five years for his other convictions. *Id.* Mr. Cobbins was convicted of first degree murder, facilitation of first degree murder, especially aggravated robbery, especially aggravated kidnapping, facilitation of especially aggravated kidnapping, and aggravated rape. *State v. Cobbins*, No. E2013-00476-CCA-R3-CD, 2014 WL 4536564, at *1 (Tenn. Crim. App. Sept. 12, 2014). He received a total effective sentence of life without parole plus one hundred years. *Id.* Ms. Coleman was convicted of facilitation of first degree murder, facilitation of aggravated kidnapping, facilitation of rape, and facilitation of misdemeanor theft. *State v. Coleman*, No. E2013-01208-CCA-R3-CD, 2014 WL 6908409, at *1 (Tenn. Crim. App. Dec. 9, 2014), *perm. app. denied, not for citation* (Tenn. May 14, 2015). She received a total effective sentence of thirty-five years. *Id.*

rape; and merged the three counts of facilitation of aggravated rape of Chris into one count of facilitation of aggravated rape.

The trial court ordered the two death sentences to be served consecutively to each other and sentenced Mr. Davidson to forty years for each of the especially aggravated robbery counts, to be served concurrently with the death sentences; forty years for each of the especially aggravated kidnapping counts, to be served concurrently with the death sentences; forty years for each of the aggravated rape counts, to be served concurrently with the death sentence for Channon's murder; and twenty years for facilitation of aggravated rape, to be served concurrently with the death sentence for Chris's murder. Mr. Davidson filed a motion for new trial and amended motions for new trial, all of which were denied.

Mr. Davidson appealed to the Court of Criminal Appeals, raising twenty-six claims of error. The Court of Criminal Appeals affirmed the convictions and sentences. *Davidson*, 2015 WL 1087126, at *58–60. The Court of Criminal Appeals remanded the case for correction of clerical errors on the judgment forms regarding the merged counts, finding that the jury's guilty verdicts on separate counts needed to be merged into a single judgment document.

Under Tennessee Code Annotated section 39-13-206, we conduct this mandatory review to consider the issues raised by Mr. Davidson and to review his death sentences.

**II.**

**Searches of Mr. Davidson's House and Person**

Mr. Davidson argues that the trial court erred in denying his motions to suppress evidence seized during the two searches of his house and the search of his person. He contends that the first search warrant for his house was defective because it was not supported by a signed affidavit, that the second search warrant for his house was defective because it was based on facts impermissibly obtained from the first search, and that the two search warrants for Mr. Davidson's person to obtain hair and DNA samples for testing were defective because the warrants were based on evidence obtained during the searches of his house. The State contends that the first search warrant was valid despite technical flaws, and that if the search warrant was defective, the evidence obtained from the search was admissible under the exigent circumstances exception to the warrant requirement. The State further argues this Court should adopt a good-faith exception for constitutional violations based on *United States v. Leon*, 468 U.S. 897 (1984). The State submits that the validity of the first search is dispositive of the issues regarding the second search warrant and the search of Mr. Davidson's person.

The trial court denied Mr. Davidson's motions to suppress, ruling that the first search warrant was valid because although Investigator Childress did not sign the affidavit, he swore to the truth of the facts in the affidavit before the judge who issued the search warrant. The trial court further ruled that the first search of Mr. Davidson's house was valid based on the outstanding attachment for Mr. Davidson's arrest and exigent circumstances. The trial court held that the doctrine of inevitable discovery was not applicable and that a good-faith exception had not been previously adopted in Tennessee. As to the second search warrant, the trial court ruled it was not valid because it relied on information discovered during the execution of the first invalid warrant.

The Court of Criminal Appeals held the trial court did not err in not suppressing evidence obtained from the execution of the first search warrant but for different reasons than the trial court. The intermediate appellate court ruled the first search warrant was not supported by a signed affidavit and that neither service of the attachment nor exigent circumstances justified entry into Mr. Davidson's house. *Davidson*, 2015 WL 1087126, at *14, *16–18. The Court of Criminal Appeals held that the evidence obtained from the first search was admissible under the doctrine of inevitable discovery. *Id.* at *21. As to the second search warrant, the Court of Criminal Appeals ruled that it should not have included information discovered in the first search, but after redacting this information, the remaining facts in the affidavit established probable cause for its issuance. The Court of Criminal Appeals found that evidence obtained from the search of Mr. Davidson's person based on a federal search warrant and a state search warrant was admissible because these warrants were based on information obtained during the lawful searches of Mr. Davidson's house. The Court of Criminal Appeals reasoned that, because evidence obtained during the first search of the house was admissible based on the inevitable discovery doctrine, it could be used to establish probable cause for the search of Mr. Davidson's person. The intermediate appellate court further concluded that if the search warrants contained tainted information, the warrants were based on probable cause after redaction of any tainted information. *Id.* at *24.

*Standard of Review*

A trial court's findings of fact on a motion to suppress are upheld on appeal unless the evidence preponderates otherwise. *State v. McCormick*, 494 S.W.3d 673, 678 (Tenn. 2016) (citing *State v. Odom*, 928 S.W.2d 18, 23 (Tenn. 1996)). We defer to the trial court's factual findings on the credibility of the witnesses, the weight and value of the evidence, and resolution of conflicts in the evidence. *Id.* (quoting *Odom*, 928 S.W.2d at 23). This Court affords the party prevailing in the trial court the strongest legitimate view of the evidence and all reasonable and legitimate inferences that may be drawn from that evidence. *State v. Ross*, 49 S.W.3d 833, 839 (Tenn. 2001); *State v. Carter*, 16 S.W.3d 762, 765 (Tenn. 2000) (quoting *State v. Keith*, 978 S.W.2d 861, 864 (Tenn. 1998)). We review the trial court's application of law to facts de novo with no presumption of

correctness. *McCormick*, 494 S.W.3d at 678; *State v. Freeland*, 451 S.W.3d 791, 810 (Tenn. 2014), *cert. denied*, 135 S. Ct. 1428 (2015).

*First Search Warrant*

A valid search warrant must comply with provisions of the United States Constitution, the Tennessee Constitution, and Tennessee statutory requirements. The federal and state constitutional prohibitions against unreasonable searches and seizures "safeguard the privacy and security of individuals against arbitrary invasions of government officials." *Keith*, 978 S.W.2d at 865 (quoting *Camara v. Mun. Ct.*, 387 U.S. 523, 528 (1967)) (internal quotation marks omitted); *State v. Yeargan*, 958 S.W.2d 626, 629 (Tenn. 1997) (quoting *Camara*, 387 U.S. at 528). Searches and seizures conducted under valid warrants are presumptively reasonable, whereas warrantless searches and seizures are presumptively unreasonable. *McCormick*, 494 S.W.3d at 678–79; *see also Yeargan*, 958 S.W.2d at 629.

We begin with the constitutional requirements. The Fourth Amendment to the United States Constitution provides:

> The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized.

U.S. Const. amend. IV. To be valid under the federal constitution, a warrant must (1) be issued by a neutral and detached magistrate, (2) particularly describe the place to be searched and the persons or things to be seized, and (3) be based upon probable cause, "supported by Oath or affirmation." *United States v. Clyburn*, 24 F.3d 613, 617 (4th Cir. 1994) (quoting U.S. Const. amend. IV) (internal quotation marks omitted). The Fourth Amendment has no affidavit requirement.

Article I, section 7 of the Tennessee Constitution provides:

> That the people shall be secure in their persons, houses, papers and possessions, from unreasonable searches and seizures; and that general warrants, whereby an officer may be commanded to search suspected places, without evidence of the fact committed, or to seize any person or persons not named, whose offences are not particularly described and supported by evidence, are dangerous to liberty and ought not to be granted.

Tenn. Const. art. I, § 7. The Tennessee Constitution, although "identical in intent and purpose with the Fourth Amendment," *State v. Smith*, 484 S.W.3d 393, 400 (Tenn. 2016) (quoting *Sneed v. State*, 423 S.W.2d 857, 860 (Tenn. 1968)), does not contain the Fourth Amendment's oath or affirmation requirement and does not require an affidavit.

The first search warrant complied with the United States and Tennessee Constitutions. The search warrant was issued by a neutral and detached magistrate. Neutrality and detachment require "severance and disengagement" from the activities of law enforcement. *Shadwick v. City of Tampa*, 407 U.S. 345, 350 (1972). Under the circumstances of this case, the issuing judge's failure to notice the unsigned affidavit does not indicate he departed from his role as a "neutral and detached" magistrate. *See United States v. Richardson*, 943 F.2d 547, 550 (5th Cir. 1991) (holding that magistrate's failure to administer oath during warrant application "was inadvertent . . . [and] clearly was not a departure from his neutral and detached role"). The search warrant specifically described the place to be searched and the persons or things to be seized and was based on probable cause supported by testimony under oath. The facts relied on to establish probable cause included the discovery of Chris's body wrapped in a sheet and/or comforter; the discovery of Channon's abandoned vehicle, with identifying stickers removed, in the area where Chris's body was found; that both victims went missing at the same time; that a latent print was found on a bank envelope on the back seat of Channon's vehicle matching Mr. Davidson's fingerprint; and that Mr. Davidson's house is a short distance from where Channon's vehicle and Chris's body were found. The Fourth Amendment's oath or affirmation requirement was satisfied when Investigator Childress raised his right hand and swore to the truth of the facts in the unsigned affidavit. Within the meaning of the Fourth Amendment, "[o]ath or affirmation" includes sworn oral and written testimony. *Sparks v. United States*, 90 F.2d 61, 64 (6th Cir. 1937); *see also Clyburn*, 24 F.3d at 617; *United States v. Shields*, 978 F.2d 943, 946 (6th Cir. 1992). Under these circumstances, the first search of Mr. Davidson's house was valid under the Fourth Amendment and Article I, section 7 of the Tennessee Constitution.

Although the search warrant passed constitutional muster, it failed to comply with the affidavit requirements of Tennessee Code Annotated section 40-6-103, Tennessee Code Annotated section 40-6-104, and Tennessee Rule of Criminal Procedure 41(c)(1).

Tennessee Code Annotated section 40-6-103 provides that a "search warrant can only be issued on probable cause, *supported by affidavit*, naming or describing the person, and particularly describing the property, and the place to be searched." (Emphasis added).

- 17 -

Tennessee Code Annotated section 40-6-104 provides:

> The magistrate, before issuing the warrant, shall examine on oath the complainant and any witness the complainant may produce, *and take their affidavits in writing, and cause them to be subscribed by the persons making the affidavits.* The affidavits must set forth facts tending to establish the grounds of the application, or probable cause for believing the grounds exist.

(Emphasis added).

Tennessee Rule of Criminal Procedure 41(c)(1) provides that a "warrant shall issue *only on an affidavit or affidavits* that are sworn before the magistrate and establish the grounds for issuing the warrant." (Emphasis added).

In preparing the affidavit for the search warrant, Investigator Childress said he "wanted to do things right" and "go by the law." He prepared an affidavit and search warrant with the help of another officer, and he hurriedly printed the documents so he could present them to a judge. Investigator Childress inadvertently failed to change the printer selection from letter to legal size, which resulted in the bottom three inches, including the signature line, being cut off of the affidavit. Investigator Childress and an assistant district attorney appeared before Judge Stansberry in his chambers. After Judge Stansberry reviewed the typewritten affidavit, Investigator Childress raised his right hand, took the oath, and swore to the truth of the contents of the affidavit. Although Investigator Childress signed the search warrant on the signature line labeled "Officer To Whom Warrant Is Delivered For Execution," no one noticed the omission of Investigator Childress's signature on the affidavit as the affiant. Judge Stansberry signed the warrant, and Investigator Childress and other law enforcement officers commenced a search of Mr. Davidson's house.

Tennessee statutory and procedural provisions require an affidavit before a magistrate can issue a valid search warrant. The affidavit must contain the signature of the affiant. *See Keith*, 978 S.W.2d at 869 (holding that a written and sworn affidavit is a prerequisite to the issuance of a valid warrant); *Harvey v. State*, 60 S.W.2d 420, 420 (Tenn. 1933); *Watt v. Carnes*, 51 Tenn. (4 Heisk.) 532, 534 (1871) ("An affidavit is a statement in writing, signed and made upon oath before an authorized magistrate."); *Freidlander, Stick & Co. v. Pollock & Co.*, 45 Tenn. (5 Cold.) 490, 495 (1868) ("An oath may be oral or written. An affidavit is a written oath."); *Grove v. Campbell*, 17 Tenn. (9 Yer.) 7, 10 (1836) ("The word affidavit, *ex vi termini*, means an oath reduced to writing."); *Kenyon v. Handal*, 122 S.W.3d 743, 752 n.6 (Tenn. Ct. App. 2003) ("An

unsigned document cannot qualify as an affidavit . . . .").[3] Because Investigator Childress inadvertently failed to sign as the affiant on the affidavit, the search warrant was not issued on the basis of a signed affidavit as required by Tennessee Code Annotated sections 40-6-103 and 40-6-104 and Tennessee Rule of Criminal Procedure 41(c)(1). All other constitutional and statutory requirements were met.

Although this case does not involve a constitutional defect, the test for constitutional violations is one of "reasonableness," and there are judicially crafted exceptions to the general requirement that a warrant issue before a search by law enforcement. *State v. Meeks*, 262 S.W.3d 710, 722 (Tenn. 2008) (citing *Brigham City, Utah v. Stuart*, 547 U.S. 398, 403 (2006); *State v. Scarborough*, 201 S.W.3d 607, 616–17 (Tenn. 2006)). Among the commonly recognized exceptions to the requirement of a warrant are: (1) a search incident to an arrest, (2) the plain view doctrine, (3) a consent to the search, (4) a *Terry* stop and frisk, and (5) the existence of exigent circumstances. *Id.* (citing *State v. Berrios*, 235 S.W.3d 99, 104 (Tenn. 2007); *State v. Cox*, 171 S.W.3d 174, 179 (Tenn. 2005)).

Given Investigator Childress's failure to sign the affidavit, the State contends that the exigent circumstances exception applies to justify the search of Mr. Davidson's house. This exception "applies when the exigencies of the situation make the needs of law enforcement so compelling that a warrantless search is objectively reasonable under the Fourth Amendment." *Missouri v. McNeely*, 133 S. Ct. 1552, 1558 (2013) (quoting *Kentucky v. King*, 563 U.S. 452, 460 (2011)) (internal quotation marks omitted). The State must show that the search is imperative, *Meeks*, 262 S.W.3d at 723, and there is no time for law enforcement to secure a warrant. *McNeely*, 133 S. Ct. at 1559. Exigency is determined on a fact-intensive, case-by-case basis. *Id.* at 1564. In making this determination, we consider the totality of the circumstances to determine whether a law enforcement officer was justified in acting without a warrant. *Id.*

Here, the State has failed to establish that the circumstances surrounding the search were so compelling that law enforcement officers did not have time to obtain a search warrant. Chris's body was discovered on Sunday afternoon, and Channon's abandoned vehicle containing a bank envelope was found early Monday morning. The crucial fingerprint evidence linking Mr. Davidson to Channon's vehicle was found on the bank envelope early Tuesday morning. On Tuesday around noon, Investigator Childress

---

[3] *See also Sammons v. Collins*, No. 01-A-01-9009CV00325, 1991 WL 1056, at *1 (Tenn. Ct. App. Jan. 9, 1991) ("An affidavit is a written or printed declaration or statement of facts confirmed by oath or affirmation of the party making it, taken before an officer having authority to administer such oath."); *Crocker v. Larson*, No. OA-A-01-9002-CV00083, 1990 WL 130087, at *4 (Tenn. Ct. App. Sept. 11, 1990) ("An affidavit, in order to be considered, must be signed and sworn to. An unsigned 'affidavit' is not evidence and cannot be considered.").

appeared before Judge Stansberry to obtain the search warrant. At 12:53 p.m., Judge Stansberry issued the search warrant. Less than an hour later, law enforcement officers searched Mr. Davidson's house. Viewing the totality of the circumstances, it does not appear the search of Mr. Davidson's house was so imperative that law enforcement could not take time to obtain a search warrant.

Although evidence seized from a warrantless search or a search stemming from an invalid warrant is subject to suppression, the State contends we should adopt a good-faith exception to the exclusionary rule based on the United States Supreme Court's holding in *United States v. Leon*, 468 U.S. 897 (1984). There, the Court held that where the officer has reasonably and in good faith conducted a search within the scope of a search warrant later determined to be constitutionally defective, evidence obtained from that search should not be excluded under the Fourth Amendment exclusionary rule. *Leon*, 468 U.S. at 919–22. The Court reasoned that the exclusionary rule is a strong deterrent to police misconduct and the violation of suspects' constitutional rights but that the "unbending application of the exclusionary sanction" may hamper the truth-finding function of a trial and can lead to criminals escaping punishment because of police negligence or misbehavior. *Id.* at 906–07 (quoting *United States v. Payner*, 447 U.S. 727, 734 (1980)); *see also State v. Sanders*, 452 S.W.3d 300, 310–11 (Tenn. 2014). Unlike *Leon*, which involved a search warrant that was constitutionally defective, 468 U.S. at 905, the search warrant here passed constitutional muster. Therefore, *Leon* is factually distinguishable.

Given the unusual facts in this case, we adopt a good-faith exception for the admission of evidence when a law enforcement officer has reasonably and in good faith conducted a search within the scope of a warrant the officer believes to be valid, but is later determined to be invalid solely because of a good-faith failure to comply with the affidavit requirement of Tennessee Code Annotated sections 40-6-103 and -104 and Tennessee Rule of Criminal Procedure 41(c)(1). In doing so, we note that Rule 41(g), a procedural rule promulgated by this Court, does not divest this Court of its authority to decide whether a good-faith exception, or any other exception, should be adopted. *State v. Reynolds*, No. E2013-02309-SC-R11-CD, 2016 WL 6525856, at \*21 (Tenn. 2016).[4] Further, the applicability and validity of the Exclusionary Rule Reform Act, Tennessee Code Annotated section 40-6-108, effective July 1, 2011, are not at issue in this case.

---

[4] In *Reynolds*, this Court held that the good-faith exception adopted in *Davis v. United States*, 564 U.S. 229 (2011), applied and prevented suppression of any evidence because the officer acted in good-faith reliance on binding judicial precedent when he obtained a sample of Ms. Reynolds's blood without a warrant. *Reynolds*, 2016 WL 6525856, at \*21. The author of this opinion dissented in *Reynolds* on the basis that a good-faith exception was not appropriate to excuse a constitutional violation but agrees that Rule 41(g) cannot be read to divest this Court of its power to develop and adapt common law principles and their application. *See id.* (citing *Hodge v. Craig*, 382 S.W.3d 325, 337 (Tenn. 2012)).

Investigator Childress intended to obtain a valid search warrant. He reasonably believed that the warrant, based on probable cause and issued by a neutral and detached magistrate, was valid. The search warrant was later determined to be invalid based on noncompliance with statutory and procedural provisions because Investigator Childress printed the affidavit on the wrong size paper, did not notice that the signature line was cut off, and failed to sign the affidavit. Instead, he placed his signature on a line on the warrant. All other constitutional and statutory requirements were met. Moreover, as soon as Investigator Childress learned there was a problem with the first warrant, he immediately stopped the search and, within hours, obtained a second search warrant supported by a properly signed affidavit. When an officer has complied with constitutional requirements to obtain a warrant, but in good faith failed to comply with the state statutory and rule affidavit requirements, societal interests are not advanced when the exclusionary rule applies to exclude evidence obtained from execution of the warrant. We hold the trial court did not err in denying Mr. Davidson's motion to suppress the evidence obtained from the search of his house.

Based on this ruling, we pretermit discussion of the issues regarding inevitable discovery and the validity of the search warrant based on the outstanding attachment.

*Second Search Warrant and the Search of Mr. Davidson's Person*

Our holding regarding the validity of the first search resolves any issue as to the validity of the second search warrant and the warrants for the search of Mr. Davidson's person. Because the first search of his house was valid, the trial court did not err in denying Mr. Davidson's motions to suppress.

**Mr. Davidson's Statements to Law Enforcement**

Mr. Davidson argues that the trial court erred by denying the motion to suppress the recorded statement he made to law enforcement after his arrest. He submits that his confession was coerced and involuntary because his will was overborne by law enforcement's show of force during his arrest and the intimidating atmosphere of the interrogation. Mr. Davidson also argues that incomplete *Miranda* warnings rendered his waiver of rights invalid and his statement inadmissible. In response, the State argues that Mr. Davidson's statement was voluntarily given without abuse, threats, or promises and that the *Miranda* warnings were sufficient. After a pretrial hearing, the trial court denied Mr. Davidson's motion to suppress the statement based on the totality of the circumstances surrounding Mr. Davidson's arrest and interrogation. The Court of Criminal Appeals affirmed. *Davidson*, 2015 WL 1087126, at *24, *61.

A trial court's findings of fact on a motion to suppress are upheld on appeal unless the evidence preponderates otherwise. *McCormick*, 494 S.W.3d at 678 (citing *Odom*, 928

S.W.2d at 23). We defer to the trial court's factual findings on the credibility of the witnesses, the weight and value of the evidence, and resolution of conflicts in the evidence. *Id.* (quoting *Odom*, 928 S.W.2d at 23). This Court affords the party prevailing in the trial court the strongest legitimate view of the evidence and all reasonable and legitimate inferences that may be drawn from that evidence. *Ross*, 49 S.W.3d at 839; *Carter*, 16 S.W.3d at 765 (quoting *Keith*, 978 S.W.2d at 864). However, we review the trial court's application of law to facts de novo with no presumption of correctness. *McCormick*, 494 S.W.3d at 678; *Freeland*, 451 S.W.3d at 810.

At the pretrial hearing, Knoxville Police Department Sergeant DeBow testified he was a member of the Special Operations Squad, or SWAT team, that arrested Mr. Davidson. Before Mr. Davidson's arrest, approximately sixteen SWAT members arrived in an armored vehicle and surrounded the house. The SWAT members wore tactical uniforms, green body dress uniforms, and body armor; some wore helmets; and most wore tactical gloves and safety glasses. Some were armed with long weapons, submachine guns or shotguns, and some had pistols or gas guns. Over thirty law enforcement officers, including members of the Tennessee Bureau of Alcohol, Tobacco, Firearms, and Explosives, the United States Marshals Service, the Knox County Sheriff's Department, and other uniformed police officers, were present around the outer perimeter of the house. As the armored vehicle approached the house, the vehicle's public address system was used to order Mr. Davidson to come out of the house. Mr. Davidson placed his hands on the window through the window shades and was "somewhat complying." After a "reasonable amount of time . . . fifteen seconds or so," Sergeant DeBow, Lieutenant Mark Fortner, and "a couple" of other officers approached the window. Sergeant DeBow was armed with a submachine gun that was pointed toward the window and leveled on Mr. Davidson. Sergeant DeBow ordered Mr. Davidson to drop what was in his hands and to open the window. In response, Mr. Davidson made an apparent attempt to open the window and said, "I can't." Sergeant DeBow told Mr. Davidson to step back from the window, and then Sergeant DeBow broke the window with the barrel of his weapon, raked it clean, and then cleared off as much of the glass as he could with his gloved hands. Sergeant DeBow asked Mr. Davidson where the gun was, and as Mr. Davidson lowered his hands, he pointed down toward either his waistline or the floor. Sergeant DeBow was unable to describe exactly how Mr. Davidson was removed but indicated that when Mr. Davidson put his hands on the window sill, a couple of officers likely grabbed Mr. Davidson by the wrists and pulled him through the window onto the ground on his stomach. At the same time, an emergency response team entered the house through a side door. Sergeant DeBow did not see anyone beat or threaten Mr. Davidson. Once Mr. Davidson was brought up off the ground, Sergeant DeBow and another officer escorted Mr. Davidson to the police vehicle which transported him to the police department. According to Sergeant DeBow, the goal when arresting someone is to safely take the person into custody but agreed that psychological intimidation, including verbal

commands, officer presence, submachine guns, uniforms, and verbal commands, could be used in an arrest.

Gregory McKnight, Knoxville Police Department crimes investigator, testified that when he arrived at the house, Mr. Davidson was already in custody and seated in the back of the police vehicle for no more than five minutes. Investigator McKnight and another officer transported Mr. Davidson to the police department. Investigator McKnight advised Mr. Davidson of his *Miranda* rights "off the top of [his] head" and engaged in general conversation with Mr. Davidson but did not interrogate him. Investigator McKnight described Mr. Davidson's demeanor as "kind of relaxed, not for sure what was going on." Upon arriving at the police department, the officers escorted Mr. Davidson to an interview room on the third floor to wait for Investigator Flores. Investigator McKnight observed a portion of Mr. Davidson's interview with police and never saw anyone hit, yell at, "be mean to," or abuse Mr. Davidson.

Investigator Flores testified that he responded to a call to the house where Mr. Davidson was arrested. Investigator Flores observed that after the Special Operations Squad pulled up to the side of the house in an armored vehicle, Mr. Davidson appeared in the window. A member of the Special Operations Squad knocked out the window, and team members pulled Mr. Davidson out of the window and onto the ground on his stomach. While officers were handcuffing Mr. Davidson, Investigator Flores introduced himself to Mr. Davidson, reassured him that everything would be okay, and told him to relax and stop resisting. Investigator Flores did not hear anyone threaten, kick, or hit Mr. Davidson and observed no injuries to him.

Before Investigator Flores began questioning Mr. Davidson at the police department, Investigator Flores offered him some food and water. Before the interview, Investigator Flores advised Mr. Davidson of his *Miranda* rights by reading from a statement and waiver of rights form:

STATEMENT OF YOUR RIGHTS

BEFORE WE ASK YOU ANY QUESTIONS, YOU MUST UNDERSTAND YOUR RIGHTS:

1.      YOU HAVE THE RIGHT TO REMAIN SILENT.

2.      ANYTHING YOU SAY CAN BE USED AGAINST YOU IN COURT.

- 23 -

3. YOU HAVE THE RIGHT TO CONSULT WITH A LAWYER AND TO HAVE A LAWYER PRESENT WITH YOU WHILE YOU ARE BEING QUESTIONED.

4. IF YOU WANT A LAWYER BUT ARE UNABLE TO PAY FOR ONE, A LAWYER WILL BE APPOINTED TO REPRESENT YOU FREE OF ANY COST TO YOU.

5. IF YOU DECIDE TO ANSWER QUESTIONS NOW WITHOUT A LAWYER PRESENT, YOU WILL STILL HAVE THE RIGHT TO STOP ANSWERING AT ANY TIME. YOU ALSO HAVE THE RIGHT TO STOP ANSWERING AT ANY TIME UNTIL YOU HAVE A LAWYER.

<u>WAIVER OF RIGHTS</u>

I UNDERSTAND EACH OF MY RIGHTS AND I AM WILLING TO MAKE A STATEMENT AND ANSWER QUESTIONS WITHOUT A LAWYER PRESENT. NO PROMISES OR THREATS HAVE BEEN MADE TO ME.

Mr. Davidson told Investigator Flores, "I know my rights you ain't gotta read my rights I know my rights." Mr. Davidson initialed each of the stated rights and signed the Waiver of Rights form. Investigator Flores signed the form as the Advising Officer/Investigator, and Agent Webb signed the form as the witness. Thereafter, Mr. Davidson provided a recorded statement and responded to questioning by Investigator Flores.

The due process clauses of the Fifth Amendment and Fourteenth Amendment of the United States Constitution require a confession to be voluntary before its admission into evidence. The due process voluntariness test is distinct from *Miranda*. *Dickerson v. United States*, 530 U.S. 428, 434–35 (2000); *Mincey v. Arizona*, 437 U.S. 385, 397–98 (1978). The issue under *Miranda* is whether a suspect received certain warnings and knowingly and voluntarily waived certain rights, whereas the essential inquiry under the voluntariness test is whether a suspect's will was overborne so as to render the confession a product of coercion. *Freeland*, 451 S.W.3d at 815 (quoting *State v. Climer*, 400 S.W.3d 537, 568 (Tenn. 2013); *State v. Smith*, 933 S.W.2d 450, 455 (Tenn. 1996)). The voluntariness test includes an assessment of the psychological impact on the accused and an evaluation of the legal significance of the accused's reaction. *Schneckloth v. Bustamonte*, 412 U.S. 218, 226 (1973) (citing *Culombe v. Connecticut*, 367 U.S. 568, 603 (1961)). Whether a confession was made voluntarily must be determined by a totality of the circumstances, including characteristics of the accused and the details of the interrogation. *Dickerson*, 530 U.S. at 434 (quoting *Schneckloth*, 412 U.S. at 226);

*Freeland*, 451 S.W.3d at 815. Relevant factors include the age, education, and intelligence of the accused; the extent of previous experience with law enforcement; whether questioning was repetitive and prolonged; the length of the detention prior to giving a statement; the lack of any advice to the accused of his constitutional rights; whether the accused was injured, intoxicated, drugged, or in ill health; deprivation of food, sleep, or medical attention; and physical abuse or threats of abuse. *Climer*, 400 S.W.3d at 568 (quoting *State v. Huddleston*, 924 S.W.2d 666, 671 (Tenn. 1996)); *see also Schneckloth*, 530 U.S. at 226. Coerced confessions are inherently unreliable. *Climer*, 400 S.W.3d at 567–68 (citing *Dickerson*, 530 U.S. at 433; *State v. Northern*, 262 S.W.3d 741, 748 (Tenn. 2008)).

Mr. Davidson contends that his statement was coerced through law enforcement's show of force during the arrest and threats of prosecution during the interview. Although a number of uniformed and armed law enforcement officers were present during Mr. Davidson's arrest, the show of force was not disproportionate to the seriousness of the crimes Mr. Davidson was suspected of committing. Sergeant DeBow and Investigator Flores testified consistently that Mr. Davidson was armed with a gun at the time of his arrest and did not fully comply with police commands. The removal of Mr. Davidson from the house by pulling him from the window was necessary given his failure to leave the house or open the window and the SWAT team's inability to enter through the front security door. Sergeant DeBow, Investigator McKnight, and Investigator Flores testified that Mr. Davidson was not beaten, abused, or injured. Mr. Davidson was not detained for an unreasonable time after his arrest and transport to the police department. Only Investigator Flores and Agent Webb were present during the interview. Mr. Davidson expressed to Investigator Flores that he did not want to be left alone for someone else to take his DNA sample, but this statement fails to support Mr. Davidson's claims of fear resulting from a coercive or intimidating atmosphere.

At the time of the statement, Mr. Davidson was twenty-five years old. He had attended high school and had above-average intelligence. Mr. Davidson had previously been convicted of aggravated robbery and carjacking and incarcerated. The duration of his detention in the interview room at the police department was reasonable. Prior to questioning, Investigator Flores provided food and water to Mr. Davidson, which Mr. Davidson consumed during the interview. Investigator Flores advised Mr. Davidson of his *Miranda* rights by reading from the Statement of Rights and the waiver form, and Mr. Davidson signed the Waiver of Rights. The interview itself took less than three hours and was not unreasonably lengthy under the circumstances. Mr. Davidson was not injured, intoxicated, impaired, in ill health, abused, or threatened with abuse.

At one point in the questioning, Investigator Flores made the following statements:

[Y]ou tell me the truth and we work with you. . . . I can go and I can say, "Well Mr. Attorney General . . . he's a liar and this is why and he continued to lie to me all day long and he's gonna deny it and we . . . we'll prove our case and we'll let 12 people judge this man who we can prove's a liar." Or I can say, "Mr. District Attorney, Mr. Judge, this man . . . this is what he said and it [corroborates] all our evidence. He's honest, he fessed up to what part he had [in] these two deaths." And their [sic] gonna go, well, liar or somebody that was a man that fessed up.

Mr. Davidson argues that these statements constituted a threat of prosecution, rendering the confession involuntary and inadmissible. Mr. Davidson relies on *United States v. Harrison*, 34 F.3d 886 (9th Cir. 1994). In *Harrison*, an agent advised the accused of evidence against her and that she might be facing up to twenty years in prison. *Id.* at 890. The agent then asked the accused whether she thought it would be better if the agent told the judge that the accused had cooperated or not cooperated. *Id.* The accused gave a statement after responding that she understood it would be better if she talked to the agents and they told the judge she had cooperated. *Id.* The trial court found the defendant's confession voluntary and admitted the statement into evidence. *Id.* at 889–90. The Court of Appeals for the Ninth Circuit reversed, holding that law enforcement officers may not suggest that an exercise of the right to remain silent may result in harsher treatment by a court or prosecutor. *Id.* at 891–92. The Ninth Circuit found that the agent did not explicitly threaten a longer sentence if the accused did not give a statement, but "[t]he improper conduct was the suggestion that they might inform the court that she had not cooperated." *Id.* at 891. The Ninth Circuit suggested that the agents' statements amounted to "subtle psychological coercion [that] can effectively overbear a suspect's free will." *Id.* at 892. Noting that the defendant broke her silence only after the statement was made to her, the Ninth Circuit reasoned that the defendant "could only conclude that she might suffer for her silence" despite the agents' "thinly veiled" suggestion. *Id.* at 891.

Mr. Davidson's reliance on *Harrison* is misplaced. In *Harrison*, the issue before the court was whether the defendant's will was so overborne by the agent's comment about cooperation that the defendant was compelled to provide a statement in violation of her Fifth Amendment right against self-incrimination. Mr. Davidson argues that his will was so overborne by Investigator Flores's comments that his waiver and statement were not freely and voluntarily given in violation of his due process rights. Unlike the defendant in *Harrison*, who remained silent until the agent made that comment, Mr. Davidson was engaged in the interview and responding to Investigator Flores before the statements were made. The record does not indicate that Mr. Davidson remained silent, resisted being interviewed, requested an attorney, or invoked his right against self-incrimination before or during the interview. Investigator Flores read Mr. Davidson

the Statement of Rights and the waiver form, and Mr. Davidson initialed each of the five stated rights. Mr. Davidson signed a Waiver of Rights, which states, "No promises or threats have been made to me." There is no showing that he construed Investigator Flores's statements as a promise of leniency that compelled him to confess. *See Smith*, 933 S.W.2d at 455 (holding that promises of leniency do not per se render subsequent confessions involuntary, but instead the Fifth Amendment prohibits confessions compelled by promises of leniency).

The trial court considered the *Huddleston* factors and concluded that Mr. Davidson's recorded statement was not the result of an inappropriate atmosphere or improper coercion. The evidence does not preponderate against the trial court's findings. Based on these findings of fact, the trial court did not err in denying Mr. Davidson's motion to suppress.

Mr. Davidson also argues that he did not voluntarily and knowingly waive his right to remain silent before giving his statement because he was given incomplete *Miranda* warnings by Investigator McKnight in the police car and on the written waiver form provided by Investigator Flores. Specifically, Mr. Davidson argues that the warnings failed to advise him that he was entitled to consult with an attorney before and during the interview.

The Fifth Amendment to the United States Constitution provides: "No person . . . shall be compelled in any criminal case to be a witness against himself." U.S. Const. amend. V.

Article I, section 9 of the Tennessee Constitution provides that in criminal prosecutions, "the accused . . . shall not be compelled to give evidence against himself." This privilege against self-incrimination affords criminal defendants the right to remain silent. *State v. Dotson*, 450 S.W.3d 1, 52 (Tenn. 2014), *cert. denied*, 135 S. Ct. 1535 (2015); *Freeland*, 451 S.W.3d at 813; *State v. Jackson*, 444 S.W.3d 554, 585 (Tenn. 2014).

In *Miranda v. Arizona*, 384 U.S. 436 (1966), the United States Supreme Court established procedural safeguards to protect the privilege against self-incrimination. *Id.* at 444. *Miranda* requires law enforcement to warn a person prior to custodial interrogation

> that he has the right to remain silent, that anything he says can be used against him in a court of law, that he has the right to the presence of an attorney, and that if he cannot afford an attorney one will be appointed for him prior to any questioning if he so desires.

*Id.* at 479. After being given these warnings and an opportunity to exercise these rights throughout the interrogation, the person being questioned may knowingly and intelligently waive these rights and agree to answer questions or make a statement. *Id.* The interrogation must cease if the right to remain silent is invoked. *Freeland*, 451 S.W.3d at 814 (citing *Miranda*, 384 U.S at 473–74). However, the accused must unambiguously invoke his constitutional right to remain silent. *Dotson*, 450 S.W.3d at 53 (citing *Berghuis v. Thompkins*, 560 U.S. 370, 381–82 (2010)).

The State bears the burden of proving by a preponderance of the evidence that the defendant waived his or her *Miranda* rights. *Freeland*, 451 S.W.3d at 814 (citing *Climer*, 400 S.W.3d at 564; *Missouri v. Seibert*, 542 U.S. 600, 608 n.1 (2004)). To satisfy this burden, the prosecution must demonstrate that

> the waiver was voluntary in that 'it was the product of a free and deliberate choice rather than intimidation, coercion, or deception,' and was knowing in that it was made 'with a full awareness of both the nature of the right being abandoned and the consequences of the decision to abandon it.'

*Id.* (quoting *Moran v. Burbine*, 475 U.S. 412, 421 (1986)). Unless the prosecution can demonstrate that, based on the totality of circumstances, the defendant's waiver was voluntary and knowing, statements given during the interrogation are not admissible in the prosecution's case-in-chief. *Id.* 451 S.W.3d at 814 (quoting *Miranda*, 384 U.S. at 479).

The *Miranda* warnings given to Mr. Davidson sufficiently advised him of his rights to consult with counsel and to remain silent. The Statement of Rights advised him that he had the right to consult with a lawyer and to have one present during questioning. The Statement of Rights also advised him that, even if he chose to answer questions without a lawyer present, he could stop answering at any time. Mr. Davidson indicated verbally that he understood his rights, and he voluntarily signed the written waiver, acknowledging, "I understand each of my rights, and I am willing to make a statement and answer questions *without a lawyer present.*" The absence of the exact language, "before and during," does not render the warnings insufficient. *Miranda* does not mandate a "talismanic incantation" or precise formulation of the warnings. *California v. Prysock*, 453 U.S. 355, 359 (1981). The question is only whether the warnings reasonably conveyed a suspect's rights as required by *Miranda*. *Duckworth v. Eagan*, 492 U.S. 195, 203 (1989) (quoting *Prysock*, 453 U.S. at 361). Based on the totality of the circumstances, we conclude that Mr. Davidson was properly advised of his right to counsel and to remain silent, he understood his rights, and he knowingly and voluntarily relinquished those rights.

We hold that the trial court did not err in denying Mr. Davidson's motion to suppress his statement to law enforcement.

## Spectator Buttons

Mr. Davidson asserts that the trial court abused its discretion by denying his motion to prohibit spectators from wearing buttons displaying photographs of the victims taken before their deaths. The trial court allowed buttons displaying images of the victims to be worn at trial but imposed restrictions on their use: the buttons could only be worn by the victims' immediate family members, defined as parents, siblings, and grandparents; the buttons had to be worn on or close to the lapel; the buttons could not be worn while the family member was testifying; the buttons could show only a photograph of the victim as a young adult; and the same button had to be worn throughout the trial. The trial court reasoned that the buttons would express nothing more than normal grief occasioned by losing a family member and would not brand Mr. Davidson with the mark of guilt. The trial court explicitly found that the buttons would not create an atmosphere of coercion or intimidation at trial. The trial court enforced the restrictions and during the trial, reminded spectators that only immediate family members could wear the buttons.

The Court of Criminal Appeals affirmed the trial court on this issue, noting that the trial court utilized a measured approach when making its decision and carefully crafted a rule designed to limit the negative impact of the buttons. *Davidson*, 2015 WL 1087126, at *35.

Mr. Davidson argues that a per se rule banning the display of buttons should be adopted. He contends the buttons constituted impermissible victim impact evidence that showed the emotional effect of the murders on the families, thereby creating an unacceptable risk that the jurors would be unduly influenced by their own emotional responses. Mr. Davidson submits that by allowing spectators to wear buttons, the trial court created an inherently prejudicial courtroom condition that deprived him of his right to a fair trial. Mr. Davidson also argues that the trial court failed to require spectators to follow the restrictions placed on the display of the buttons. The State argues that Mr. Davidson can show neither inherent prejudice nor actual prejudice and therefore is entitled to no relief.

The right to a trial by an impartial jury is guaranteed by the Fifth, Sixth, and Fourteenth Amendments to the United States Constitution and Article I, section 9 of the Tennessee Constitution. *State v. Carruthers*, 35 S.W.3d 516, 559 (Tenn. 2000). These constitutional provisions entitle a criminal defendant to a fair trial, not a perfect one. *Delaware v. Van Arsdall*, 475 U.S. 673, 681 (1986); *State v. Hutchison*, 482 S.W.3d 893, 921 (Tenn. 2016). The right to an impartial jury is a fundamental aspect of a fair trial. *State v. Odom*, 336 S.W.3d 541, 556 (Tenn. 2011). An impartial jury is "one which is of

impartial frame of mind at the beginning of trial, is influenced only by legal and competent evidence produced during trial, and bases its verdict upon evidence connecting defendant with the commission of the crime charged." *Durham v. State*, 188 S.W.2d 555, 558 (Tenn. 1945). This Court's inquiry is whether the jury that tried the case was fair and impartial. *State v. Leath*, 461 S.W.3d 73, 110–11 (Tenn. Crim. App. 2013) (quoting *State v. Taylor*, No. W2011-00671-CCA-R3-CD, 2012 WL 2308088, at *6 (Tenn. Crim. App. June 18, 2012)). A defendant is entitled to have his "guilt or innocence determined solely on the basis of the evidence introduced at trial, and not on grounds of official suspicion, indictment, continued custody, or other circumstances not adduced as proof at trial." *Taylor v. Kentucky*, 436 U.S. 478, 485 (1978).

We review the trial court's decision under an abuse of discretion standard. A trial court abuses its discretion when it applies an incorrect legal standard, reaches a conclusion that is not logical, bases its decision on a clearly erroneous assessment of the evidence, or uses reasoning that causes an injustice to the complaining party. *State v. Davis*, 466 S.W.3d 49, 61 (Tenn. 2015). The trial court has broad discretion in controlling the course and conduct of trial. *State v. King*, 40 S.W.3d 442, 449 (Tenn. 2001); *State v. Cazes*, 875 S.W.2d 253, 260 (Tenn. 1994). One of the court's basic responsibilities is to ensure a fair trial. *State v. Holton*, 126 S.W.3d 845, 870 app. (Tenn. 2004) (quoting *State v. Franklin*, 714 S.W.2d 252, 258 (Tenn. 1986)).

> Generally, the trial court, which has presided over the proceedings, is in the best position to make determinations regarding how to achieve this primary purpose, and absent some abuse of the trial court's discretion in marshalling the trial, an appellate court should not redetermine in retrospect and on a cold record how the case could have been better tried.

*Franklin*, 714 S.W.2d at 258.

Whether spectators can wear buttons displaying images of the victims is an issue of first impression in Tennessee. The United States Supreme Court addressed state-sponsored courtroom practices in *Estelle v. Williams*, 425 U.S. 501, 503–06 (1976), and *Holbrook v. Flynn*, 475 U.S. 560, 568 (1986). In *Williams*, the State required the defendant to wear an orange prison jumpsuit during his trial. The Supreme Court found this government action was highly prejudicial and deprived the defendant of due process. *Williams*, 425 U.S. at 504. The Court reasoned that the defendant's clothing was likely to be a continuing influence throughout the trial, and there was an unacceptable risk it would affect a juror's judgment. *Id.* at 504–05. Finding that no essential state policy was advanced by compelling a defendant to dress in prison clothing at trial, the Supreme Court held that the practice constituted a violation of due process. *Id.* at 512. In *Flynn*, the issue was whether four uniformed, armed state troopers seated in the front row of the gallery directly behind the defendant was so inherently prejudicial that he was deprived

of his constitutional right to a fair trial. *Flynn*, 475 U.S. at 562. The Court determined that conspicuous presence of security personnel in the courtroom was not an inherently prejudicial practice, such as shackling and prison clothing. *Id.* at 568–69. The Court noted that, unlike a policy requiring defendants to wear prison garb, the deployment of troopers to maintain security during trial served a legitimate state interest. *Id.* at 571–72.

Both of these cases involved state-sponsored courtroom practices, rather than the spectator or private-actor conduct at issue here. In *Cary v. Musladin*, 549 U.S. 70 (2006), the United States Supreme Court reviewed a state trial court decision that allowed the victim's family to wear buttons displaying the victim's image. The trial court found no possible prejudice to the defendant and denied the defendant's motion to forbid the buttons. The Court of Appeals for the Ninth Circuit reversed and remanded, concluding that the state court applied a test for prejudice different from the one stated in *Williams* and *Flynn*, and therefore, the trial court's decision was contrary to clearly established applicable federal law. *Id.* at 73. In considering the case, the United States Supreme Court noted that the issue of spectator button display was an open question and one that the Court had not previously addressed. *Id.* at 76.

Due to a lack of guidance from the United States Supreme Court, lower courts resolved the issue of spectator-conduct claims in divergent ways. Some courts applied the *Williams* and *Flynn* standard to spectator conduct. For example, in *Norris v. Risley*, 918 F.2d 828, 829–30 (9th Cir. 1990), approximately fifteen female members of a Rape Task Force and the National Organization for Women wore "Women Against Rape" buttons during the defendant's trial for kidnapping and rape. The buttons were two and one-half inches in diameter with the word "Rape" underlined with a broad red stroke. *Id.* at 830. The trial court denied the defendant's motion to have the women excluded from the courtroom or to prevent them from wearing the buttons. *Id.* at 829. The trial court ruled that the public was entitled to attend court proceedings and that the buttons constituted no imminent threat. *Id.* The defendant was convicted of kidnapping and rape, his convictions were affirmed on appeal, and his application for habeas corpus relief was denied. *Id.* The United States Court of Appeals for the Ninth Circuit held that the defendant did not receive a fair trial because the risk that the buttons had an impact on the jurors was unacceptably high. *Id.* at 834. Relying on the holdings of *Williams* and *Flynn*, the Ninth Circuit concluded that "these large and boldly highlighted buttons tainted Norris's right to a fair trial both by eroding the presumption of innocence and by allowing extraneous, prejudicial considerations to permeate the proceedings without subjecting them to the safeguards of confrontation and cross-examination." *Id.*

Other courts distinguished *Flynn* on its facts. For example, in *Woods v. Dugger*, 711 F. Supp. 586, 594 (M.D. Fla. 1989), the court found that the presence of correctional officers and co-workers of the victim as spectators was not inherently prejudicial to defendant's right to a fair trial or otherwise intimidated or influenced the jury.

Still other courts have ruled on the button issue without discussing *Williams* and *Flynn*. *See, e.g.*, *Buckner v. State*, 714 So. 2d 384, 389 (Fla. 1988) (holding that photograph of the victim displayed by family members and a collage of photographs of the victim by another spectator were non-prejudicial where the jury had only brief exposure to the photographs and stated that the display of photographs would not influence their decisions); *State v. Speed*, 961 P.2d 13, 30 (Kan. 1998) (finding no evidence that jurors were affected by buttons or t-shirts but noting in dicta that the wearing of buttons and t-shirts is "not a good idea because of the possibility of prejudice"); *State v. Braxton*, 477 S.E.2d 172, 177 (N.C. 1996) (holding that the incomplete record did not support claim that spectators were trying to influence the jury by wearing buttons or that they were prejudicial to defendant's right to a fair trial); *Pachl v. Zenon*, 929 P.2d 1088, 1093 (Or. Ct. App. 1996) (en banc) (holding that the failure of the defendant's trial counsel to object to or move for a mistrial based on spectators wearing "Crime Victims United" buttons was a legal strategy upon which reasonable minds could differ and did not entitle defendant to post-conviction relief).

In *Musladin*, after noting the lack of guidance and resulting divergent opinions, the United States Supreme Court vacated the decision of the Court of Appeals, concluding that the state court did not unreasonably apply clearly established federal law. *Musladin*, 549 U.S. at 77. The Supreme Court, however, did not establish a rule for trial courts to follow in deciding issues regarding the display of buttons.

Since *Musladin*, there is no clear consensus on how trial courts should handle spectator displays of buttons and other victim memorials in the courtroom. *See, e.g.*, *People v. Zielesch*, 101 Cal. Rptr. 3d 628, 638 (Cal. Ct. App. 2009), *as modified* (Dec. 3, 2009) (following *Flynn* and *Williams* and finding that courtroom spectators wearing buttons depicting image of fallen officer presented no probability of deleterious effects on the defendant's right to a fair trial); *Shootes v. State*, 20 So. 3d 434, 438 (Fla. Dist. Ct. App. 2009) (relying on *Flynn* and *Musladin* and finding that the presence of spectators "wearing uniforms, insignia, buttons, or other indicia of support for the accused, the prosecution, or the victim of the crime does not automatically constitute denial of the accused's right to a fair trial"); *People v. Nelson*, 53 N.E.3d 691, 698 (N.Y. 2016) (declining to apply a per se rule of reversal to spectator conduct, declining to apply the *Williams-Flynn* framework, and concluding that spectator displays depicting a victim should be prohibited in the courtroom during trial, but applying a harmless error analysis).

Mr. Davidson argues that we should adopt a per se rule banning all spectator buttons in the courtroom, as images of the deceased create a courtroom condition that conveys to the jury the emotional impact of the murders on the families and constitute impermissible impact evidence during the guilt-innocence phase of trial. Victim impact evidence is evidence that shows the "financial, emotional, psychological, or physical

effects of the victim's death on the members of the victim's immediate family" and may be considered by the jury in determining an appropriate punishment. *State v. Nesbit*, 978 S.W.2d 872, 892 (Tenn. 1998). In *Nesbit*, the evidence in question concerned the testimony of the victim's mother regarding the impact of her daughter's death on the family, particularly the children. *Id.* After concluding that victim impact evidence is admissible at the sentencing phase of a capital trial under due process and evidentiary constraints, this Court held that the probative value of the proof was not substantially outweighed by the danger of unfair prejudice. *Id.* at 893. *Nesbit*, however, offers no guidance on whether buttons worn by the immediate family constitute impermissible victim impact evidence during the guilt-innocence phase of trial.

After carefully reviewing applicable authorities, we conclude that a per se rule banning buttons is not appropriate. Instead, we extend the *Williams-Flynn* test to spectator conduct. Under this framework, trial courts should consider the totality of the circumstances and decide the issue on a case-by-case basis. Factors to be considered include the size and appearance of the buttons; by whom, when, and where they are worn; and whether the buttons display only a photograph of the deceased or contain a message suggesting or advocating guilt or innocence. A trial court should not allow buttons to be worn if they are so inherently prejudicial as to pose an unacceptable threat to the defendant's right to a fair trial or when the defendant establishes actual prejudice.

In reaching this decision, we are guided by the decisions of courts from other jurisdictions allowing buttons and t-shirts with victim photographs and other memorial displays to be worn at trial in certain circumstances. *See, e.g.*, *United States v. Farmer*, 583 F.3d 131, 149–50 (2d Cir. 2009) (holding that t-shirts displaying victim's photograph were not so inherently prejudicial as to pose an unacceptable threat to the defendant's right to a fair trial); *Overstreet v. State*, 877 N.E.2d 144, 159 (Ind. 2008) (finding that defendant failed to show deficient performance by counsel for failing to object or move the trial court to disallow spectators from wearing buttons); *State v. Iromuanya*, 806 N.W.2d 404, 432 (Neb. 2011) (holding that there was no reasonable probability that the wearing of memorial buttons by spectators displaying an in-life photograph of the victim created an unacceptable threat to the defendant's right to a fair trial); *State v. Paige*, 654 S.E.2d 300, 303–04 (S.C. Ct. App. 2007) (finding no actual or inherent prejudice resulted from the trial court's refusal to order spectators to remove buttons from their clothing); *State v. Lord*, 165 P.3d 1251, 1258–59 (Wash. 2007) (en banc) (finding that buttons carrying in-life photograph of the victim were a silent display of affiliation, which did not explicitly advocate guilt or innocence, were not inherently prejudicial); *In re Woods*, 114 P.3d 607, 616–17 (Wash. 2005) (en banc) (holding that black and orange ribbons worn by victims' families were not inherently prejudicial so as to taint the defendant's right to a fair trial).

Here, the trial court properly recognized that a fair trial requires the courtroom atmosphere to be free of coercion or intimidation. After consideration of Mr. Davidson's objections, the trial court established and enforced restrictions on the appearance and display of the buttons that minimized any prejudicial effect. The buttons were of reasonably small size, worn by only immediate family members, and contained an image of a deceased victim. They were not worn while the family member was testifying. The buttons did not convey a specific message suggesting or advocating guilt or innocence. The record does not indicate how many family members wore the buttons, the number of days they were worn, or whether any juror saw the buttons or was affected by the buttons. Although the trial court noted at one point during the trial that it observed non-family members wearing the buttons and cautioned against this, there is no indication that the trial court's restrictions on the display of the buttons were not heeded.

We conclude that Mr. Davidson failed to show that the buttons worn by the victims' immediate family members were so inherently prejudicial as to pose an unacceptable threat to his right to a fair trial or that there was any actual prejudice.

### Admissibility of Post-Mortem Photographs

Mr. Davidson argues that the trial court abused its discretion by admitting into evidence photographs of the victims taken after their deaths. He submits these photographs, described as "gruesome, graphic, disturbing, and horrifying," had minimal probative value. Mr. Davidson contends that the victims' injuries and causes of death were not disputed and therefore the probative value of the photographs was outweighed by their prejudicial effect and inflamed the jury against Mr. Davidson. The State responds that the trial court did not abuse its discretion because the photographs were relevant to show premeditation and the brutality and force of the injuries to the victims. The Court of Criminal Appeals found no abuse of discretion, holding that the photographs accurately illustrated the nature and circumstances of the crimes and that the probative value of the photographs was not substantially outweighed by the danger of unfair prejudice. *Davidson*, 2015 WL 1087126, at *26.

Mr. Davidson filed a pretrial motion to exclude the post-mortem photographs of the victims, arguing that under Tennessee Rule of Evidence 401, the photographs were not relevant and that under Tennessee Rule of Evidence 403, the photographs would be substantially more unfairly prejudicial than probative and would inflame, confuse, and distract the jury. The trial court allowed the State to introduce the photographs after conducting two pretrial hearings, hearing testimony from the medical examiner that the photographs were necessary to illustrate her testimony, reviewing approximately seventy photographs, and excluding many photographs as redundant or lacking probative value. The twenty-two color photographs that Mr. Davidson argues should not have been admitted into evidence were introduced during the testimony of the medical examiner.

Twelve photographs are of Chris's body and show the significant charring, how his hands were tied behind his back and his feet bound together, the fabric wrapped around his head, the bandana that covered his eyes, the sock in his mouth, the gunshot wounds, and the blunt force trauma to his anus. Ten photographs show the condition of Channon's body after being removed from the garbage can in Mr. Davidson's house. The photographs show how her partially unclad body was bound, how she was positioned in the garbage can, the injuries to her face, vagina, and anus from the rapes and the blunt force trauma, and the evidence of asphyxiation and suffocation.

A trial court has broad discretion regarding the admissibility of photographs. *State v. Banks*, 564 S.W.2d 947, 949 (Tenn. 1978). A trial court abuses its discretion when it applies an incorrect legal standard, reaches a conclusion that is not logical, bases its decision on a clearly erroneous assessment of the evidence, or uses reasoning that causes an injustice to the complaining party. *Davis*, 466 S.W.3d at 61.

Before a photograph is admissible, it must be verified and authenticated by a knowledgeable witness. *Banks*, 564 S.W.2d at 949. After authentication, the photographs must be shown to be relevant to the issues at trial. *See State v. Vann*, 976 S.W.2d 93, 102–03 (Tenn. 1998) (citing *State v. Stephenson*, 878 S.W.2d 530, 542 (Tenn. 1994); *Banks*, 564 S.W.2d at 951). Relevant evidence is "evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." Tenn. R. Evid. 401. In other words, "[t]o be relevant, evidence must tend to prove a material issue." Tenn. R. Evid. 401 advisory commission comment; *see also State v. Faulkner*, 154 S.W.3d 48, 67 (Tenn. 2005) (holding that "a photograph must be found relevant to an issue that the jury must decide before it may be admitted into evidence"). Factors to be considered in determining the relevance of photographic evidence include the photograph's accuracy and clarity, the need for the photograph to be used in addition to testimonial evidence to relate the facts to the jury, and the need to admit the photograph to establish the elements of the crime or to rebut the defendant's contentions. *Banks*, 564 S.W.2d at 951.

Generally, relevant evidence is admissible. However, relevant evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice. Tenn. R. Evid. 403; *see Vann*, 976 S.W.2d at 102–03 (citing *Stephenson*, 878 S.W.2d at 542; *Banks*, 564 S.W.2d at 951). Exclusion of relevant evidence is an extraordinary remedy that should be used sparingly, and the party seeking to exclude the evidence bears a heavy burden of persuasion. *State v. James*, 81 S.W.3d 751, 757–58 (Tenn. 2002) (citing *White v. Vanderbilt Univ.*, 21 S.W.3d 215, 227 (Tenn. Ct. App. 1999)).

After determining that photographic evidence is relevant, the trial court must then weigh its probative value against any undue prejudice. *Banks*, 564 S.W.2d at 951. A

relevant photograph "may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence." *Id.* (quoting Fed. R. Evid. 403). "[T]he issue is not whether the evidence is prejudicial, but whether it is *unfairly prejudicial*." *Vann*, 976 S.W.2d at 103 (alteration in original) (citing *State v. DuBose*, 953 S.W.2d 649, 655 (Tenn. 1997)). "'[U]nfair prejudice' is '[a]n undue tendency to suggest decision on an improper basis, commonly, though not necessarily, an emotional one.'" *Id.* at 103 (quoting *DuBose*, 953 S.W.2d at 654). Photographs must never be used "solely to inflame the jury and prejudice them against the defendant." *Banks*, 564 S.W.2d at 951 (citing *Milam v. Commonwealth*, 275 S.W.2d 921, 924 (Ky. 1955)).

Photographs of a corpse may be admissible even though the photographs may be of a "gruesome and horrifying character." *Id.* at 950–51 (citing *People v. Jenko*, 102 N.E.2d 783, 785 (Ill. 1951)). The more gruesome the photograph, the more likely it is that a defendant can establish that the photograph's prejudicial effect outweighs its probative value. *See id.* at 951 (citing *Commonwealth v. Scaramuzzino*, 317 A.2d 225, 226 (Pa. 1974)).

Admission of photographs of a murder victim is often problematic. Post-mortem photographs can be helpful to show how the victim died and the nature of the injuries inflicted before death. Post-mortem pictures can also be relevant to the issue of deliberation or premeditation. *See id.* at 950. The intent to kill may be inferred from the brutality of the attack. *Id.* (quoting *State v. LaChance*, 524 S.W.2d 933, 937 (Tenn. 1975), *abrogated on other grounds by State v. Brown*, 836 S.W.2d 530, 543 (Tenn. 1992)). "[T]he succession of blows, the patently vicious manner of their infliction, the enormity of the cruelty and the horrendous injuries suffered provide further evidence of a wil[l]ful execution of an intent to kill." *Id.* (quoting *LaChance*, 524 S.W.2d at 937–38). The manner in which the killing was committed, such as "repeated shots, blows, and other acts of violence" may constitute sufficient evidence of premeditation. *Id.* (quoting *LaChance*, 524 S.W.2d at 938). Post-mortem photographs can be gruesome because of their subject matter, and therefore their prejudicial effect must be considered.

In *State v. Willis*, 496 S.W.3d 653 (Tenn. 2016), *petition for cert. filed*, No. 16-6995 (U.S. Nov. 21, 2016), we held the trial court did not abuse its discretion in admitting a number of graphic post-mortem photographs during the guilt and sentencing phases of the defendant's capital trial. The challenged photographs in *Willis* included color photographs of the decomposed bodies of the two victims, one of which had been mutilated after death. *Id.* at 725. The photographs from the guilt phase depicted the locations of the victims' bullet wounds, fly larvae and pupae, a storage tote containing the body of one of the victims, one victim's bound hands and feet, and one victim's severed head and hands. *Id.* The photographs from the sentencing phase depicted the severely

decomposed headless and handless body of one victim and that victim's severed and severely decomposed head. *Id.* We found that each of these photographs had probative value. *Id.* at 727. The photographs admitted during the guilt phase were probative on the contested issues of premeditation and time of death, and the photographs admitted during the sentencing phase were probative on the aggravating circumstances, which supported the State's decision to seek the death penalty. *Id.* Further, in considering the danger of unfair prejudice, we observed that it is fair to consider the grotesque and horrifying nature of the charged conduct. *Id.* at 729. To the extent the photographs tended to be shocking or gruesome, it was because the crime depicted was of that sort. *Id.* (quoting *State v. Sandles*, 740 S.W.2d 169, 177 (Mo. 1987) (en banc)). We held in *Willis* that the defendant's failure to establish the probative value of the challenged photographs was substantially outweighed by the danger of unfair prejudice. *Id.*

In *State v. Brown*, 836 S.W.2d 530, 551–52 (Tenn. 1992), this Court found no error in the trial court's admission of nine color, close-up photographs of the deceased victim's body. The State presented testimony regarding the injuries, but under the *Banks* standards, we held the graphic photographs were relevant to the brutality of the attack and extent of force used against the victim, from which the jury could infer the element of malice. *Id.* at 551 (citing *Banks*, 564 S.W.2d at 950). We noted that each photograph represented a different part of the victim's body and that no two photographs depicted the same injuries. *Id.*

In *State v. Cole*, 155 S.W.3d 885, 912–13 (Tenn. 2005), this Court upheld the admissibility of post-mortem photographs of the victim's scalp, which showed a ring of soot around a bullet wound. The photographs were relevant to supplement the medical examiner's testimony that the bullet wound was inflicted from contact range, which supported an inference of premeditation and contradicted the defendant's claim of self-defense and the defendant's statement to police that he shot the victim from a few feet away. *Id.* at 913. We concluded that the probative value of the photographs was not outweighed by their prejudicial effect. *Id.*

In *State v. Carter*, 114 S.W.3d 895, 903–04 (Tenn. 2003), we upheld the trial court's decision to admit into evidence three photographs depicting the bodies of two murder victims at the crime scene. The photographs showed a male victim's body crouched in a closet and covered with blood and a female victim's body lying in a pool of blood on a bathroom floor. *Id.* at 901. One photograph showed that the female victim was partially nude. *Id.* We held that the photographs were relevant to show the nature and circumstances of the crimes and to demonstrate the "especially heinous, atrocious, or cruel" aggravating circumstance for the crimes. *Id.* at 903 (quoting Tenn. Code Ann. § 39-13-204(i)(5)). We further held that the probative value of the photographs was not substantially outweighed by the danger of unfair prejudice. *Id.* at 904.

Applying these factors here, we find the trial court did not abuse its discretion in admitting the photographs into evidence. The trial court reviewed numerous photographs and only allowed certain photographs to be admitted into evidence. The verification and authenticity of the photographs were not in dispute. The photographs accurately depicted different aspects of Channon's and Chris's bodies and the injuries inflicted on them. The photographs were not cumulative because they showed different views of various parts of their bodies, and they assisted in the jury's understanding of the medical examiner's testimony. During the pretrial hearing, the medical examiner stated that she could testify about her findings but that her testimony alone was "not good enough" for the jury to truly comprehend the method and manner of the victims' deaths. During her trial testimony, she used the photographs to describe how the victims died, including showing the binding around Chris's hands and feet, the shirt wrapped around his head, the sock placed in his mouth, the places where he had been shot, how severely burned and charred his body was, the damage to his anus from blunt force trauma, how Channon was bound and positioned in the garbage can, and the injuries to various parts of her body. These photographs were relevant to the issues at trial. They showed that the manner in which the rapes and murders were committed was deliberate, premeditated, and took some time to accomplish. They also showed the repeated blunt force trauma that the victims endured and the extent of their injuries. The photographs were graphic but not unnecessarily gruesome or horrifying especially given the facts. The photographic evidence of the torture inflicted on the victims during their last hours cannot be ignored or recreated in any other manner. The photographs were likely prejudicial to Mr. Davidson—but not unfairly prejudicial.

We conclude that the photographs were relevant and that their probative value was not substantially outweighed by the danger of unfair prejudice. We hold that the trial court did not abuse its discretion in admitting the photographs of the victims into evidence.

### Jury's Review of Evidence in Courtroom

Mr. Davidson argues the trial court erred in allowing the deliberating jury to view his video recorded statement in the courtroom with members of the public present. Mr. Davidson contends this public display violated the sanctity of jury deliberations, and the jury improperly conducted deliberations in the courtroom. The State submits the trial court did not abuse its discretion in allowing the jury to review the video recorded statement in open court and that the jury did not deliberate openly. The Court of Criminal Appeals held that the trial court should have shown the jury how to operate the equipment in the courtroom and then left them to review the recording alone. Because this error did not prejudice the defendant, the intermediate appellate court concluded it was harmless error. *Davidson*, 2015 WL 1087126, at *60.

- 38 -

A video recording of a statement Mr. Davidson gave to law enforcement after his arrest was introduced into evidence as a part of the State's proof. During deliberations, the jury sent the trial court a note asking to review Mr. Davidson's statement. The trial court granted the jury's request and determined that the video should be shown on the screen in the courtroom rather than in the jury room. The trial court reasoned this procedure would allow the court and counsel to view the same evidence the jury was viewing and to ensure the equipment worked properly. Because the viewing was to occur in the courtroom, the trial court determined it was a public proceeding and spectators could remain in the courtroom. The trial court admonished everyone not to make any comments or react to the video. Mr. Davidson's counsel objected, arguing that jury deliberations were not public proceedings and should not be conducted in the courtroom. The trial court overruled the objection, stating the jury was only being brought into the courtroom to view the video and that no jury deliberations or discussions would occur in the courtroom. After the jury was brought into the courtroom, the foreperson asked the trial court whether the video could be zoomed in on Mr. Davidson and the volume increased. The trial court responded that the video recording could not be adjusted to zoom in and that the volume was at the highest level. The jury watched a portion of Mr. Davidson's statement while members of the public were present. After approximately one hour and twenty minutes, the trial court recessed the proceedings for a break, and the jury retired to the jury room. During the break, the jury sent a note to the trial court indicating they had seen enough of the video.

We review this issue under an abuse of discretion standard. *State v. Smith*, 993 S.W.2d 6, 32 (Tenn. 1999); *State v. Jenkins*, 845 S.W.2d 787, 793 (Tenn. Crim. App. 1992). "A trial court abuses its discretion when it applies an incorrect legal standard, reaches an illogical conclusion, bases its decision on a clearly erroneous assessment of the evidence, or employs reasoning that causes an injustice to the complaining party." *State v. Smith*, 492 S.W.3d 224, 243 (Tenn. 2016) (citing *Davis*, 466 S.W.3d at 61).

Mr. Davidson argues that the jury's viewing of his statement in open court was an intrusion on the secrecy of jury deliberations. It is well-established that jury deliberations shall remain private and secret. *See United States v. Olano*, 507 U.S. 725, 737 (1993); *Rushing v. State*, 565 S.W.2d 893, 895 (Tenn. Crim. App. 1977); *see also Yeager v. United States*, 557 U.S. 110, 122 (2009) ("The jury's deliberations are secret and not subject to outside examination."). The sanctity of jury deliberations is a fundamental tenet of our criminal justice system. *United States v. Schwarz*, 283 F.3d 76, 97 (2d Cir. 2002). The right to a jury trial requires that the jury be unbiased and impartial when deciding factual issues. *State v. Smith*, 418 S.W.3d 38, 45 (Tenn. 2013). "[T]he primary if not exclusive purpose of jury privacy and secrecy is to protect the jury's deliberations from improper influence." *Olano*, 507 U.S. at 737–38.

Although jury deliberations should remain private and no jury deliberations should occur in public, the jury's viewing of evidence in the open courtroom does not necessarily violate the privacy of jury deliberations. Tennessee Rule of Criminal Procedure 30.1 provides that "[u]nless for good cause the court determines otherwise, the jury shall take to the jury room for examination during deliberations all exhibits and writings, except depositions, that have been received in evidence." Tenn. R. Crim. P. 30.1. Based on this rule, jurors may examine evidence in the jury room during deliberations. This rule, however, does not address how jurors may view evidence, such as video recorded statements that require special equipment for viewing and cannot be appropriately examined or viewed in the jury room.

The Court of Criminal Appeals has held the trial court does not abuse its discretion by allowing the jury to view evidence in the open courtroom. *See, e.g.*, *Jenkins*, 845 S.W.2d at 793 (finding no abuse of discretion under ABA Standards for Criminal Justice, Trial by Jury, Standard 15-5.2[5] where the trial court allowed the jury, in open court, to view a tape of an eyewitness's testimony); *State v. Phillips*, No. E1999-02776-CCA-R3-CD, 2000 WL 1877486, at *5 (Tenn. Crim. App. Dec. 28, 2000) (citing *Jenkins*, 845 S.W.2d at 792, 793; Standards Relating to Admin. of Criminal Justice 15-4.2) (holding that the trial court acted within its discretion in replaying detective's testimony for the jury in open court); *cf. State v. Case*, No. M2014-00949-CCA-R3-CD, 2015 WL 7458507, at *13 (Tenn. Crim. App. Nov. 24, 2015) (holding if the jury must review evidence in the courtroom, the better practice is for the court officer to bring the jury into the courtroom without the presence of the trial court and counsel; if the jury views the evidence in the courtroom with the judge and counsel present, then the defendant should also be present); *State v. Morris*, No. M2005-02909-CCA-R3-CD, 2007 WL 609203, at *3 (Tenn. Crim. App. Feb. 26, 2007) (criticizing decision of the trial court to allow the jury during deliberations to view a video in open court with the defendant and counsel present rather than instructing the jury on the operation of the equipment and then leaving the jury alone to view the video, but finding no prejudice to the defendant, no violation of Rule 30.1, and no abuse of discretion).

Courts in other jurisdictions have also found no abuse of discretion by the trial court in allowing the jury to review or rehear recorded evidence in open court. *See, e.g.*, *United States v. Muhlenbruch*, 634 F.3d 987, 1001–02 (8th Cir. 2011) (finding no abuse of discretion by the trial court by allowing the jury to review a videotaped confession in

---

[5] ABA Standards Relating to the Administration of Criminal Justice, Standard 15-4.2 was revised and redesignated 15-5.2. ABA Standard 15-5.2 provides that "[u]nless the court decides that a review of requested testimony is inappropriate, the court should have the requested parts of the testimony submitted to the jury in the courtroom."

open court); *United States v. Plato*, 629 F.3d 646, 652 (7th Cir. 2010) (finding that the district judge acted within her discretion by allowing the jurors to watch the surveillance video in slow motion in open court); *United States v. Thabateh*, 40 F. App'x 392, 395 (9th Cir. 2002) (holding that there was no error in permitting the jury to read along in the transcript as the tape was replayed in open court during deliberations); *Maples v. State*, 758 So. 2d 1, 63 (Ala. Crim. App. 1999) (holding that the trial court did not err in allowing jury's review of videotaped confession and audiotape of 911 call in open court); *State v. Blankinship*, 622 P.2d 66, 70 (Ariz. Ct. App. 1980) (holding that "[s]ince the jury requested the repeated playings of the taped confession, the court acted within its discretion in allowing the tape to be played in open court"); *State v. Jones*, 102 A.3d 694, 701 (Conn. 2014) (holding that the trial court properly exercised its discretion by requiring the jury to review video in open court because of equipment issues); *State v. Osbourne*, 53 A.3d 284, 296–98 (Conn. App. Ct. 2012) (finding no error in replaying video evidence in open court, under the supervision of the trial judge and in the presence of counsel and the parties, despite the jury's request to review the evidence "in private"); *Bridges v. State*, 613 S.E.2d 621, 625 (Ga. 2005) (stating that the accepted practice is to bring the jury back into open court to rehear recorded evidence during deliberations); *Summage v. State*, 546 S.E.2d 910, 913 (Ga. 2001) (holding that the trial court has the discretion to allow the jury to rehear recorded statements if done in open court); *Sturma v. State*, 683 N.E.2d 606, 609–10 (Ind. Ct. App. 1997) (finding the trial court did not abuse its discretion by allowing testimony to be replayed for the jury in open court); *Linger v. State*, 508 N.E.2d 56, 61 (Ind. Ct. App. 1987) (holding that state law "required the judge, on the jury's request, to replay the properly admitted audio tape in open court"); *State v. Daby*, 197 N.W.2d 670, 672 (Minn. 1972) (stating that when a jury requests to review testimony, the proper procedure is set forth in ABA Standard 5.2(a)); *State v. Anthony*, 837 S.W.2d 941, 945 (Mo. Ct. App. 1992) (determining that "allowing the jury to hear the tape during deliberations was not an abuse of discretion. The tape had been played in open court"); *State v. Weston*, 118 A.3d 331, 340 (N.J. 2015) (holding that replay of a videotaped witness statement or testimony "must be conducted in open court, under the careful supervision of the trial judge" to address concerns that a particular segment will be overemphasized or viewed out of context); *State v. Miller*, 13 A.3d 873, 881 (N.J. 2011) (holding that video playbacks should take place in open court with all parties present); *State v. Morgensen*, 197 P.3d 715, 718–19 (Wash. Ct. App. 2008) (finding that the trial court took proper precautions prior to playing audiotape of testimony in open court to the deliberating jury in part by cautioning the parties "not to make expressions of any kind during the playing of the tape"); *State v. Hughes*, 691 S.E.2d 813, 826–27 (W. Va. 2010) (surveying cases and finding it is "universally accepted" that a trial court may allow the jury, while deliberating, to return to open court to review a tape recording admitted into evidence).

We hold that during jury deliberations, when a jury requests to view or hear evidence that cannot be appropriately examined in the jury room, the trial court should

bring the jury into the courtroom with the parties and counsel present to view the evidence. The trial court, in its discretion, may allow members of the public to remain in the courtroom or may conduct the viewing with only counsel and the parties present. The trial court should instruct the jury that it is not to deliberate in the courtroom and should admonish the parties, counsel, and any spectators not to comment on the evidence or in any manner attempt to influence the jury.

Here, the trial court did not abuse its discretion by allowing the jury to view the recorded statement in the courtroom. There is no evidence that the jury deliberated in open court, that the jury was exposed to any outside influence, or that the public interfered with the secretive deliberative process. The jury's request to adjust the video to zoom in on Mr. Davidson and to increase the volume and the note from the jury that it had seen enough of the video did not constitute jury deliberations. The trial court did not abuse its discretion by allowing the jury to view the video recorded statement in the courtroom with members of the public present.

### Admissibility of Expert Testimony

*Ballistics*

Mr. Davidson argues that the trial court abused its discretion by admitting ballistics evidence through the testimony of Knoxville Police Department Firearms Examiner Patricia M. Resig. Mr. Davidson's argument is two-fold: the evidence was not relevant under Tennessee Rules of Evidence 401 and 403, and as scientific testimony under Tennessee Rules of Evidence 702 and 703, it failed to satisfy the factors required for admissibility under *McDaniel v. CSX Transportation, Inc.*, 955 S.W.2d 257, 265 (Tenn. 1997). In response, the State argues Ms. Resig's testimony was relevant under Rules 401 and 403 and her testimony was admissible based on the *McDaniel* factors and Rules 702 and 703. The Court of Criminal Appeals held that the trial court had not abused its discretion by admitting the ballistics evidence. *Davidson*, 2015 WL 1087126, at *33.

At the pretrial hearing on Mr. Davidson's motion in limine, Ms. Resig testified she has a Bachelor of Science degree in nursing, a Bachelor of Arts degree in anthropology, and two years of intensive training in firearm and tool mark examination from the Florida Department of Law Enforcement. She has worked as a Knoxville Police Department firearms examiner for ten years and has made 600 to 700 comparisons yearly. The Knoxville Police Department is accredited by the Commission on Accreditation for Law Enforcement Agencies, which establishes and administers an accreditation process specifically for law enforcement agencies. Ms. Resig is not certified by the Association of Firearm and Tool Mark Examiners, and the Knoxville Police Department is not accredited by the American Society of Crime Laboratory Directors. Ms. Resig had

previously been qualified as an expert in firearms examination and testified as an expert witness regarding ballistics.[6] On this record, we agree with the trial court that Ms. Resig was qualified to testify as an expert witness.

Ms. Resig explained that her process for examining firearms involves a comparative analysis of bullets to bullets, cartridge cases to cartridge cases, or bullets and cartridge cases to those that have been test-fired. Ms. Resig testified that she looks at firearms class characteristics, including caliber, the number and measurement of rifling marks called lands and grooves, and the direction of twists. Ms. Resig then examines the individual characteristics of the bullet or cartridge case being compared, such as firing pin impressions, breech face marks, and location and shape of extractor and ejector marks. The result of her analysis is either an identification or an elimination, or the result is inconclusive. When determining whether a bullet was discharged from a particular firearm, Ms. Resig compares it to a bullet test-fired from the same weapon. If the bullets have different class characteristics, the finding is elimination. If they have shared class characteristics, she compares the individual characteristics, such as unintentional imperfections, irregularities of tool surfaces used to make the gun, the barrel, or the breech face. Ms. Resig testified, "It's like a fingerprint," and uniqueness may result from use, abuse, corrosion, and erosion. Ms. Resig stated that sufficient agreement of individual characteristics allows her to make a positive identification.

---

[6] *See, e.g.*, *State v. Brown*, No. E2015-00899-CCA-R3-CD, 2016 WL 3633474, at *4 (Tenn. Crim. App. June 29, 2016); *State v. Jackson*, No. E2014-01387-CCA-R3-CD, 2015 WL 6756318, at *3 (Tenn. Crim. App. Nov. 5, 2015), *perm. app. denied* (Tenn. May 5, 2016); *State v. Campbell*, No. E2014-00697-CCA-R3-CD, 2015 WL 6155893, at *4 (Tenn. Crim. App. Oct. 20, 2015), *perm. app. denied* (Tenn. Apr. 6, 2016), *petition for cert. docketed*, No. 16-5256 (U.S. July 19, 2016); *State v. Keith*, No. E2014-00448-CCA-R3-CD, 2015 WL 4366575, at *4 (Tenn. Crim. App. July 16, 2015), *perm. app. denied* (Tenn. Jan. 14, 2016); *State v. Harris*, No. E2014-00822-CCA-R3-CD, 2015 WL 871740, at *5 (Tenn. Crim. App. Feb. 28, 2015), *perm. app. denied* (Tenn. May 14, 2015); *State v. Smith*, No. E2013-00215-CCA-R3-CD, 2014 WL 4215882, at *14 (Tenn. Crim. App. Aug. 27, 2014), *perm. app. denied* (Tenn. Jan. 16, 2015); *State v. James*, No. E2012-01912-CCA-R3-CD, 2013 WL 4680205, at *12 (Tenn. Crim. App. Aug. 29, 2013); *State v. Goodman*, No. E2011-02044-CCA-R3-CD, 2012 WL 6633845, at *4 (Tenn. Crim. App. Dec. 20, 2012); *State v. Smith*, No. E2010-00549-CCA-R3-CD, 2011 WL 5517646, at *3 (Tenn. Crim. App. Nov. 14, 2011); *State v. Echols*, No. E2009-01697-CCA-R3-CD, 2011 WL 2418737, at *2 (Tenn. Crim. App. June 14, 2011), *aff'd*, 382 S.W.3d 266 (Tenn. 2012); *State v. McLean*, No. E2009-00221-CCA-R3-CD, 2010 WL 4323029, at *2 (Tenn. Crim. App. Oct. 29, 2010); *State v. Nolan*, No. E2008-02762-CCA-R3-CD, 2009 WL 5083496, at *5 (Tenn. Crim. App. Dec. 28, 2009); *State v. Foster*, No. E2007-01585-CCA-R3-CD, 2009 WL 3335580, at *7 (Tenn. Crim. App. Oct. 16, 2009); *State v. Burnett*, No. E2007-01788-CCA-R3-CD, 2008 WL 4613531, at *2 (Tenn. Crim. App. Oct. 1, 2008); *State v. Mattress*, No. E2006-00862-CCA-R3-CD, 2007 WL 2325352, at *5 (Tenn. Crim. App. Aug. 16, 2007); *State v. Mobley*, No. E2006-00469-CCA-R3-CD, 2007 WL 1670195, at *4 (Tenn. Crim. App. June 11, 2007); *State v. Thompson*, No. E2003-00569-CCA-R3-CD, 2004 WL 1592817, at *3 (Tenn. Crim. App. July 16, 2004).

Ms. Resig examined a .22 caliber High Standard Model Sentinel revolver, a .22 caliber Clerke revolver, six .22 caliber long-rifle Remington cartridges, a .30 M1 caliber Universal semi-automatic Carbine with a detachable magazine, two .22 caliber Remington test-fired cartridges, and three .22 caliber bullets removed from Chris's body. The High Standard revolver was found with Mr. Davidson when he was arrested, the Clerke revolver was found in a box under a bed at Ms. Hays's house after Mr. Cobbins was arrested, and the Carbine and .22 cartridges were found in Mr. Davidson's house when it was searched.

Ms. Resig test fired each of the revolvers and compared the test-fired bullets to the two bullets removed from Chris's neck and back. The bullet that was taken from his skull was damaged and could not be compared. She concluded that the bullets removed from Chris's neck and back were fired from the same weapon.

Ms. Resig compared the test-fired bullets from the High Standard and Clerke revolvers with two bullets recovered from Chris's body. The bullets from the High Standard shared similar class characteristics, but there was a lack of agreement or disagreement of the individual characteristics such that she could not be 100 percent certain they were fired from the High Standard revolver. The similar class characteristics indicated the bullets could have been fired by the High Standard revolver and other revolvers made by several manufacturers, including FIE, High Standard, Regent, Rossie, Smith & Wesson, and Taurus. Ms. Resig's analysis showed that the six cartridge cases found at Mr. Davidson's house were fired from the High Standard revolver. The test-fired bullets from the Clerke revolver and the bullets removed from Chris's body shared class characteristics, but there was significant disagreement of the individual characteristics such that she excluded the Clerke revolver as the murder weapon.

The trial court admitted Ms. Resig's testimony under Tennessee Rules of Evidence 401 and 403, finding her testimony relevant and its probative value not substantially outweighed by the danger of unfair prejudice or jury confusion. The trial court further concluded that Ms. Resig's testimony satisfied the *McDaniel* factors. The Court of Criminal Appeals affirmed the trial court's decision, finding no abuse of discretion. *Davidson*, 2015 WL 1087126, at *33.

We first consider Mr. Davidson's challenge to the relevancy of Ms. Resig's testimony. Tennessee Rule of Evidence 401 defines "relevant evidence" as "evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." Tenn. R. Evid. 401. In general, relevant evidence is admissible, and irrelevant evidence is inadmissible. Tenn. R. Evid. 402. The court may, however, exclude relevant evidence if its "probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue

delay, waste of time, or needless presentation of cumulative evidence." Tenn. R. Evid. 403. Prejudicial evidence is not excluded as a matter of law under Rule 403. The court must still determine the relevance of the evidence and weigh its probative value against any undue prejudice. *State v. Reid*, 164 S.W.3d 286, 330 (Tenn. 2005) (citing *Carruthers*, 35 S.W.3d at 577).

The plain language of these rules "strongly suggests that when the balance between the evidence's probative value and any prejudicial effect is close, the evidence should be admitted." *White v. Beeks*, 469 S.W.3d 517, 528 (Tenn. 2015), *as revised on denial of reh'g* (Aug. 26, 2015) (quoting *Goodale v. Langenberg*, 243 S.W.3d 575, 587 (Tenn. Ct. App. 2007)). Excluding relevant evidence under Rule 403 is an "extraordinary step that should be used sparingly." *Id.* at 528 (quoting *Levine v. March*, 266 S.W.3d 426, 439 (Tenn. Ct. App. 2007)). Under these rules, trial courts possess the inherent authority to exclude any evidence that would "threaten the fairness of the trial process." *State v. Sexton*, 368 S.W.3d 371, 408 (Tenn. 2012), *as corrected* (Oct. 10, 2012) (citing Neil P. Cohen et al., *Tennessee Law of Evidence* § 8.01[3][a], at 4–60 (5th ed. 2005)).

We review a trial court's decision to admit evidence under an abuse of discretion standard. *State v. Bell*, No. W2012-02017-SC-DDT-DD, 2015 WL 12582638, at *15 (Tenn. Sept. 10, 2015), *cert. denied*, 136 S. Ct. 2006 (2016) (citing *State v. Banks*, 271 S.W.3d 90, 116 (Tenn. 2008)). A decision to admit evidence will be reversed only when the court applied an incorrect legal standard, reached an illogical conclusion, or based its decision on a clearly erroneous assessment of the evidence or employs reasoning that causes an injustice to the party complaining. *Bell*, 480 S.W.3d at 508 (citing *Banks*, 271 S.W.3d at 116).

Mr. Davidson argues this ballistics evidence was not relevant because it did not assist the trier of fact in determining whether the High Standard revolver was used in the commission of crimes and any probative value was substantially outweighed by the likelihood of unduly prejudicing, misleading, or confusing the jury. Although Ms. Resig could not state with certainty that the High Standard revolver was the murder weapon, she testified that it shared common class characteristics with the bullets found in Chris's body and therefore could have been used to fire the bullets. Mr. Davidson argues this testimony does not assist the trier of fact because thousands of guns made by different manufacturers could have fired bullets with similar class characteristics to those test-fired from the High Standard revolver. Mr. Davidson argues that the cartridge casings were found at his house, not where Chris's body was found, and therefore, this evidence was not probative.

We conclude that the trial court did not abuse its discretion in allowing Ms. Resig to testify. Her testimony, while not highly probative, was sufficiently probative on whether the bullets found in Chris's body were fired from Mr. Davidson's High Standard

revolver and thus material to the issue of Mr. Davidson's guilt or innocence. The jury could infer from Ms. Resig's testimony that the High Standard revolver was the weapon used to shoot Chris because test bullets and the bullets from Chris's body shared class characteristics and that the cartridge cases found in Mr. Davidson's house were associated with the murder. It was up to the jury to decide how much weight to give this testimony. Mr. Davidson's counsel effectively cross-examined Ms. Resig and had the option of calling his own expert ballistics witness. Under these circumstances, the trial court did not err by admitting the evidence.

Mr. Davidson also argues that Ms. Resig's testimony was inadmissible under Rules 702 and 703 because it failed to comply with the *McDaniel* factors. The trial court, after considering the *McDaniel* factors, determined Ms. Resig's testimony was admissible. We agree.

The admissibility of expert testimony is governed by Tennessee Rules of Evidence 702 and 703. Rule 702 addresses when expert testimony is needed and the expert's qualifications.[7] Rule 703 focuses on reliability of expert testimony.[8] In *McDaniel*, this Court identified five nonexclusive factors courts are to consider in assessing the reliability of expert testimony:

> (1) whether scientific evidence has been tested and the methodology with which it has been tested; (2) whether the evidence has been subjected to peer review or publication; (3) whether the potential rate of error is known; (4) whether . . . the evidence is generally accepted in the scientific community; and (5) whether the expert's research in the field has been conducted independent of litigation.

---

[7] Rule 702 provides: "If scientific, technical, or other specialized knowledge will substantially assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise." Tenn. R. Evid. 702.

[8] Rule 703 provides:

> The facts or data in the particular case upon which an expert bases an opinion or inference may be those perceived by or made known to the expert at or before the hearing. . . . Facts or data that are otherwise inadmissible shall not be disclosed to the jury by the proponent of the opinion or inference unless the court determines that their probative value in assisting the jury to evaluate the expert's opinion substantially outweighs their prejudicial effect. The court shall disallow testimony in the form of an opinion or inference if the underlying facts or data indicate lack of trustworthiness.

Tenn. R. Evid. 703.

*McDaniel*, 955 S.W.2d at 265. These factors are not requirements for admissibility but may be considered by the trial judge when weighing the reliability of the expert testimony and forensic evidence. A court "must assure itself that the [expert's] opinions are based on relevant scientific methods, processes, and data, and not upon an expert's mere speculation." *Id.* Instead of a rigid application of the *McDaniel* factors, their application in assessing reliability depends upon the nature of the issue, the witness's particular expertise, and the subject of the expert's testimony. *Brown v. Crown Equip. Corp.*, 181 S.W.3d 268, 277 (Tenn. 2005) (citing *State v. Stevens*, 78 S.W.3d 817, 833 (Tenn. 2002); *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 150 (1999)); *State v. Scott*, 275 S.W.3d 395, 402 (Tenn. 2009).

Determinations regarding the qualifications, admissibility, relevance, and competence of expert testimony fall within the broad discretion of the trial court and will be overturned only for an arbitrary exercise or abuse of that discretion. *McDaniel*, 955 S.W.2d at 263–64; *Scott*, 275 S.W.3d at 404 (citing *State v. Reid*, 91 S.W. 247, 294 (Tenn. 2002); *Stevens*, 78 S.W.3d at 832). A trial court abuses its discretion if it applies an incorrect legal standard or reaches an illogical or unreasonable decision that results in injustice to the complaining party. *Stevens*, 78 S.W.3d at 832 (quoting *State v. Shuck*, 953 S.W.2d 662, 669 (Tenn. 1997)). When assessing the admissibility of expert testimony, the trial court must first determine whether the witness is qualified by knowledge, skill, experience, training, or education to express an opinion within the limits of his or her expertise. *Scott*, 275 S.W.3d at 402 (citing *Stevens*, 78 S.W.3d at 834). The determinative factor is whether the witness's qualifications authorize him or her to give an informed opinion on the subject. *Stevens*, 78 S.W.3d at 834.

On the first *McDaniel* factor regarding the validity of the methodology, Mr. Davidson argues that the methodology underlying ballistics evidence is unreliable. Relying again on a 2009 publication by the National Research Council, Mr. Davidson contends ballistics testing to match a firearm to a particular bullet fired is unsupported by science. Ms. Resig testified that firearms examination has been subject to scientific review and repeated testing. She testified that "there is an extensive body of research extending back over probably 100 years which establishes the accuracy, the reliability, and validity of conclusions rendered in the field of firearm and tool mark . . . examination." While the National Research Council publication may suggest more research is needed in the field of ballistics, particularly for identification based on individualized characteristics, Mr. Davidson has not demonstrated that the methodology or science underlying ballistics evidence is unreliable.

On the second *McDaniel* factor regarding peer testing or publication, Ms. Resig referenced studies from the Association of Firearm and Tool Mark Examiners Journal, a scientific peer review journal published four times a year. As for her particular findings, Ms. Resig testified that she submitted the evidence to Special Agent Don Carmas of the

Tennessee Bureau of Investigation for forensic consultation and verification of evidence, who concurred with Ms. Resig's findings after examining the evidence and reviewing Ms. Resig's report.

Regarding the third *McDaniel* factor, which concerns the rate of error, Ms. Resig referred to data from a collaborative testing service for the years of 1978 through 1997 and for 1998 through 2002. She testified that the percentage of false identifications for firearms was .9 percent and .1 percent. Upon cross-examination, Ms. Resig testified that a study from 1978 through 1991 resulted in an error rate of 12 percent for firearms and 26 percent for tool marks when inconclusive results were included; however, she opined that the error rate is "much less" when inconclusive results are omitted and only incorrect responses are considered. Ms. Resig further cited to a study that provided a 1.4 percent error rate for firearms.[9]

On the fourth *McDaniel* factor regarding the general acceptance in the scientific community, Ms. Resig testified that ballistics evidence has been relied upon for about one hundred years and is generally accepted in the scientific community.

On the fifth *McDaniel* factor regarding whether the research was independent of litigation, Ms. Resig testified that she conducted the testing in her employment with the Knoxville Police Department, independently of litigation. The trial court found that Ms. Resig's testimony strongly supported the admissibility of the ballistics evidence, and a report prepared by a defense expert would go to the weight of Ms. Resig's testimony.

We conclude that the trial court did not abuse its discretion in admitting Ms. Resig's expert testimony under Rules 402 and 702 of the Tennessee Rules of Evidence. Ms. Resig was qualified to testify as an expert witness; the evidence was relevant and, under the *McDaniel* factors, was properly admitted.

*Fingerprints*

Mr. Davidson argues that the trial court abused its discretion by admitting fingerprint identification evidence through the testimony of Knoxville Police Department Senior Evidence Technicians Daniel Crenshaw and Tim Schade. Mr. Davidson filed a motion in limine to exclude their testimony, asserting that the ACE-V[10] methodology of

---

[9] In its written order, the trial court summarized this testimony as follows: "When questioned about whether a potential rate of error is known, she testified that proficiency testing facilities establish that it is approximately .9%."

[10] ACE-V is an acronym for "analysis, comparison, evaluation, and verification."

fingerprint analysis was inherently unreliable and lacked scientific validity. Mr. Davidson argues that fingerprint examination is the subject of considerable debate within the forensic science community, and fingerprint analysis has not been subjected to sufficient testing and peer review. Mr. Davidson contends the ACE-V methodology is heavily reliant on subjective assessments, it is not subject to verifiable review, and its verification process is flawed. He argues that the error rate for latent fingerprint analysis is unknown, and the experts' analysis was conducted during criminal prosecution and therefore not outside the context of litigation. The State argues the trial court properly considered all of these factors and did not abuse its discretion by admitting the expert testimony of Mr. Crenshaw and Mr. Schade. The Court of Criminal Appeals held that the trial court did not abuse its discretion in admitting the expert testimony of Mr. Crenshaw and Mr. Schade. *Davidson*, 2015 WL 1087126, at *59.

We analyze this issue using the same standards discussed above for the *McDaniel* factors and Tennessee Rules of Evidence 702 and 703. At the pretrial hearing on the motion in limine, Mr. Schade testified that he has college degrees in criminal justice and political science and a master's degree in public administration. He attended the Federal Bureau of Investigation fingerprint school for beginning and advanced training and participated in a forty-hour ridgeology class. Since 1998, he has been certified as a latent fingerprint examiner through the International Association for Identification and recertified twice since his initial certification. Mr. Schade testified that a fingerprint examiner can lose his certificate due to a misidentification. Mr. Schade has regularly taught a course on fingerprint identification at the National Forensic Academy and previously testified as an expert witness in state and federal courts.[11] Mr. Crenshaw testified he has worked for the Knoxville Police Department for sixteen years. He received fingerprint training and worked for six years as a fingerprint examiner with the Federal Bureau of Investigation. He is certified by the International Association of Identification. Mr. Crenshaw estimated that he has examined and identified roughly 10,000 fingerprints. He has also previously testified as an expert witness in other cases.[12]

---

[11] *See, e.g.*, *United States v. Hatcher*, 513 F. App'x 581, 584 (6th Cir. 2013); *State v. Keith*, 2015 WL 4366575, at *4; *State v. Johnson*, No. E2013-02356-CCA-R3-CD, 2015 WL 913657, at *4 (Tenn. Crim. App. Mar. 2, 2015), *perm. app. denied* (Tenn. June 11, 2015); *State v. Foust*, 482 S.W.3d 20, 29 (Tenn. Crim. App. 2015); *State v. Gray*, No. E2010-00637-CCA-R3-CD, 2012 WL 2870264, at *2 (Tenn. Crim. App. July 13, 2012), *rev'd on other grounds*, No. E2014-00849-CCA-R3-PC, 2015 WL 2257191 (Tenn. Crim. App. May 13, 2015); *Taylor v. State*, No. E2006-02555-CCA-R3-PC, 2007 WL 3332847, at *3 (Tenn. Crim. App. Nov. 9, 2007); *State v. Pierce*, No. E2001-00437-CCA-R3-CD, 2002 WL 523453, at *2 (Tenn. Crim. App. Apr. 9, 2002.

[12] *See, e.g.*, *Echols*, 2011 WL 2418737, at *2; *State v. Williams*, No. E2002-00325-CCA-R3-CD, 2003 WL 22462533, at *2 (Tenn. Crim. App. Oct. 31, 2003); *State v. Wyrick*, 62 S.W.3d 751, 760 (Tenn. Crim. App. 2001); *State v. Poole*, No. 03C01-9802-CR-00060, 1998 WL 784252, at *2 (Tenn. Crim. App. Nov. 5, 1998).

We agree with the trial court that Mr. Schade and Mr. Crenshaw were qualified to testify as experts in fingerprint analysis.

Next, the trial court had to determine whether the expert testimony was reliable and relevant. *See Kumho Tire*, 526 U.S. at 152. This included an analysis of the basis for the witness's opinion, i.e., testing, research, studies, or experience-based observations, and whether it adequately supported the expert's conclusions, to ensure there was not a significant analytical gap between the expert's opinion and the data upon which the opinion was based. *Scott*, 275 S.W.3d 402–03 (quoting *Stevens*, 78 S.W.3d 834–35). At issue was the methodological and foundational reliability of the expert's testimony. *Id.* at 401–03. The first step in this process is an assessment of the expert's field or discipline by focusing on the reliability of the studies, articles, and data that compose the field and provide the underlying foundation for the expert's testimony. *Id.* The second step is an analysis of the reliability of the underlying facts or data upon which the expert's opinion is predicated. *Id.* Tennessee Rule of Evidence 703, unlike the comparable federal rule, provides that "[t]he court shall disallow testimony in the form of an opinion or inference if the underlying facts or data indicate lack of trustworthiness." Tenn. R. Evid. 703. In this respect, our rule expresses a greater concern with the bases of expert testimony than does Rule 703 of the Federal Rules of Evidence. *Shuck*, 953 S.W.2d at 668 (Tenn. 1997) (citing *McDaniel*, 955 S.W.2d at 264; *Omni Aviation v. Perry*, 807 S.W.2d 276 (Tenn. Ct. App. 1990)).

Mr. Schade detailed the ACE-V methodology and the process by which Mr. Davidson's fingerprints were matched to various pieces of evidence linking him to the crimes. Mr. Schade explained that the first step is to digitize an image of the latent print and to mark the details for a comparison with prints in the Tennessee Bureau of Investigation's Automated Fingerprint Identification system. Mr. Schade testified that the analysis portion of fingerprint identification required the examination of "three levels of detail." Level one concerns only the flow of ridges as they go through fingers and palms; level two comprises bifurcations and closures, dots, islands, and the like; level three entails ridgeology, which includes examination of the width of the ridges, the flow of the ridges, how ridges go around each other, and pores. The comparison and evaluation stages involve visual analysis to determine whether the fingerprints match. The last step is verification of the identification by a second person. Mr. Schade and Mr. Crenshaw verified each other's fingerprint identifications.

Mr. Davidson makes several arguments regarding the lack of reliability of fingerprint identification. As we review this issue, we consider the *McDaniel* factors but do not apply them rigidly, as not all factors are relevant here. Under Tennessee Rule of Evidence 702, expert evidence is not limited to "scientific" evidence but instead includes technical or other specialized knowledge. Tenn. R. Evid. 702; *see also Kumho Tire*, 526 U.S. at 141; *Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579, 589–90 (1993). Mr.

Davidson challenges the general area of and methodology behind fingerprint evidence. Citing excerpts from a 2009 study published by the National Research Council, "Strengthening Forensic Science in the United States: A Path Forward," Mr. Davidson argues that the ACE-V methodology requires the subjective assessment by the examiner and "does not guard against bias; is too broad to ensure repeatability and transparency; and does not guarantee that two analysts following it will obtain the same result." According to the study, the ACE-V framework has not been sufficiently tested and is not a validated method for friction ridge analysis. We disagree.

While there may be disagreement among experts in the field, this does not establish the inherent unreliability of the ACE-V methodology that would render fingerprint evidence inadmissible. This method of fingerprint identification has been widely accepted by courts. *See* Andre A. Moenssens, *Fingerprint Identification: A Valid, Reliable "Forensic Science"?*, 18-SUM Crim. Just. 30, 33 (2003); *see also Hatcher*, 513 F. App'x at 584; *United States v. Watkins*, 450 F. App'x 511, 516 (6th Cir. 2011); *United States v. Scott*, 403 F. App'x 392, 398 (11th Cir. 2010); *United States v. Mahone*, 453 F.3d 68, 72 (1st Cir. 2006); *United States v. Sullivan*, 246 F. Supp. 2d 700, 704 (E.D. Ky. 2003); *Jarnigan v. State*, 761 S.E.2d 256, 260–61 (Ga. 2014); *People v. Luna*, 989 N.E.2d 655, 679 (Ill. App. Ct. 2013); *Burnett v. State*, 815 N.E.2d 201, 208–09 (Ind. Ct. App. 2004); *Markham v. State*, 984 A.2d 262, 276 (Md. 2009); *Commonwealth v. Gambora*, 933 N.E.2d 50, 59 (Mass. 2010); *State v. Langill*, 945 A.2d 1, 12 (N.H. 2008); *State v. Leonard*, 736 S.E.2d 647 (N.C. Ct. App. 2013); *State v. Woodard*, 330 P.3d 1283, 1288–89 (Utah Ct. App. 2014).

Our Court of Criminal Appeals has not examined the ACE-V methodology but has held fingerprint evidence to be admissible. *See, e.g.*, *State v. Pugh*, No. W2011-02496-CCA-R3-CD, 2012 WL 5381375, at *7 (Tenn. Crim. App. Nov. 2, 2012); *Gray*, 2012 WL 2870264, at *6; *State v. Toomes*, 191 S.W.3d 122, 131 (Tenn. Crim. App. 2005); *Rutherford v. State*, No. E1999-00932-CCA-R3-PC, 2000 WL 246411, at *15 (Tenn. Crim. App. Mar. 6, 2000); *State v. Evans*, 669 S.W.2d 708, 710 (Tenn. Crim. App. 1984).

The trial court properly considered the *McDaniel* factors in finding that the expert evidence was sufficiently reliable to be admissible. Mr. Davidson's counsel effectively cross-examined Mr. Schade and Mr. Crenshaw and had the opportunity to present expert testimony for the defense. We hold the trial court did not abuse its discretion in allowing Mr. Schade and Mr. Crenshaw to testify as experts in fingerprint analysis and identification.

**Sufficiency of the Evidence**

Mr. Davidson challenges the sufficiency of the evidence to support his convictions. Mr. Davidson points to no specific facts but argues generally that the evidence did not establish the elements of the offenses beyond a reasonable doubt. The Court of Criminal Appeals concluded that the evidence was sufficient. *Davidson*, 2015 WL 1087126, at *41. Tennessee Rule of Appellate Procedure 13(e) provides that "[f]indings of guilt in criminal actions . . . shall be set aside if the evidence is insufficient to support the finding by the trier of fact of guilt beyond a reasonable doubt." When assessing whether there is sufficient evidence to support a criminal conviction, a jury's verdict of guilt removes the presumption of innocence and replaces it with a presumption of guilt. *State v. Wilson*, 211 S.W.3d 714, 718 (Tenn. 2007); *Scarborough*, 201 S.W.3d at 624. A defendant must demonstrate that the evidence is not sufficient to sustain a guilty verdict. *State v. Dotson*, 254 S.W.3d 378, 395 (Tenn. 2008) (citing *State v. Evans*, 838 S.W.2d 185, 191 (Tenn. 1992)); *State v. Campbell*, 245 S.W.3d 331, 335 (Tenn. 2008) (citing *Evans*, 838 S.W.2d at 191).

When reviewing the evidence in a criminal case, appellate courts must afford the State the strongest legitimate view of the evidence and give the State the benefit of all reasonable inferences that may be drawn therefrom. *Willis*, 496 S.W.3d at 686; *State v. McGouey*, 229 S.W.3d 668, 671 (Tenn. 2007) (citing *Carruthers*, 35 S.W.3d at 558). The jury is entrusted with the responsibility of determining the weight and credibility to be given to witnesses' testimony and reconciling conflicts in the testimony. *Campbell*, 245 S.W.3d at 335 (citing *Byrge v. State*, 575 S.W.2d 292, 295 (Tenn. Crim. App. 1978)); *State v. Langford*, 994 S.W.2d 126, 127 (Tenn. 1999). With this framework in mind, the ultimate question for an appellate court "is whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319 (1979) (alteration in original); *see also Dotson*, 254 S.W.3d at 395 (citations omitted); *Campbell*, 245 S.W.3d at 335; *State v. Berry*, 141 S.W.3d 549, 564 (Tenn. 2004).

*Premeditated First Degree Murder Convictions*

Mr. Davidson was convicted of first degree murder for the premeditated killing of Chris and first degree murder for the premeditated killing of Channon. Under Tennessee Code Annotated section 39-13-202(a)(1), first degree murder includes the "premeditated and intentional killing of another."

"Premeditation" is defined as an "act done after the exercise of reflection and judgment." *Id.* § 39-13-202(d). The statute provides that premeditation

means that the intent to kill must have been formed prior to the act itself. It is not necessary that the purpose to kill pre-exist in the mind of the accused for any definite period of time. The mental state of the accused at the time the accused allegedly decided to kill must be carefully considered in order to determine whether the accused was sufficiently free from excitement and passion as to be capable of premeditation.

*Id.* "Premeditation may be inferred from the manner and circumstances of the killing." *Finch v. State*, 226 S.W.3d 307, 318 (Tenn. 2007) (citing *State v. Bland*, 958 S.W.2d 651, 660 (Tenn. 1997)). Tennessee courts have identified a number of factors that tend to demonstrate a homicide was premeditated. These factors include, but are not limited to: (1) the use of a deadly weapon to kill an unarmed victim; (2) the procurement of weapons used to commit a murder; (3) declarations of intent to kill the victim; (4) preparations for the concealment of a crime; (5) lack of provocation by the victim; (6) failure to provide aid or assistance to the victim; and (7) calmness after the killing. *State v. Brooks*, 249 S.W.3d 323, 329 (Tenn. 2008).

First degree murder also includes felony murder, which is defined as the "killing of another committed in the perpetration of . . . any first degree murder, . . . rape, robbery, . . . theft, [or] kidnapping." Tenn. Code Ann. § 39-13-202(a)(2). To come within the definition of felony murder, a killing must have been "done in pursuance of the unlawful act, and not collateral to it." *State v. Rice*, 184 S.W.3d 646, 663 (Tenn. 2006) (quoting *Farmer v. State*, 296 S.W.2d 879, 883 (Tenn. 1956)) (internal quotation marks omitted). In other words, "[t]he killing must have had an intimate relation and close connection with the felony . . . and not be separate, distinct, and independent from it." *Id.* at 663 (quoting *Farmer*, 296 S.W.2d at 883). "The killing may precede, coincide with, or follow the felony and still be considered as occurring in the perpetration of the felony offense, so long as there is a connection in time, place, and continuity of action." *State v. Thacker*, 164 S.W.3d 208, 223 (Tenn. 2005) (quoting *State v. Buggs*, 995 S.W.2d 102, 106 (Tenn. 1999)) (internal quotation marks omitted). The defendant must have the intent to commit the underlying felony either before or concurrent with the act causing the victim's death. *Id.* at 223. The defendant's actions immediately after the killing can provide a basis from which the jury may reasonably infer that the defendant, either prior to or concurrent with committing the act that caused the victim's death, had an intent to commit the underlying felony. *Id.* (quoting *Buggs*, 995 S.W.2d at 108).

"A person is criminally responsible as a party to an offense, if the offense is committed by the person's own conduct, by the conduct of another for which the person is criminally responsible, or by both." Tenn. Code Ann. § 39-11-401(a). Criminal responsibility for the actions of another arises when the defendant, "[a]cting with intent to promote or assist the commission of the offense, or to benefit in the proceeds or results of the offense, . . . solicits, directs, aids, or attempts to aid another person to commit the

offense." *Id.* § 39-11-402(2); *see also State v. Lemacks*, 996 S.W.2d 166, 170 (Tenn. 1999) ("As reflected in this case, criminal responsibility is not a separate, distinct crime. It is solely a theory by which the State may prove the defendant's guilt of the alleged offense . . . based upon the conduct of another person."). Furthermore, "[a] person is criminally responsible for the facilitation of a felony, if, knowing that another intends to commit a specific felony, but without the intent required for criminal responsibility under [section] 39-11-402(2), the person knowingly furnishes substantial assistance in the commission of the felony." Tenn. Code Ann. § 39-11-403(a).

Mr. Davidson and his accomplices, using guns, kidnapped Chris and Channon and stole Channon's vehicle. They tied Chris's and Channon's hands behind their backs and stole money and personal items. After raping Chris, Mr. Davidson and his accomplices forced Chris to walk without shoes, socks, or pants on a January night to a desolate area beside a set of train tracks. They bound his feet with his belt. They blindfolded Chris, stuck a sock in his mouth and secured it with a shoelace, and wrapped a hooded sweatshirt around his head. They shot him three times and killed him. Two of the bullets removed from Chris's body were shot from the same gun and shared class characteristics with the High Standard revolver Mr. Davidson had in his possession when he was arrested. To hide the evidence of the murder, they wrapped Chris's body in a comforter, poured gasoline on him, and set his body on fire. Afterwards, Mr. Davidson was seen wearing Chris's shoes. Within an hour of the murder, Mr. Davidson tried to contact his girlfriend by using Chris's cell phone.

After killing Chris, Mr. Davidson and his friends returned to Mr. Davidson's house where they beat and repeatedly raped Channon. Abusing her for many hours, they then tied her into a fetal position, secured a plastic bag tightly over her head, put her in five plastic garbage bags, and stuffed her in a garbage can to suffocate to death. While Channon was dying in the garbage can, Mr. Davidson left to spend time with his girlfriend. He gave Channon's clothes and personal items to his girlfriend. Mr. Davidson and his friends could have released Chris and Channon unharmed after stealing Channon's vehicle. Mr. Davidson did not know Chris and Channon and had no reason to kidnap, rape, and murder them. Chris and Channon had no defensive wounds. According to Mr. Davidson, Channon asked him if she was going to die, indicating she likely knew her fate. Viewing the facts in the light most favorable to the State, a reasonable jury could have easily found beyond a reasonable doubt that Mr. Davidson acted with premeditation when he shot Chris three times and killed him and bound Channon and stuffed her into a garbage can to die. A reasonable jury could have easily found beyond a reasonable doubt that Mr. Davidson committed these murders while also committing the crimes of kidnapping, robbery, and rape.

*Especially Aggravated Robbery Convictions*

Mr. Davidson was convicted of especially aggravated robbery of Chris and especially aggravated robbery of Channon. The record contains ample evidence to support Mr. Davidson's convictions for these crimes. The Court of Criminal Appeals concluded that the evidence presented was sufficient for a reasonable jury to conclude that the elements of especially aggravated robbery had been proven beyond a reasonable doubt. *Davidson*, 2015 WL 1087126, at *41. We agree.

Robbery "is the intentional or knowing theft of property from the person of another by violence or putting the person in fear." Tenn. Code Ann. § 39-13-401(a). Especially aggravated robbery is a robbery that is "(1) [a]ccomplished with a deadly weapon; and (2) [w]here the victim suffers serious bodily injury." *Id.* § 39-13-403(a).

At the time of the robbery, Mr. Davidson did not have a vehicle or money. His rent and his debt to Ms. Freeman were past due. Ms. Freeman, who lived in the Washington Ridge Apartments, expected Mr. Davidson to come and pay her between 10:00 p.m. and 10:30 p.m. on Saturday night, January 6. He never arrived at her apartment. Instead, Mr. Davidson and others intercepted Chris and Channon as they were leaving the Washington Ridge Apartments between 9:10 p.m. and 11:00 p.m. He and his accomplices tied them up and forced them into the back seat of Channon's vehicle. Channon's vehicle was parked in front of Mr. Davidson's house around 12:30 a.m. on Sunday morning. Mr. Davidson drove Channon's vehicle on Sunday morning and evening. The evidence shows that Mr. Davidson had a handgun, he planned to go to the Washington Ridge Apartments to pay his debt to Ms. Freeman around the time the young couple was kidnapped, and his fingerprints were found on an envelope and other items taken from Channon's vehicle. He admitted to wiping his fingerprints off the exterior of the vehicle. He admitted to driving the stolen vehicle, which was corroborated by witnesses who saw him driving it. Mr. Davidson was seen, and eventually arrested, while in possession of Chris's Nike Shox athletic shoes. Viewing the facts in the light most favorable to the State, a reasonable jury could find beyond a reasonable doubt that Mr. Davidson committed the especially aggravated robberies of Chris and Channon.

*Especially Aggravated Kidnapping Convictions*

Mr. Davidson was convicted of the especially aggravated kidnapping of Chris and the especially aggravated kidnapping of Channon. The Court of Criminal Appeals concluded that the evidence presented was sufficient for a reasonable jury to conclude that the elements of especially aggravated kidnapping had been proven beyond a reasonable doubt. *Davidson*, 2015 WL 1087126, at *41. We conclude that the record contains ample evidence to support Mr. Davidson's convictions for especially aggravated kidnapping.

Especially aggravated kidnapping is false imprisonment "[a]ccomplished with a deadly weapon or by display of any article used or fashioned to lead the victim to reasonably believe it to be a deadly weapon; . . . or . . . [w]here the victim suffers serious bodily injury." Tenn. Code Ann. § 39-13-305(a). False imprisonment is defined as the knowing removal or confinement of another unlawfully so as to interfere substantially with that person's liberty. *Id.* § 39-13-302(a).

Mr. Davidson and others forced Chris and Channon to get into Channon's vehicle at gunpoint and tied their hands behind their backs. After confining Chris against his will, Mr. Davidson killed him. Mr. Davidson and his accomplices kept Channon confined in Mr. Davidson's house from Saturday night until she died sometime between Sunday afternoon and Monday afternoon. Viewing the facts in the light most favorable to the State, a reasonable jury could find beyond a reasonable doubt that Mr. Davidson committed the especially aggravated kidnappings of Chris and Channon.

*Facilitation of Aggravated Anal Rape of Chris*

Mr. Davidson was convicted of the facilitation of aggravated anal rape of Chris. The record contains ample evidence to support Mr. Davidson's conviction. We agree with the Court of Criminal Appeals that the evidence presented was sufficient for a reasonable jury to conclude that the elements of facilitation of aggravated anal rape had been proven beyond a reasonable doubt. *See Davidson*, 2015 WL 1087126, at *41.

Aggravated rape is the

> unlawful sexual penetration of a victim by the defendant . . . accompanied by any of the following circumstances: (1) Force . . . is used to accomplish the act and the defendant is armed with a weapon . . . (2) The defendant causes bodily injury to the victim; (3) The defendant is aided or abetted by one (1) or more other persons; and (A) Force . . . is used to accomplish the act; or (B) The defendant knows or has reason to know that the victim is . . . physically helpless.

Tenn. Code Ann. § 39-13-502(a). Tennessee Code Annotated section 39-13-501(7) defines "sexual penetration" as "sexual intercourse, cunnilingus, fellatio, anal intercourse, or any other intrusion, however slight, of any part of a person's body or of any object into the genital or anal openings of the victim's, the defendant's, or any other person's body, but emission of semen is not required."

A person commits the facilitation of a crime when he or she "knowing that another intends to commit a specific felony, but without the intent required for criminal responsibility under [Tennessee Code Annotated section] 39-11-402(2), the person

knowingly furnishes substantial assistance in the commission of the felony." *Id.* § 39-11-403(a).

The evidence showed that Chris had his hands tied behind his back during the carjacking. He could not defend himself against the armed perpetrators. Chris was anally raped with such force that his anus was injured. This occurred after Mr. Davidson robbed and kidnapped Chris and while he was under Mr. Davidson's control. The DNA of any semen left in Chris's anus was destroyed when his body was set on fire. Viewing the facts in the light most favorable to the State, a reasonable jury could have easily found beyond a reasonable doubt that Mr. Davidson facilitated the aggravated rape of Chris.

*Aggravated Anal, Oral, and Vaginal Rapes of Channon*

Mr. Davidson was convicted of the aggravated anal rape, the aggravated oral rape, and the aggravated vaginal rape of Channon. We agree with the Court of Criminal Appeals that the evidence presented was sufficient for a reasonable jury to conclude that the elements of aggravated anal, oral, and vaginal rape had been proven beyond a reasonable doubt. *See Davidson*, 2015 WL 1087126, at *41.

We have previously noted the elements of aggravated rape under Tennessee Code Annotated section 39-13-502(a). The evidence is sufficient to show that Mr. Davidson raped Channon in her mouth, anus, and vagina. He did so with such force that her mouth and genital/anal area were injured. The membrane connecting her lip to her gum was torn, and she had bruising and abrasions around her mouth. This was caused by an object, such as a penis, being forced into her mouth. Her vaginal/anal area suffered tremendous damage. Her vaginal area had bruises, lacerations, contusions, and swelling, and a solid blood clot had formed under the entire area. The depth and extent of her injuries were so grave, they were not caused by a "regular" rape but were instead caused by her genital area coming in contact with a blunt object. Mr. Davidson's DNA from sperm was found in Channon's vagina and anus and on her jeans. A substance containing bleach had been sprayed or poured into her mouth to remove any identifying DNA. These repeated rapes of Channon were cruel, brutal, and vicious. Viewing the facts in the light most favorable to the State, a reasonable jury could find beyond a reasonable doubt that Mr. Davidson committed the especially aggravated anal, vaginal, and oral rapes of Channon.

**Merger of Convictions**

The Court of Criminal Appeals remanded this case to the trial court for correction of clerical errors on the judgment forms regarding the merged counts, finding that the trial court failed to properly effectuate the mergers. *Davidson*, 2015 WL 1087126, at *57–58. The Court of Criminal Appeals directed the trial court to vacate the previously entered judgment forms for the merged offenses and to enter a single judgment of

conviction for first degree murder as to each victim, a single judgment of conviction for especially aggravated kidnapping of each victim, a single judgment of conviction for especially aggravated robbery of each victim, a single judgment of conviction for the aggravated anal rape of Channon, a single judgment of conviction for the aggravated oral rape of Channon, a single judgment of conviction for the aggravated vaginal rape of Channon, and a single judgment of conviction for the facilitation of aggravated rape of Chris. *Id.* at \*58. Each judgment was required to identify the jury's verdicts that were merged or subsumed into the convictions. *Id.*

Under certain circumstances, multiple convictions must merge into a single conviction. Merger is required when a jury returns guilty verdicts on two offenses, one of which is a lesser-included offense of the other offense. *See, e.g.*, *Davis*, 466 S.W.3d at 77. Merger is required when a jury returns guilty verdicts on two counts representing alternative theories of the same offense. *See, e.g.*, *State v. Cribbs*, 967 S.W.2d 773, 788 (Tenn. 1998) (citing *Carter v. State*, 958 S.W.2d 620, 624 n.6 (Tenn. 1997)). Here, the trial court did not err in merging the offenses or in effectuating the merger. Merger only requires a "single judgment of conviction." It does not require a "single judgment 'document.'" *State v. Berry*, No. W2014-00785-SC-R11-CD, Order at 3–4 (Tenn. Nov. 16, 2015).

Where merger is required, the trial court should prepare the judgment using the uniform judgment document. *See* Tenn. Sup. Ct. R. 17. The trial court "should complete a uniform judgment document *for each count*." *Berry*, Order at 5. The trial court should follow these guidelines when preparing the uniform judgment document:

> The judgment document for the greater (or surviving) conviction should reflect the jury verdict on the greater count and the sentence imposed by the trial court. The judgment document for the lesser (or merged) conviction should reflect the jury verdict on the lesser count and the sentence imposed by the trial court. Additionally, the judgment document should indicate in the "Special Conditions" box that the conviction merges with the greater conviction. To avoid confusion, the merger also should be noted in the "Special Conditions" box on the uniform judgment document for the greater or surviving conviction.

*Id.* This method "maintains the integrity of each of the jury's dual verdicts and accurately reflects the merger for purposes of appellate review and collateral challenges to the conviction." *Id.*

The Court of Criminal Appeals indicated that the trial court, by not effectuating the judgment on a single form, exposed Mr. Davidson to double jeopardy and undermined the holding in *State v. Addison*, 973 S.W.2d 260 (Tenn. Crim. App. 1997).

*Davidson*, 2015 WL 1087126, at \*58. However, effectuating merged convictions on separate uniform judgment documents reflects that the guilty verdict in the lesser or alternative charge is "not mere surplusage but remains a valid jury verdict of guilt that need not be 'dismiss[ed],['] vacat[ed],' 'or stri[cken].'" *Berry*, Order at 5 (alterations in original) (quoting *Addison*, 973 S.W.2d at 267).

The trial court prepared separate judgment documents for each of the guilty verdicts, including those verdicts for alternative charges and lesser-included offenses. This properly effectuated the necessary mergers. We vacate the portion of the Court of Criminal Appeals' judgment remanding this case to the trial court to correct the judgments of convictions.

## Mandatory Review of Death Sentence

When reviewing a first degree murder conviction and an accompanying sentence of death, we are statutorily required to review the record to determine whether

(A) The sentence of death was imposed in any arbitrary fashion;
(B) The evidence supports the jury's finding of statutory aggravating circumstance or circumstances;
(C) The evidence supports the jury's finding that the aggravating circumstance or circumstances outweigh any mitigating circumstances; and
(D) The sentence of death is excessive or disproportionate to the penalty imposed in similar cases, considering both the nature of the crime and the defendant.

Tenn. Code Ann. § 39-13-206(c)(1). The Court of Criminal Appeals found that the sentences of death were not imposed in an arbitrary fashion, proof of the aggravating circumstances was "simply overwhelming," the jury did not err by concluding that the aggravating circumstances outweighed the mitigating circumstances, and the death penalty imposed in the present case is not excessive or disproportionate to the penalty imposed in other cases. *Davidson*, 2015 WL 1087126, at \*54–57.

We have carefully reviewed the record and conclude that Mr. Davidson's sentences were not imposed in any arbitrary fashion. We have also determined that the evidence supports the jury's findings that the State proved the aggravating circumstances in Tennessee Code Annotated sections 39-13-204(i)(5), 39-13-204(i)(6), 39-13-204(i)(7), and 39-13-204(i)(13) beyond a reasonable doubt, and these aggravating circumstances outweigh the mitigating circumstances offered by Mr. Davidson. Finally, we have considered the nature of Mr. Davidson's crimes and all the evidence in the record concerning Mr. Davidson as a person and have concluded that the sentences of death

imposed by the jury are neither excessive nor disproportionate to the penalties imposed for similar offenses.

## *Arbitrariness*

The jury that imposed Mr. Davidson's sentences of death unanimously found the State proved beyond a reasonable doubt that Mr. Davidson was guilty of two counts of first degree premeditated murder, and the manner in which the murders occurred supported the application of the aggravating circumstances in Tennessee Code Annotated sections 39-13-204(i)(5), 39-13-204(i)(6), 39-13-204(i)(7), and 39-13-204(i)(13). We are satisfied from our review of the entire record that Mr. Davidson's trial was conducted in a manner that complied with all applicable statutes and rules of procedure. We hold that Mr. Davidson's death sentences were not imposed arbitrarily.

## *Evidentiary Support for the Aggravating Circumstances*

Before a death penalty can be imposed, a jury must unanimously determine that the State proved beyond a reasonable doubt one or more of the aggravating circumstances in Tennessee Code Annotated section 39-13-204(i). We must undertake this review of the evidence presented even when the defendant does not expressly challenge the sufficiency of an aggravating circumstance found by a jury. Tenn. Code Ann. § 39-13-206(c)(1)(B); *see also Reid*, 164 S.W.3d at 314. In reviewing the jury's findings, we must view the facts in the light most favorable to the State and consider whether a rational trier of fact could have found the existence of an aggravating circumstance beyond a reasonable doubt. *Id.* (citing *Terry v. State*, 46 S.W.3d 147, 160–61 (Tenn. 2001)). Here, the jury determined that the State had proved the existence of three aggravating circumstances as to the murders of Chris and Channon:

1.    Tennessee Code Annotated section 39-13-204(i)(5) ("The murder was especially heinous, atrocious, or cruel, in that it involved torture or serious physical abuse beyond that necessary to produce death.");

2.    Tennessee Code Annotated section 39-13-204(i)(6) ("The murder was committed for the purpose of avoiding, interfering with, or preventing a lawful arrest or prosecution of the defendant or another.");

3.    Tennessee Code Annotated section 39-13-204(i)(7) ("The murder was knowingly committed, solicited, directed, or aided by the defendant, while the defendant had a substantial role in committing or attempting to commit, or was fleeing after having a substantial role in committing or attempting to commit, any first degree murder, . . . rape, robbery . . . [or] kidnapping . . . .").

In addition, the jury determined that the State proved the existence of the following aggravating circumstance as to Chris's murder: Tennessee Code Annotated section 39-13-204(i)(13) ("The defendant knowingly mutilated the body of the victim after death.").

### 1. Tennessee Code Annotated section 39-13-204(i)(5)

The jury unanimously found that the State proved beyond a reasonable doubt that "[t]he murder was especially heinous, atrocious, or cruel, in that it involved torture or serious physical abuse beyond that necessary to produce death." *Id.* § 39-13-204(i)(5). The phrase "heinous, atrocious, or cruel" is a unitary concept that may be proven under either of two prongs: torture or serious physical abuse. *State v. Keen*, 31 S.W.3d 196, 209 (Tenn. 2000) (citing *State v. Van Tran*, 864 S.W.2d 465, 479 (Tenn. 1993)). "Torture" is the "infliction of severe physical or mental pain upon the victim while he or she remains alive and conscious." *State v. Pike*, 978 S.W.2d 904, 917 (Tenn. 1998) (citing *State v. Williams*, 690 S.W.2d 517, 529 (Tenn. 1985)). "Serious" alludes to a matter of degree, and the physical, rather than mental, abuse must be beyond or more than what is necessary to produce death. *State v. Suttles*, 30 S.W.3d 252, 262 (Tenn. 2000); *see also Odom*, 928 S.W.2d at 26 (defining abuse as an act that is "excessive" among other things). Jurors do not have to agree on which prong makes the murder "especially heinous, atrocious, or cruel." *Keen*, 31 S.W.3d at 208–09. As long as the proof is sufficient under either prong for finding the aggravating circumstance beyond a reasonable doubt, and all jurors agree that the aggravating circumstance is present and applicable to the case at hand, different jurors may rely upon either theory to reach their conclusion. *Id.* at 209.

The State's proof showed that Chris was robbed at gunpoint and taken against his will to a place where he was anally raped with sufficient force to injure his anus. After being raped, he was forced to walk without shoes, socks, and pants to a desolate area beside a set of train tracks. Chris was blindfolded with a bandana, his sock was forced in his mouth and tied with a shoelace, and his head wrapped in a sweatshirt. His ankles were bound by his belt and a strip of fabric, and his wrists were tied behind his back. He was shot three times—in his lower back, his neck, and his head. The trajectory of the bullet to his back indicated he was bent over when the shot was fired. The contact shot to his head was fatal. He had a hematoma in the right forehead region, indicating blunt force trauma possibly resulting from his fall to the ground after being shot. Chris had no defensive wounds because, according to the medical examiner, he could not defend himself.

The State introduced evidence that before her death, Channon was robbed, tied up, and taken to Mr. Davidson's house where she was brutally raped—orally, vaginally, and anally—by more than one assailant with such force that her anal/genital area and mouth were injured. The medical examiner explained this was not "just a rape," explaining that

some object came into contact with the genital area to inflict such serious injury; it may have been caused by someone kicking her in the genital area. She had extensive hemorrhages under her scalp, bruises on her arms, and "carpet burns" on her lower back and upper right buttock. A bleach-based cleaning liquid was sprayed into her mouth in an attempt to destroy the perpetrators' DNA. After being repeatedly forcibly raped and beaten, Channon was bound into a fetal position with her hands and feet tied, her face wrapped in a plastic bag, her body put in five plastic garbage bags, and then stuffed into a garbage can to suffocate to death.

Without question, the murders of Chris and Channon were especially heinous, atrocious, or cruel and clearly involved torture and serious physical abuse beyond that necessary to produce death. The evidence is more than sufficient to support the jury's finding of this aggravating circumstance.

### 2. Tennessee Code Annotated section 39-13-204(i)(6)

The jury unanimously found that the State proved beyond a reasonable doubt that "[t]he murder was committed for the purpose of avoiding, interfering with, or preventing a lawful arrest or prosecution of the defendant or another." Tenn. Code Ann. § 39-13-204(i)(6). This aggravating circumstance arises when one of the defendant's reasons, but not necessarily the sole reason, for killing the victim was to avoid arrest or prosecution. *State v. Ivy*, 188 S.W.3d 132, 149 (Tenn. 2006) (citing *Reid*, 164 S.W.3d at 315; *Terry*, 46 S.W.3d at 162). This can include the murder of a witness to a crime to avoid arrest or prosecution. *Banks*, 271 S.W.3d at 149 (citing *State v. Reid*, 213 S.W.3d 792, 818 (Tenn. 2006); *State v. Rollins*, 188 S.W.3d 553, 572 (Tenn. 2006); *State v. Davis*, 141 S.W.3d 600, 618–19 (Tenn. 2004)).

The State's proof showed that Chris and Channon were forcibly abducted from the Washington Ridge Apartments, robbed, and taken in Channon's vehicle to Mr. Davidson's house. Chris and Channon were witnesses to the robbery and kidnapping. Mr. Davidson was determined to avoid detection. Chris and Channon were murdered, the stolen vehicle was "wiped down" to remove fingerprints, identifying decals were removed from it, bleach was sprayed into Channon's mouth to attempt to destroy DNA, gasoline was poured on Chris's body and set on fire in an apparent attempt to hide his identity and destroy DNA, and Channon's body was hidden in a garbage can. In his statement to police, Mr. Davidson admitted he had expressed concern to Mr. Cobbins that Channon had been brought into the house after the carjacking without a blindfold and had seen them.

The evidence fully supports the conclusion that the murders of Chris and Channon were committed to avoid Mr. Davidson's arrest or prosecution for robbery and

kidnapping. The evidence is more than sufficient to support the jury's finding of this aggravating circumstance.

### 3. Tennessee Code Annotated section 39-13-204(i)(7)

The jury unanimously found that the State proved beyond a reasonable doubt that "[t]he murder was knowingly committed, solicited, directed, or aided by the defendant, while the defendant had a substantial role in committing or attempting to commit, or was fleeing after having a substantial role in committing or attempting to commit" any first degree murder, rape, robbery, theft, or kidnapping. Tenn. Code Ann. § 39-13-204(i)(7). Besides the murder convictions, Mr. Davidson was convicted of two counts of especially aggravated robbery, two counts of especially aggravated kidnapping, three counts of aggravated rape of Channon, and one count of facilitation of aggravated rape of Chris. The murders of Chris and Channon occurred in relation to Mr. Davidson's commission of especially aggravated robbery, especially aggravated kidnapping, aggravated rape, and facilitation of aggravated rape. The evidence is more than sufficient to support the jury's finding of this aggravating circumstance.

### 4. Tennessee Code Annotated section 39-13-204(i)(13)

The jury unanimously found that, as to the murder of Chris, the State proved beyond a reasonable doubt that "[t]he defendant knowingly mutilated the body of the victim after death." Tenn. Code Ann.§ 39-13-204(i)(13). Mutilation includes destroying a body by setting it on fire. *Byford v. State*, 994 P.2d 700, 717 (Nev. 2000); *State v. Price*, 46 S.W.3d 785, 827–28 (Tenn. Crim. App. 2000). After Chris was murdered, his body was wrapped in a cloth comforter, gasoline was poured on him, and he was set on fire. The evidence is more than sufficient to support the jury's finding of this aggravating circumstance.

### *Aggravating Circumstances Outweigh the Mitigating Circumstances*

Tennessee Code Annotated section 39-13-206(c)(1)(C) requires this Court to consider whether the evidence supports the jury's finding that the aggravating circumstance or circumstances outweigh any mitigating circumstances. Our standard of review requires us to determine whether a rational trier of fact could find that the aggravating circumstances outweigh the mitigating circumstances beyond a reasonable doubt when the evidence is viewed in the light most favorable to the State. *State v. Stephenson*, 195 S.W.3d 574, 593 (Tenn. 2006), *abrogated on other grounds by State v. Watkins*, 362 S.W.3d 530 (Tenn. 2012). We have carefully reviewed the record and conclude that a reasonable jury could find, based on the evidence, that the aggravating circumstances outweigh the mitigating circumstances.

Mr. Davidson presented mitigation evidence through the testimony of Rosalind Andrews, Hugh Wilburn, Laquitta Boddie, Jason Bramblett, Alice Rhea, Flo Rudd, Carl Rudd, Seth Rudd, Isinell Newbill, and Dr. Peter Brown.

Ms. Andrews, a mitigation specialist, described Mr. Davidson's social history and personal background. Mr. Davidson's mother grew up as one of five children in a home filled with violence, substance abuse, and incest. She continued the cycle of substance abuse and violence with her own six children by five fathers. She had her first child at age fifteen, with Mr. Davidson being her second-born child. Mr. Davidson's father played no role in his life. Mr. Davidson's mother was neglectful and physically abusive to her children, a crack cocaine addict, and a prostitute. Mr. Davidson moved back and forth between his mother's house and his aunt's house, attending a different school nearly every year. Mr. Davidson's uncle, Mr. Wilburn, confirmed the violence and instability of Mr. Davidson's mother's home life. Mr. Davidson's sister, Ms. Boddie, testified to the very difficult childhood she and Mr. Davidson endured, detailing the violence and neglect they suffered because of their mother's drug and alcohol use.

Mr. Bramblett and Ms. Rhea testified about their interactions with Mr. Davidson while he lived at the West Tennessee Children's Home. Mr. Bramblett, who worked as weekend relief staff, recalled that Mr. Davidson did not have visitors during the scheduled visitation days. He observed that Mr. Davidson did well at the Children's Home and was active in church and school activities. Mr. Bramblett and Mr. Davidson had a good, trustful relationship, and Mr. Davidson was in Mr. Bramblett's wedding. Ms. Rhea, who with her husband was a house parent at the Children's Home, recalled that Mr. Davidson was helpful, followed the rules, and did well in a structured environment. She considered Mr. Davidson to be like a son and maintained contact with him after he left the Children's Home.

Mr. and Mrs. Rudd and their son, Seth, testified they became acquainted with Mr. Davidson around the time he left the Children's Home. Seth met Mr. Davidson while playing basketball after church. Mr. and Mrs. Rudd became foster parents to Mr. Davidson and took him into their home. He lived with them from December 1998 to February 2000. While living with the Rudd family, Mr. Davidson attended a private Christian school, went to church regularly, and played football. Mr. Davidson was helpful, well-behaved, respectful, and never violent. Mr. Davidson violated Mr. and Mrs. Rudd's rule against drug use by bringing marijuana into the house on two occasions. After finding marijuana in Mr. Davidson's room the second time, Mr. and Mrs. Rudd made Mr. Davidson leave their home. Mr. Davidson moved in with a coach from his school until he got a job and rented an apartment.

Mrs. Newbill, a retired teacher who helped Mr. Davidson with his math when he stayed with the Rudds, confirmed the Rudds' testimony that Mr. Davidson was a friendly and open young man.

Dr. Brown, a psychiatrist, testified about various risk factors for violence, including neglect, rejection, poverty, family size, birth order, lack of monitoring, violence/drugs/crime, school failure, and age of onset. In Dr. Brown's opinion, by the age of ten, Mr. Davidson was exposed to all of these factors and was steered toward violent behavior as an adult. Mr. Davidson had above-average intelligence, and his neuropsychological evaluation was normal. According to Dr. Brown, Mr. Davidson has the capacity to perform well in a stable, structured setting. He explained that when Mr. Davidson is sober, he can show considerable empathy, understanding, and appreciation of other people. Dr. Brown predicted that Mr. Davidson would do extremely well if living in a structured environment and not using drugs.

The State introduced certified judgments of convictions dated January 18, 2001, wherein Mr. Davidson was convicted of aggravated robbery and carjacking that occurred September 6, 2000, in Madison County, Tennessee. He was sentenced to serve eight years in the penitentiary.

From this evidence, it appears that Mr. Davidson had a difficult childhood due to a neglectful, drug-addicted, abusive mother and an absent father. He had numerous adverse childhood experiences that predisposed him to committing violent acts as an adult. Mr. Davidson, however, was given opportunities to better himself. He had above-average intelligence and no apparent psychological issues. He was removed from his mother's abusive home and began living at the Children's Home. Ms. Rhea and Mr. Bramblett at the Children's Home took an interest in him and encouraged and supported him. After Mr. Davidson left the Children's Home, Mr. and Mrs. Rudd took him into their home and treated him as one of their own children. He attended a private high school, was provided tutoring assistance, went to church, played football, and had friends and a supportive foster family. Yet, he violated Mr. and Mrs. Rudd's rule on drug use—not once but twice—and Mr. Davidson had to leave their home. Even then, a coach at Mr. Davidson's school gave him a place to live until he could get a job and find housing. Despite this support and assistance, Mr. Davidson, at the age of nineteen, committed aggravated robbery and carjacking and was incarcerated. Mr. Davidson had a chaotic and unstable childhood, but as an adult, he had choices. Unfortunately, he made bad choices. Based on this evidence, a reasonable jury could have easily concluded that any one or all four aggravating circumstances outweighed the mitigating circumstances presented by Mr. Davidson.

Finally, we consider whether Mr. Davidson's death sentences are "excessive or disproportionate to the penalty imposed in similar cases, considering both the nature of the crime and the defendant." Tenn. Code Ann. § 39-13-206(c)(1)(D). In *State v. Bland*, 958 S.W.2d 651, 665 (Tenn. 1997), this Court determined that the precedent-seeking method of analysis satisfied this statutory directive.[13] Under this approach, we compare Mr. Davidson's case with the cases of other defendants convicted of first degree murder in which the State sought the death penalty, a capital sentencing hearing was held, and the jury determined whether the sentence should be life, life without parole, or death. *Willis*, 496 S.W.3d at 733 (citing *Rice*, 184 S.W.3d at 679). To identify similar cases, this Court looks at several factors including: (1) the means of death; (2) the manner of death; (3) the motivation for the killing; (4) the place of death; (5) the similarity of the victims' circumstances, including age, physical and mental conditions, and the treatment of the victims during the killing; (6) the absence or presence of premeditation; (7) the absence or presence of provocation; (8) the absence or presence of justification; and (9) the injury to and effects on nondecedent victims. *Pruitt*, 415 S.W.3d at 213 (citing *Bland*, 958 S.W.2d at 667). The Court also identified several criteria used to compare the characteristics of defendants including: (1) the defendant's prior criminal record or activity; (2) the defendant's age, race, and gender; (3) the defendant's mental, emotional, or physical condition; (4) the defendant's involvement or role in the murder; (5) the defendant's cooperation with authorities; (6) the defendant's remorse; (7) the defendant's knowledge of helplessness of victim(s); and (8) the defendant's capacity for rehabilitation. *Id.* at 213–14 (citing *Bland*, 958 S.W.2d at 667).

In conducting a statutory comparative proportionality review, we do not search for proof that a defendant's sentence is "perfectly symmetrical" with the sentences imposed in all other first degree murder cases. *Godsey*, 60 S.W.3d at 782. The Court's function is not to second-guess the jury or act as a "super jury," but to identify and invalidate a death sentence that is an aberration. *Id.* A sentence of death is disproportionate if "the case taken as a whole is plainly lacking in circumstances consistent with those cases where the death penalty has been imposed." *Pruitt*, 415 S.W.3d at 214 (quoting *Bland*, 958 S.W.2d at 668); *see also Godsey*, 60 S.W.3d at 782.

---

[13] In *State v. Pruitt*, 415 S.W.3d 180, 217 (Tenn. 2013), and *State v. Godsey*, 60 S.W.3d 759, 784–85 (Tenn. 2001), this Court adhered to *Bland*. I recognize the Court's adherence to *Bland* but continue to support a broader analysis that includes all first degree murder cases, including those in which the death penalty was not sought. *See Pruitt*, 415 S.W.3d at 230–31 (Koch and Lee, JJ., concurring in part and dissenting in part). Based on these facts, however, I conclude that even under the broader analysis, Mr. Davidson's sentences are "[neither] excessive [n]or disproportionate to the penalty imposed in similar cases, considering both the nature of the crime and the defendant."

The proof established that Channon and Chris were forcibly robbed, kidnapped, and abducted in Channon's vehicle. Chris was brutally raped. He was forced to walk partially undressed and barefoot on a January night to a place near a set of train tracks. His hands were tied behind his back, his feet were bound together, and he was blindfolded, gagged, and then shot three times. His body was wrapped in a comforter, gasoline was poured over him, and his partially naked body was set on fire. Channon was beaten and repeatedly and brutally anally, orally, and vaginally raped by Mr. Davidson before eventually being tightly bound, put in five plastic garbage bags, and left to suffocate inside a garbage can in Mr. Davidson's kitchen. Chris was twenty-three years old, healthy, and gainfully employed as a trim carpenter. He had a loving family, many friends, and a promising future. Channon was twenty-one years old, a student at the University of Tennessee, and worked two jobs. She also had a loving family, many friends, and a promising future. Mr. Davidson did not know Chris and Channon before he stole Channon's vehicle and kidnapped them. Mr. Davidson had no reason to murder them other than to avoid arrest for the robberies and kidnappings; it does not appear they fought back or provoked Mr. Davidson. The brutality and time span of the criminal episode, among other factors, indicate premeditation. These were senseless and brutal murders of two young people who had lived good and decent lives, had bright futures, and left many family members and friends who mourn their passing.

We now review Mr. Davidson's circumstances. Mr. Davidson is an African-American male with a high school education who was twenty-five years old when the crimes were committed. He had previously been incarcerated for convictions of aggravated robbery and carjacking. Even though Mr. Davidson did not have a stable and nurturing home life and upbringing, he was given opportunities to better his circumstances. He was removed from an abusive home and given the opportunity for a fresh start. Staffers at the Children's Home where he lived supported him. His foster family welcomed him into their family. A coach from his high school gave him a place to live. He did well in school, succeeded in sports, and had the support of many people. His stay with his foster parents ended when he refused to follow their rule regarding the possession of drugs. As an adult, he did not make an honest living, choosing instead to sell drugs. There was no proof that Mr. Davidson had any mental, emotional, or health issues. He had an active and prominent role in the commission of the crimes for which he was convicted. He did not cooperate with the authorities and took no responsibility for the crimes—instead blaming his brother and others. He showed no remorse. Besides kidnapping, robbing, facilitating the rape of, and murdering Chris, Mr. Davidson stole Chris's shoes and wore them until he was arrested. After killing Chris, Mr. Davidson tried to contact his girlfriend by using Chris's cell phone. After kidnapping, robbing, and raping Channon, Mr. Davidson drove Channon's vehicle and gave her clothes to his girlfriend. Chris and Channon suffered physically and emotionally before their deaths, and both likely knew that Mr. Davidson would murder them. There was very little proof that Mr. Davidson could be rehabilitated.

The death sentences imposed on Mr. Davidson are neither excessive nor disproportionate when compared to defendants in other cases. The following are cases in which this Court determined that application of the death penalty was not disproportionate in light of other similar circumstances:

- In *State v. Willis*, 496 S.W.3d 653 (Tenn. 2016), *petition for cert. filed*, No. 16-6995 (U.S. Nov. 21, 2016), the male defendant met the victims, ages seventeen and sixteen, through his daughter, and the young couple lived in the defendant's mobile home before they disappeared. *Id.* at 666, 668. The badly decomposed bodies of the victims were discovered in a self-storage unit. *Id.* at 671. Like Channon, the female victim was nude, gagged, and had been bound with ties while alive. *Id.* at 672. She had two gunshot wounds to her head. *Id.* The male victim had been shot beneath his chin. *Id.* at 673. As with Chris, the male victim's body was mutilated after death. *Id.* at 672–73. The male victim's severed head and hands were found in a nearby lake. *Id.* at 672. The defendant was convicted of first degree premeditated murder of both victims and felony murder of the female victim. *Id.* at 683. The defendant presented no mitigation evidence. As to the male victim, the jury found aggravating circumstance (i)(13). As to the female victim, the jury found aggravating circumstances (i)(5), (i)(6), and (i)(7). *Id.*

- In *State v. Freeland*, 451 S.W.3d 791 (Tenn. 2014), the twenty-eight-year-old, African-American male defendant shot and killed an older female victim while kidnapping her from a grocery store parking lot and then disposed of her body in a remote location. *Id.* at 800–01. The defendant was a high school graduate with some college education and the unmarried father of two children. *Id.* at 816. The defendant argued that he was an accomplice in the murder committed by another person, that his participation was relatively minor, and that he acted under extreme duress or under the substantial domination of another person. *Id.* at 820. The defendant's mother, stepfather, and younger brother testified in mitigation, supplemented with photographs, certificates, and numerous letters of support from community members and friends. *Id.* at 808–09. The jury found aggravating circumstances (i)(2), (i)(6), and (i)(7).

- In *State v. Davidson*, 121 S.W.3d 600 (Tenn. 2013), the fifty-two-year-old, Caucasian male defendant killed the victim during a kidnapping and severed her head and left hand after death. *Id.* at 605–06. The jury found aggravating circumstances (i)(2), (i)(7), and (i)(13).

- In *Terry v. State*, 46 S.W.3d 147 (Tenn. 2001), the middle-aged, Caucasian male defendant was employed as a minister and had no prior criminal record. He concocted an elaborate scheme to disappear and change his identity. *Id.* at 150–52.

The defendant shot and killed the church handyman, dismembered the body, and set fire to the church. *Id.* The jury found aggravating circumstances (i)(5) and (i)(6).

- In *State v. Carruthers*, 35 S.W.3d 516 (Tenn. 2000), the twenty-six-year-old, male defendant kidnapped, bound, and abused three victims before shooting them and burying them alive. *Id.* at 525–28. During the penalty phase, the defendant's sister explained that the defendant had endured a difficult upbringing, and she believed his claim of innocence. *Id.* at 531. A prison minister said the defendant was a "person of quality and worth" and was upset about the deaths of the victims. *Id.* The jury found four aggravating circumstances: (i)(2), (i)(5), (i)(7), and (i)(12).

- In *State v. Keen*, 31 S.W.3d 196 (Tenn. 2000), the twenty-seven-year-old, Caucasian male defendant forcibly raped his minor victim and killed her by manual and ligature strangulation. *Id.* at 220. The evidence indicated that the victim struggled to free herself and was alive and conscious during the beating and rape. *Id.* The defendant had no significant criminal record. *Id.* The jury found the (i)(1) and (i)(5) aggravating circumstances.

- In *State v. Bondurant*, 4 S.W.3d 662 (Tenn. 1999), the male defendant beat a man to death and continued to beat him after death. *Id.* at 665. The defendant and his brother dismembered the body and burned the pieces at their parents' home. *Id.* In mitigation, the defendant was portrayed as an exemplary son, a family man, and a good employee. *Id.* at 666. The jury found the (i)(2) and (i)(5) aggravating circumstances.

- In *State v. Pike*, 978 S.W.2d 904 (Tenn. 1998), the eighteen-year-old, female defendant was convicted of premeditated first degree murder and conspiracy to commit first degree murder. *Id.* at 907. The defendant and others tortured and mutilated the nineteen-year-old female victim, who begged the defendant to let her live. *Id.* at 916. A clinical psychologist testified that the defendant had above-average intelligence despite only completing ninth grade, was not insane, suffered marijuana dependence and inhalant abuse, and had borderline personality disorder. *Id.* at 912. In mitigation, the defendant presented evidence to show a lack of maternal bonding and a family history of substance abuse. *Id.* at 913. The jury found the (i)(5) and (i)(6) aggravating circumstances.

- In *State v. Nichols*, 877 S.W.2d 722 (Tenn. 1994), the male defendant broke into the home of his twenty-one-year-old female victim and violently raped her. *Id.* at 726. Because of the victim's resistance, the defendant struck her in the head with a two-by-four and later repeatedly struck her again after the rape, which eventually

led to the victim's death. *Id.* In mitigation, the defendant highlighted his cooperation with the police and the psychological effects of his childhood. *Id.* at 727. Several witnesses testified to his good character and passive nature. *Id.* The jury found the (i)(2) and (i)(7) aggravating circumstances.

- In *State v. Alley*, 776 S.W.2d 506 (Tenn. 1989), the twenty-nine-year-old, Caucasian male defendant struck a young woman jogging on the side of the road while driving under the influence. *Id.* at 508. He then kidnapped her and took her to another location where he stabbed her in the head with a screwdriver, raped her with a thirty-one-inch tree branch, and beat and strangled her to death. *Id.* at 509. The defendant was the father of two children. *Id.* at 508. The jury found aggravating circumstances (i)(5) and (i)(7).

- In *State v. Thompson*, 768 S.W.2d 239 (Tenn. 1989), the African-American defendant and a runaway female juvenile kidnapped their victim in a Walmart parking lot, drove her to a remote area, and stabbed her repeatedly in the back. *Id.* at 243. The jury found the (i)(5), (i)(6), and (i)(7) aggravating circumstances.

Based on our review of the entire record and similar cases where the death penalty was imposed, Mr. Davidson's death sentences are neither excessive nor disproportionate. The death penalty should never be imposed lightly. It is limited to those offenders who commit "a narrow category of the most serious crimes" and whose extreme culpability makes them "the most deserving of execution." *Atkins v. Virginia*, 536 U.S. 304, 319 (2002). The death penalty is reserved for the "worst of the worst." *Kansas v. Marsh*, 548 U.S. 163, 206 (2006) (Souter, J., dissenting). Without question, Mr. Davidson has shown by his conduct he is the "worst of the worst" and deserves the death penalty.

## III.

We have reviewed all the other issues raised by Mr. Davidson in this appeal and hold that the Court of Criminal Appeals reached the correct results on these issues. All issues not directly addressed in this opinion are included in the attached appendix. We vacate the Court of Criminal Appeals' decision to remand this case to the trial court to correct the judgment documents. We have conducted the statutorily mandated review and have determined that the sentences of death imposed on Mr. Davidson were not arbitrary, were supported by the evidence, and were neither disproportionate nor excessive.

The sentences of death shall be carried out as provided by law on the 3rd day of January, 2018, unless otherwise ordered by this Court or other proper authority. It appearing that Mr. Davidson is indigent, the costs of this appeal are taxed to the State of Tennessee.

_____

SHARON G. LEE, JUSTICE

## APPENDIX
### (Excerpts from the Decision of the Court of Criminal Appeals)

Court of Criminal Appeals of Tennessee, at Knoxville.

State of Tennessee
v.
Lemaricus Devall Davidson

No. E2013-00394-CCA-R3-DD

October 21, 2014 Session

March 10, 2015

Direct Appeal from the Criminal Court for Knox County, No. 86216B; Walter C. Kurtz, Judge.[1]

David M. Eldridge and Douglas A. Trant, Knoxville, Tennessee, for the appellant, Lemaricus Devall Davidson.

Herbert H. Slatery III, Attorney General and Reporter; John H. Bledsoe, Assistant Attorney General; Randall E. Nichols, Assistant District Attorney General; and Leland Price and Takisha Fitzgerald, Assistant District Attorneys General, for the appellee, State of Tennessee.

JAMES CURWOOD WITT, JR., J., delivered the opinion of the Court, in which D. KELLY THOMAS, JR., and ROBERT L. HOLLOWAY, JR., JJ., joined.

## OPINION

[Deleted: Summary of Facts and Testimony]

---

[1][Deleted: footnote]

*I. Structural Error*

We consider first the defendant's claim of structural error based upon the out-of-court behavior of the trial judge because the judge's behavior, his subsequent plea of guilty to criminal charges and resulting resignation, and the media frenzy that those events created have loomed large over what was an already highly-publicized case. As indicated above, after the trial judge resigned from the bench following his plea of guilty to official misconduct, the defendant then sought a new trial based upon his claim that the trial judge's misconduct constituted structural error. Our supreme court concluded that the record did not support a conclusion that the trial judge's out-of-court misconduct had resulted in structural error requiring a new trial. *See Rule 10 Order*, slip op. at 3–4. In this appeal, the defendant revives his claim of structural error and argues that our supreme court erred by requiring a showing of prejudice under the circumstances of this case. The State asserts that the law-of-the-case doctrine prohibits this court from making a ruling on this issue.

Like our supreme court, we do not condone or excuse the trial judge's out-of-court malfeasance. That being said, our supreme court has held that "a trial judge's out-of-court misconduct, by itself" does not "constitute[] structural error unless there is proof that the misconduct affected the trial proceedings." *Rule 10 Order*, slip op. at 3 (citing *State v. Benson*, 973 S.W.2d 202, 206 (Tenn. 1998)). Our supreme court concluded that although the trial judge's out-of-court misconduct in this case was reprehensible, the record contained no proof that his misconduct "affected the integrity of the trials." *Rule 10 Order*, slip op. at 4. Two important principles of law prohibit us from revisiting that ruling.

First, the law-of-the-case doctrine prevents this court from considering the defendant's claim of structural error because that issue was already decided by our supreme court in a previous appeal in the same case. Our supreme court addressed the law-of-the-case doctrine in great detail in *Memphis Publishing Company v. Tennessee Petroleum Underground Storage Tank Board*:

> The phrase "law of the case" refers to a legal doctrine which generally prohibits reconsideration of issues that have already been decided in a prior appeal of the same case. In other words, under the law of the case doctrine, an appellate court's decision on an issue of law is binding in later trials and appeals of the same case if the facts on the second trial or appeal are substantially the same as the facts in the first trial or appeal. The doctrine applies to issues that were actually before the appellate court in the first appeal and to issues that were necessarily decided by implication. The doctrine does not apply to dicta.

The law of the case doctrine is not a constitutional mandate nor a limitation on the power of a court. Rather, it is a longstanding discretionary rule of judicial practice which is based on the common sense recognition that issues previously litigated and decided by a court of competent jurisdiction ordinarily need not be revisited. This rule promotes the finality and efficiency of the judicial process, avoids indefinite relitigation of the same issue, fosters consistent results in the same litigation, and assures the obedience of lower courts to the decisions of appellate courts.

Therefore, when an initial appeal results in a remand to the trial court, the decision of the appellate court establishes the law of the case which generally must be followed upon remand by the trial court, and by an appellate court if a second appeal is taken from the judgment of the trial court entered after remand. There are limited circumstances which may justify reconsideration of an issue which was [an] issue decided in a prior appeal: (1) the evidence offered at a trial or hearing after remand was substantially different from the evidence in the initial proceeding; (2) the prior ruling was clearly erroneous and would result in a manifest injustice if allowed to stand; or (3) the prior decision is contrary to a change in the controlling law which has occurred between the first and second appeal.

*Memphis Publ'g Co. v. Tenn. Petroleum Underground Storage Tank Bd.*, 975 S.W.2d 303, 306 (Tenn. 1998) (citations omitted). None of the delineated exceptions apply here. The defendant offered no new evidence following the remand by our supreme court, and there has been no change in the controlling law. Moreover, we cannot say that the ruling of our supreme court was "clearly erroneous." In consequence, the law-of-the-case doctrine requires that we adhere to the ruling of our supreme court that the out-of-court misconduct of the trial judge did not constitute structural error in this case.

Second, even assuming for the sake of argument that we disagreed with the previous ruling of our supreme court, we lack the authority to overturn the ruling because the allocation of judicial power in this state forbids us from doing so. Our supreme court "is a direct creature of the [state] Constitution and constitutes the supreme judicial tribunal of the state and is a court of last resort." *Barger v. Brock*, 535 S.W.2d 337, 340 (Tenn. 1976). This court and "[a]ll other courts are constitutionally inferior tribunals subject to the actions of the Supreme Court." *Id.* The adjudications of the supreme court "are final and conclusive upon all questions determined by it, subject only to review, in appropriate cases by the Supreme Court of the United States." *Id.* (citing *Railroad v. Bryne*, 104 S.W. 460 (1907)).

Accordingly, because our supreme court has already ruled that the malefactions of the trial judge did not occasion structural error in this case, we cannot consider the issue in this appeal.

[Deleted: *II. Motion to Suppress Evidence Obtained During the January 9, 2007 Searches of the Chipman Street Residence*]

[Deleted: *III. Motion to Suppress Pretrial Statements*]

[Deleted: *IV. Motion to Suppress Searches of the Defendant's Person on January 19, 2007, and March 13, 2008*]

[Deleted: *V. Admission of Photographs*]

[Deleted: *VI. Fingerprint Identification*]

[Deleted: *VII. Ballistics Testing*]

[Deleted: *VIII. Buttons Depicting Victims*]

*IX. Interception of Privileged Communications*

The defendant asserts that the trial court erred by refusing to dismiss the presentment following the discovery that the State had intercepted a letter from the incarcerated defendant addressed to his counsel. The State avers that the trial court did not err.

Prior to trial, the defendant moved the trial court to dismiss the presentment on grounds that the State had violated his Sixth Amendment right to counsel by intercepting privileged communications between the defendant and his attorneys. The defendant noted that correspondence from the defendant, who was in jail, to his counsel had been opened, copied, reviewed by members of the district attorney's office and reproduced in the discovery materials provided to all the parties.

At the hearing on the defendant's motion, Knox County Sheriff's Office ("KCSO") Officer Frank P. Nauss, Jr., the "gang intelligence officer in the mailroom" of the Knox County Detention Center, testified that in 2008, "homeland security division" Officer Hugh Williams instructed Officer Nauss to "censor" the defendant's mail, which meant he was to copy all of the defendant's mail and send a copy to Officer Williams. He said that he was to copy "everything except legal mail," which he described as "off-limits" and "irrelevant." Every item he copied was forwarded to Officer Williams

and Investigator Tom Walker. He acknowledged that the request for copies of the defendant's mail came from the district attorney general's office.

When "censoring" mail, Officer Nauss typically opened the letters from the inmate and copied the contents. He then returned the contents to the envelope and resealed it before sending it on to the intended recipient. He insisted that he did not read the contents while copying the letters. His process, he said, changed "around July 1st of 2008" due to an increase in "the sheer volume of copies" that he was asked to make. At that point, Officer Williams instructed him to "pull the mail, look at it as needed, look at the documentation – the letter as needed and then copy anything that [Officer Nauss] thought was – would be of interest to homeland security."

On February 21, 2008, Officer Nauss "processed and copied" an envelope from the law firm of Eldridge & Blakney that was addressed to the defendant and marked "personal and confidential." On April 23, 2008, Officer Nauss opened and copied one letteraddressed to and three letters from the defendant, including legal mail. All the copies were sent to KCSO homeland security department.

Officer Nauss testified that he could not answer the question why the defendant's legal mail had been opened and copied when it was his practice to avoid tampering with legal mail. He said that he "just did not catch it" when he opened the defendant's legal mail. He maintained that he had not intentionally copied the defendant's legal mail. The same thing happened, he said, when he accidentally opened and copied legal correspondence between Vanessa Coleman and her attorney. He insisted that he had not been instructed to copy legal mail and claimed that he copied Ms. Coleman's mail only because he did not recognize the name of her attorney. Officer Nauss said that after Officer Williams realized that a piece of legal mail had been copied, he alerted the district attorney general's office. He was then instructed to shred his copy of the letter and prepare a memorandum recounting the situation.

KCSO Officer Hugh Williams testified that shortly after the defendant's arrest, the district attorney general's office instructed him to monitor the defendant's mail and that his instructions strictly forbade the intercepting of legal mail. He identified a letter addressed to the defendant's counsel that was intercepted in April 2008 and said that "[i]t stands to reason that" he had reviewed the letter in the course of his duties. He said that the letter would have been copied and the copy forwarded to the district attorney general's office. A copy of the letter would also be retained in his office.

Although Officer Williams could not recall the specific contents of the April 2008 letter, he said "for a fact that it was nonconsequential [sic], whatever it was," or he would have remembered it, "especially on a case of this magnitude." He said that he had, "[o]n occasion," discussed the contents of the defendant's mail with members of the district

attorney general's office. He could not explain how the April letter had come to be copied given that it was obviously legal mail. He said that he was "absolutely flabbergasted" that his office "had made a mistake, and this is obviously a mistake."

In the letter, which was exhibited to the hearing, the defendant asked his counsel to obtain photographs and bring them to him at the detention center. He also raised questions regarding the potential handling of Daphne Sutton's trial testimony and the handling of the motion to suppress evidence obtained via the first search warrant executed at the Chipman Street residence. The defendant specifically referenced his personal knowledge of information revealed during the federal carjacking trial of Eric Boyd.[11]

The parties stipulated that a member of the district attorney general's office read the letter intercepted on April 23, 2008.

The defendant argued that the State's interception and the prosecution's reading of the letter violated his First and Sixth Amendment rights and that the only appropriate remedies available to the trial court were dismissal of the presentment or recusal of the Knox County District Attorney General's Office. The State acknowledged that the defendant's legal mail had been intercepted but claimed that the interception was inadvertent. The State argued that the appropriate remedy was suppression of any information gleaned from the erroneous interception. The prosecutor adamantly asserted that the letter had not altered the State's theory of the case. Finally, the State averred that the defendant could not establish that he had been prejudiced by the interception.

At the conclusion of the hearing, the trial court accredited the testimony of Officers Nauss and Williams, finding that "they testified truthfully," "that this was not an intentional action on their behalf in copying this letter," "that they are aware of the fact that this is privileged communication," and "that there was a mistake made here that they readily admit and were embarrassed by." The court also concluded that although the letter was reviewed by someone in the district attorney general's office, "it created no particular interest on their behalf over there" because "it was nothing of any great significance." The court observed that the fact that the communication was disseminated in the discovery materials for all those charged in this case indicated that the State was "unaware of the fact that they had in their possession a communication from a defendant

---

[11] A federal jury convicted Eric Boyd of "being an accessory after the fact to a carjacking leading to serious bodily injury and death[] and (2) misprision of a felony" for providing aid to the defendant and helping him elude authorities following the discovery of the victims' bodies. *United States v. Boyd*, 640 F.3d 657, 662 (6th Cir. 2011).

to his lawyer." The court noted that, despite that all the defense lawyers involved had been in possession of the letter since June 2008, "the first time that anybody has heard anything about this is the first week of October of 2009 when, apparently, . . . you got looking at what you had in your file." The court said, "[M]y point of all that is, is that this is not something that – that caused a great deal of concern . . . it was not something that jumped out as a matter of great concern." The court commented that "it certainly appears that it affected in no way anybody's preparation for the trial of this case." The court emphasized that the letter was "confined to a very specific issue at a very specific time, which . . . is not of major import one way or the other."

The court concluded,

So it seems to me that although there's no question that this was a privileged communication between a client and attorney that the information that's discussed in this communication is not information that is going to prejudice the defendant in the preparation or presentation of the case. I think all of that preparation has already been done, that everything that has transpired up until last week was done without any reference to or interference by this communication. I don't think it affects the way that the [S]tate is going to present their case or the way that the defendant is going to defend their case.

The only thing that the Court can do, in my judgment, is as the trial progresses, determine whether or not during the course of the trial anything that . . . arises that in my judgment is influenced in any way by the contents of this communication, and if it is, I'll fashion a remedy that I think is appropriate at the time. . . .

. . . I believe it is an inadvertent, unintentional breach on behalf of the Knox County Sheriff's Department, but it is a breach. I do not believe that the appropriate remedy in this case is dismissal of the case.

On appeal, the defendant contends that "the interception and review of this correspondence between [the defendant] and his counsel violated the attorney client privilege, [the defendant's] access to the courts, right to the assistance of counsel, and right to free speech." He argues that the only appropriate remedy is reversal of his conviction. The State acknowledges that the defendant's legal mail should not have been opened and read but maintains that the trial court did not err by refusing to dismiss the presentment or recuse the Knox County District Attorney General's Office because the action was unintentional and because it resulted in no prejudice to the defendant.

To be sure, correspondence between the defendant and his counsel should not have been opened and read by members of the KCSO outside the defendant's presence and should not have, in any case, been copied and shared with the district attorney general's office. *See Wolff v. McDonnell*, 418 U.S. 539, 576–77 (1974) (recognizing Sixth Amendment protection for inmate legal correspondence but approving prison policy of opening legal mail in the inmate's presence so long as the mail is not read). Outside of those cases indicating a complete deprivation of the right to counsel, Sixth Amendment violations "are subject to the general rule that remedies should be tailored to the injury suffered from the constitutional violation and should not unnecessarily infringe on competing interests." *United States v. Morrison*, 449 U.S. 361, 364 (1981). Indeed, "certain violations of the right to counsel may be disregarded as harmless error." *Id.* at 365. Absent proof that "the constitutional infringement identified has had or threatens some adverse effect upon the effectiveness of counsel's representation or has produced some other prejudice to the defense," "there is no basis for imposing a remedy in that proceeding, which can go forward with full recognition of the defendant's right to counsel and to a fair trial." *Id.*

In this case, the record contains no evidence to suggest that the reading of the single letter from the defendant to his counsel that was exhibited to the hearing resulted in any prejudice. The letter did not divulge any defense strategy and did not, based on the record before us, result in the presentation of tainted evidence at the defendant's trial. Under these circumstances, the trial court did not err by denying the defendant's motion. *See Weatherford v. Bursey*, 429 U.S. 545, 558 (1977) ("There being no tainted evidence in this case, no communication of defense strategy to the prosecution, and no purposeful intrusion . . . , there was no violation of the Sixth Amendment insofar as it is applicable to the States by virtue of the Fourteenth Amendment.").

[Deleted: *X. Thirteenth Juror*]

[Deleted: *XI. Sufficiency*]

*XII. Presentment*

The defendant makes two challenges to the presentment in this case: (1) that the presentment was "constitutionally insufficient" because it did not "properly specify the time, place, and a description of the occurrence of the alleged offenses" and (2) that the presentment failed to charge the elements of criminal responsibility. The State asserts that the presentment sufficiently apprised the defendant of the charges against him and that the failure to include the elements of criminal responsibility in the presentment did not render it deficient.

The presentment in this case charged the defendant, George Thomas, Letalvis Cobbins, and Vanessa Coleman with the following offenses, which, the presentment alleged, occurred "[o]n or about the ____ day of January, 2007":

[Deleted: Table of charges]

Each of the counts tracked the language of the relevant statute and contained an appropriate statutory citation.

### A. Sufficiency of the Presentment

Prior to trial, the defendant moved the trial court to dismiss the presentment on grounds that it was insufficient in providing sufficient detail to allow the defendant to defend the charges. The trial court denied the motion in summary fashion.

Challenges to the legal sufficiency of a presentment present questions of law subject to de novo review on appeal. *See State v. Wilson*, 31 S.W.3d 189, 191 (Tenn. 2000); *State v. Hill*, 954 S.W.2d 725, 727 (Tenn. 1997); *State v. Davis*, 940 S.W.2d 558, 561 (Tenn. 1997).

"[T]he Sixth and Fourteenth Amendments to the United States Constitution and Article I, Section 9 of the Tennessee Constitution guarantee to the accused the right to be informed of the nature and cause of the accusation." *Hill*, 954 S.W.2d at 727; *State v. Berry*, 141 S.W.3d 549, 561 (Tenn. 2004) ("The overriding purpose of an indictment is to inform the accused of 'the nature and cause of the accusation.'"). "[T]he touchstone for constitutionality is adequate notice to the accused." *Hill*, 954 S.W.2d at 729. Additionally, Tennessee Code Annotated section 40-13-202 provides:

> The indictment must state the facts constituting the offense in ordinary and concise language, without prolixity or repetition, in a manner so as to enable a person of common understanding to know what is intended and with that degree of certainty which will enable the court, on conviction, to pronounce the proper judgment. In no case are the words "force and arms" or "contrary to the form of the statute" necessary.

T.C.A. § 40-13-202 (2006). As a general rule, "an indictment is valid if it provides sufficient information (1) to enable the accused to know the accusation to which answer is required, (2) to furnish the court adequate basis for the entry of a proper judgment, and (3) to protect the accused from double jeopardy." *Hill*, 954 S.W.2d at 729 (citing *State v. Byrd*, 820 S.W.2d 739, 741 (Tenn. 1991); *VanArsdall v. State*, 919 S.W.2d 626, 630 (Tenn. Crim. App. 1995); *State v. Smith*, 612 S.W.2d 493, 497 (Tenn. Crim. App. 1980)).

"It is generally sufficient for the indictment to state the offense charged in the words of the statute." *State v. Majors*, 318 S.W.3d 850, 864 (Tenn. 2010); *see also State v. Carter,* 121 S.W.3d 579, 587 (Tenn. 2003) ("[A]n indictment which references the statute defining the offense is sufficient and satisfies the constitutional and statutory requirements of Hill."); *State v. Sledge*, 15 S.W.3d 93, 95 (Tenn. 2000); *State v. Carter*, 988 S.W.2d 145, 148 (Tenn. 1999); *Ruff v. State*, 978 S.W.2d 95, 100 (Tenn. 1998) ("[W]here the constitutional and statutory requirements outlined in Hill are met, an indictment which cites the pertinent statute and uses its language will be sufficient to support a conviction."). "[A]n indictment need not allege the specific theory or means by which the State intends to prove each element of an offense to achieve the overriding purpose of notice to the accused." *State v. Hammonds*, 30 S.W.3d 294, 300 (Tenn. 2000).

Here, the defendant concedes that the presentment includes a "description of the date and a recitation of the statutes," and we observe that each count contains an appropriate statutory reference. Nothing more is required.

Regarding the defendant's claim that the presentment was insufficient because it failed to allege a date beyond "the ___ day of January, 2007," Code section 40-13-207 provides:

> The time at which the offense was committed need not be stated in the indictment, but the offense may be alleged to have been committed on any day before the finding of the indictment, or generally before the finding of the indictment, unless the time is a material ingredient in the offense.

T.C.A. § 40-13-207; *see also Byrd*, 820 S.W.2d at 740 (stating that "the exact date, or even the year, of an offense need not be stated in an indictment or presentment unless the date or time 'is a material ingredient in the offense.'" (citations omitted)); *Bosley v. State*, 401 S.W.2d 770, 772 (Tenn. 1966) ("It is the well settled law of this state that an indictment in a case of this character . . . that shows that the offense the defendant is alleged to have committed occurred prior to the date of indictment is sufficient."). Our courts have repeatedly ruled that inclusion of the month and year of an offense in the indictment is sufficient. *See, e.g.*, *State v. Shaw*, 82 S.W. 480 (Tenn. 1904) (stating that "where there is no statute of limitations barring the offense, it is unnecessary to state the day, or even the year, but it is sufficient to aver generally that the offense was committed before the finding of the indictment; that it is not necessary to state in any case the day on which the offense was committed, unless the day itself is of the essence of the offense").

With regard to his claim that the presentment should have stated a precise location of the offense, Code section 40-13-208 provides: "It is not necessary for the indictment to allege where the offense was committed, but the proof shall show a state of facts

bringing the offense within the jurisdiction of the county in which the indictment was preferred." T.C.A. § 40-13-208. We have observed that "[i]n the context of indictments, the place of the offense is typically considered a matter of form rather than of substance." *State v. Gerald L. Powers*, No. W1999-02348-CCA-R3-DD, slip op. at 13 (Tenn. Crim. App., Jackson, Sept. 28, 2001) (citing *State v. Nixon*, 977 S.W.2d 119, 121 (Tenn. Crim. App. 1997)); *State v. Sowder*, 826 S.W.2d 924, 928 (Tenn. Crim. App. 1991) ("The indictment need not be specific regarding the time or place of the offense.").

### B. Criminal Responsibility

The defendant also contends that the presentment should have been dismissed because it "failed to allege the elements of criminal responsibility and facts in support thereof." The defendant is correct that the presentment contains no reference to the theory of criminal responsibility, but his claim that this omission voids the presentment is inapt. As our supreme court explained in *State v. Sherman*, Code "[s]ection 39-11-402(2) does not prescribe a separate and distinct crime; rather, it works in synergy with the charged offense to establish a defendant's guilt through the actions of another." *State v. Sherman*, 266 S.W.3d 395, 408 (Tenn. 2008) (citing *State v. Lemacks*, 996 S.W.2d 166, 170 (Tenn. 1999)). Importantly, "[a] separate indictment for criminal responsibility is unnecessary when a defendant has been indicted for the primary offense." *Sherman*, 266 S.W.3d at 408 (citing *Lemacks*, 996 S.W.2d at 170; *State v. Barnes*, 954 S.W.2d 760, 763 (Tenn. Crim. App. 1997)). This is because "[a]n indictment that charges an accused on the principal offense 'carries with it all the nuances of the offense,' including criminal responsibility." *Lemacks*, 996 S.W.2d at 173 (quoting *State v. Johnson*, 910 S.W.2d 897, 900 (Tenn. Crim. App. 1995)). Thus, the presentment need not have alleged the theory of guilt via criminal responsibility for the acts of another.

### XIII. Juror Questions

The defendant next contends that the trial court erred by informing the jurors that they could ask questions of the witnesses and by permitting the jurors to ask questions during the trial. He does not complain about any specific question posed by a particular juror but instead asserts that the practice has no place in a capital trial.

Rule 24.1 of the Tennessee Rules of Criminal Procedure provides that the trial court "may permit a juror to ask a question of a witness" and provides a procedure for the submission of juror questions:

> (1)　Written Submission of Questions.
>
> The juror shall put the question in writing and submit it to the judge through a court officer at the end of a witness' testimony. A juror's

question shall be anonymous and the juror's name shall not be included in the question.

(2)     Procedure After Submission.

The judge shall review all such questions and, outside the hearing of the jury, shall consult the parties about whether the question should be asked. The judge may ask the juror's question in whole or part and may change the wording of the question before asking it. The judge may permit counsel to ask the question in its original or amended form in whole or part.

(3)     Jury Instructions.

When juror questions are permitted, the court shall instruct jurors early in the trial about the mechanics of asking a question and to give no meaning to the fact that the judge chose not to ask a question or altered the wording of a question submitted by a juror.

Tenn. R. Crim. P. 24.1(c). The purpose of the rule is "to assist jurors in their understanding of evidence and to make them feel more involved in the trial process." *Id.*, Advisory Comm'n Comments. Although once described as "a perilous practice which trial courts should scrupulously avoid," *Branch v. State*, 469 S.W.2d 533, 534 (Tenn. Crim. App. 1969), the practice of permitting jurors to pose questions to witnesses is no longer disfavored in this state, *see State v. James*, 315 S.W.3d 440, 458 (Tenn. 2010) (observing that the adoption of Rule 24.1 "changed that policy"). A reviewing court will not find error "[a]bsent a clear abuse of the discretionary authority of the trial judge, one that manifestly prejudices the rights of a defendant." *James*, 315 S.W.3d at 460.

Here, the trial court denied the defendant's pretrial motion to prohibit the jurors from submitting questions and then followed the procedure set forth in Rule 24.1 for the handling of juror questions during the trial. The defendant cites no authority for the proposition that Rule 24.1 is inapplicable to capital trials, and we find none. Under these circumstances, we cannot say that the trial court abused its discretion by permitting jurors to submit questions.

[Deleted: *XIV. Jury Deliberations*]

*XV. Composition of Jury Venire*

Prior to the trial, the defendant moved the court to dismiss the presentment on grounds that the juror selection process resulted in the jury venire's being unconstitutionally composed. The trial court summarily denied the motion, and the

defendant now appeals, claiming that "the structure of the jury selection process . . . and the compensation rate for jurors made it so the jury venire, the grand jury, and the petit jury were not composed of a fair cross section of the community." Specifically, he argues that "the jury selection process systematically excluded distinctive groups within the community" and that "the compensation authorized to be paid to jurors does not even provide the minimum wage . . . and therefore makes it practically impossible for wage laborers and persons caring for young children to serve on the jury."

It is important that the defendant's issue be appropriately cast. His challenge is solely to "the *potentially* arbitrary and discriminatory method used to select the grand and petit juries in his case." (Emphasis added). To "establish a prima facie violation of the fair-cross-section requirement," however, a

> defendant must show (1) that the group alleged to be excluded is a "distinctive" group in the community; (2) that the representation of this group in venires from which juries are selected is not fair and reasonable in relation to the number of such persons in the community; and (3) that this underrepresentation is due to systematic exclusion of the group in the jury-selection process.

*Duren v. Missouri*, 439 U.S. 357, 364 (1979). Although he claims that the method of venire selection affected the grand and petit juries that heard his case, the defendant presented no proof that those groups he alleges were excluded from the venire[12] were "distinctive" within 12 the community. Additionally, he did not establish that the representation of the identified groups was "not fair and reasonable in relation to the number of such persons in the community." Indeed, he offered no proof of the number of members of the identified groups on the venire versus the number of those persons in the community. Finally, the defendant offered no proof that any underrepresentation of the identified groups was "due to systematic exclusion." Instead, he points to the Code sections governing jury selection and compensation, a 2005 study from the University of Wisconsin-Milwaukee titled "The Driver License Status of the Voting Age Population in Wisconsin," and the United States Election Commission clearinghouse website. The defendant correctly asserts that both the state and federal constitutions guarantee the right to an impartial jury selected from a fair cross-section of the community, but he has failed to establish that he was actually deprived of those constitutional guarantees.

---

[12] The groups identified by the defendant were "minorities and poor populations" along with "wage laborers and persons caring for young children."

Moreover, our supreme court, considering a direct challenge identical to the one presented by the defendant, approved the method of juror selection utilized in Knox County:

> The defendant insists that the method used by the Knox County Jury Commission to select the jury pool denied defendant a fair and impartial cross section of the community. The Commission selected prospective jurors solely from the lists of registered voters. The defendant argued that this excluded the class of those who are not registered to vote and introduced evidence, largely held incompetent and irrelevant by the court, to show that those who do not register to vote are less wealthy and less educated than those who do register and that over a quarter of the city population and almost one-third of the county population are not registered to vote.
>
> The method used by the Commission has been impliedly approved by the Tennessee courts, although it may be that the list should be supplemented with some other source of names. In the federal system voter registration lists are the preferred method. Several federal cases approve the use of such lists in choosing juries and note that those complaining must still show that the method results in the systematic exclusion of a cognizable group from the jury source. The defendant here has shown no discrimination, either racial or sexual, by the Commission; in fact it is not even shown that any cognizable group has been excluded. In *Test*, the court noted that voter registration lists provide a large and easily accessible source of names, to which all potential jurors have equal access and which disqualifies jurors solely on the basis of objective criteria. The defendant has not proved any constitutional invalidity in the method of jury selection in this case.

*State v. Caruthers*, 676 S.W.2d 935, 939 (Tenn. 1984) (citations omitted). The high court has also specifically approved the use of driver's license records to select potential jurors, noting that it found "no material difference between the use of a list of registered voters and the use of a list of registered drivers." *State v. Mann*, 959 S.W.2d 503, 535 (Tenn. 1997). The defendant is not entitled to relief on this issue.

*XVI. Death Penalty Related Issues*

*A. Economic Costs of the Death Penalty*

The defendant raises two issues related to the economic costs of the death penalty in this state. He first asserts that the trial court erred by refusing to allow him to present proof during the penalty phase about the costs associated with implementing the death

penalty. Prior to trial, the defendant filed a motion seeking permission to present evidence that first degree murder trials where death is a potential punishment cost more than those where death is not a potential punishment and that the cost of executing an inmate is greater than the cost of imprisoning an inmate for the entirety of his life. In support of his motion, the defendant pointed to the questionnaires returned by potential jurors in this case, which revealed that 76 percent of potential jurors believed that it costs more to imprison an individual for life than it does to execute an individual. The trial court denied the defendant's motion but offered the following to the jury before giving the jury charge:

> Ladies and gentlemen, one of the issues that . . . was in your questionnaire and one of the issues that had come up related to economic costs of sentencing issues, and . . . we did not get into that during the proof in this case. But what I've agreed to do at the request of and with the agreement of the parties is to make this following statement to you with regard to economic costs as it relates to the death penalty and as it relates to life imprisonment.

> There was a study by the [C]omptroller of the [S]tate of Tennessee that was done, and what that study showed is that the economic costs of . . . imposing the death penalty . . . is more expensive than imprisoning somebody for life without parole. Now that's one study done by the [C]omptroller of the [S]tate of Tennessee.

> Now, having said that, I want you to understand that the economic cost[] . . . should have absolutely no bearing on your decision in this case. What you should base your decision on in this case is the evidence that's presented to you, the law that we tell you that applies on how you should make your decision, and the weight to be given the evidence that's presented to you.

> We just . . . don't want people to operate under any . . . , misguided misperceptions [sic] about . . . economics so that's why I told you that.

> But I want to stress to you that you are to make your decision in this case solely on the . . . evidence that's presented to you, the law that we tell you that applies, and those are the things that are important to how you decide what's appropriate in this case. I'm going to leave it here, okay.

The defendant claims on appeal that the trial court's ruling and its instruction to the jury deprived him of the right to present mitigation evidence. The State argues that because the economic costs of the death penalty bear no relation to the defendant or his

crime, evidence of the same was irrelevant and properly excluded by the trial court. We agree with the State.

Tennessee Code Annotated section 39-13-204 provides, in pertinent part, as follows:

> In the sentencing proceeding, evidence may be presented as to any matter that the court deems relevant to the punishment, and may include, but not be limited to, the nature and circumstances of the crime; the defendant's character, background history, and physical condition; any evidence tending to establish or rebut the aggravating circumstances enumerated in subsection (i); and any evidence tending to establish or rebut any mitigating factors. Any such evidence that the court deems to have probative value on the issue of punishment may be received, regardless of its admissibility under the rules of evidence; provided, that the defendant is accorded a fair opportunity to rebut any hearsay statements so admitted. However, this subsection (c) shall not be construed to authorize the introduction of any evidence secured in violation of the constitution of the United States or the constitution of Tennessee. . . .

T.C.A. § 39-13-204(c). An accused facing the death penalty has the constitutional right to present evidence of "any aspect of a defendant's character or record and any of the circumstances of the offense that the defendant proffers as a basis for a sentence less than death," *Lockett v. Ohio*, 438 U.S. 586, 604 (1978), but this right does not "limit[] the traditional authority of a court to exclude, as irrelevant, evidence not bearing on the defendant's character, prior record, or the circumstances of his offense," *id.* n.12; *see also State v. Odom*, 928 S.W.2d 18, 31 n.10 (Tenn. 1996) (noting that "evidence that does not bear on the defendant's character, prior record or the circumstances of the offense is not relevant and may be excluded by the trial court"). Indeed, "'[t]he primary concern in the Eighth Amendment context has been that the sentencing decision be based on *the facts and circumstances of the defendant, his background, and his crime*.'" *State v. Dellinger*, 79 S.W.3d 458, 473 (Tenn. 2002) (quoting *Clemons v. Mississippi*, 494 U.S. 738, 748 (1990)) (emphasis added).

Those courts to consider the issue have concluded that evidence of the economic costs of imposing the death penalty is not relevant to the issue of punishment and, as such, can be properly excluded from a capital sentencing hearing. For example, in *State v. Clabourne*, the Arizona Supreme Court cited as error the sentencing court's decision to permit Clabourne to utilize the cost of imposing the death penalty as a mitigating factor because "the economic cost of the death penalty is unrelated to Clabourne, his character or record, or the circumstances of his offense." *State v. Clabourne*, 983 P.2d 748, 757 (Ariz. 1999). The *Clabourne* court observed, "The cost/benefit analysis of the death

penalty is a decision left to the legislature in the first instance, and to the State in any given case." *Id.*; *see also State v. Bell*, 33 A.3d 167, 180 (Conn. 2011) (stating that the economic costs associated with a particular punishment "are to be considered not by the sentencing authority but by the legislature when it is enacting sentencing provisions").

In our view, the trial court did not err by refusing to allow the defendant to introduce evidence regarding the cost of imposing the death penalty compared to the cost associated with imprisoning an individual for life. Evidence of the expense associated with implementing the death penalty bore no relation to the defendant or his crimes, and as such, it was irrelevant.

In a related issue, the defendant contends that the "enormous economic costs" associated with the death penalty render it unconstitutional, arguing that "given the substantial expense of imposing the death penalty as compared to a sentence of incarceration for life without parole, the [S]tate does not have a compelling interest in the continued use of capital punishment."

Regardless of the costs associated with implementing the death penalty, the responsibility of weighing the economic costs associated with continuing the death penalty in this State lies solely with the general assembly, not with this or any other court. We cannot fathom a situation in which the potential financial burden on Tennessee taxpayers associated with implementing the death penalty could result in the finding of a violation of the death sentenced inmate's constitutional protection against cruel and unusual punishment.

### B. Death Qualified Jurors

The defendant next asserts that the trial court erred by excluding from the jury those individuals who expressed that they could not impose the death penalty for religious or other reasons. As the State correctly points out, our supreme court has repeatedly approved of the process of death qualifying the jury by excluding those individuals on the extremes, those who would flout the law and "always" or "never" vote for the death penalty regardless of the evidence. *See, e.g.*, *State v. Sexton*, 368 S.W.3d 371, 391 (Tenn. 2012); *State v. Teel*, 793 S.W.2d 236, 246 (Tenn. 1990). The defendant's attempt to shoehorn this claim into a violation of the fair cross-section requirement does not alter our decision. The defendant is not entitled to relief on this issue.

### C. Constitutionality of the Death Penalty

Finally, the defendant raises a number of separate but related challenges to the constitutionality of the death penalty in general and the death penalty as it was imposed

in this case. He argues that these flaws should have resulted in the dismissal of the death notice in this case.

## 1. Sufficient Narrowing

He first contends that Code section 39-13-204 "does not sufficiently narrow the population of defendants convicted of first degree murder who are eligible for a sentence of death" in violation of constitutional protections. He claims that the (i)(5), (i)(6), (i)(7), and (i)(13) aggravating circumstances, each of which was found by the jury in this case, are unconstitutionally vague and do not achieve a constitutionally sufficient narrowing. Again, as the State correctly points out, the supreme court has considered and rejected arguments identical to those presented by the defendant.

The defendant claims that the (i)(5) aggravating factor, that "[t]he murder was especially heinous, atrocious, or cruel, in that it involved torture or serious physical abuse beyond that necessary to produce death," T.C.A. § 39-13-204(i)(5), does not sufficiently narrow the class of death-eligible murderers because "a person of ordinary sensibility could fairly characterize almost every murder as involving the infliction of severe physical or mental pain." Our supreme court has "consistently upheld the constitutionality of [the (i)(5)] aggravating circumstance" and has "rejected the argument that the terms are vague or overbroad." *See Terry v. State*, 46 S.W.3d 147, 159 (Tenn. 2001).

The defendant claims that the (i)(6) aggravating circumstance, that "[t]he murder was committed for the purpose of avoiding, interfering with, or preventing a lawful arrest or prosecution of the defendant or another," T.C.A. § 39-13-204(i)(6), is unconstitutional as "significantly expanded" by our supreme court's ruling in *State v. Coe*, 655 S.W.2d 903 (Tenn. 1989). Specifically, he complains that the expanded definition afforded to the (i)(6) aggravating circumstance by the ruling in *Coe* actually encroaches upon the underlying justification for the (i)(7) aggravating circumstance, which justification is, according to the defendant, "to deter 'witness killings.'" We are unpersuaded by any part of the defendant's argument. Our supreme court "has consistently recognized that [the (i)(6)] aggravating circumstance requires that a motive for the killing must have been avoiding, interfering with, or preventing an arrest or prosecution. There is nothing vague or overbroad about this aggravating circumstance." *State v. Banks*, 271 S.W.3d 90, 152 (Tenn. 2008) (citation omitted). The (i)(7) aggravating circumstance does not require that the murder be "committed for the purpose of avoiding, interfering with, or preventing a lawful arrest or prosecution of the defendant or another," *see* T.C.A. § 39-13-204(i)(6), and instead requires that the murder was "knowingly committed . . . while the defendant had a substantial role in committing or attempting to commit, or was fleeing after having a substantial role in committing or attempting to commit, any" of the enumerated felonies, *see id.* § 39-13-204(i)(7). The provisions are not duplicative. *See Banks*, 271

S.W.3d at 153. Additionally, as our supreme court observed in Banks, "Even assuming, for the sake of argument, that the aggravating circumstances are duplicative, Mr. Banks has failed to demonstrate or explain why this duplication would undermine their constitutionality." *Id.*

The defendant also invites this court "to take a second look" at the rationale underlying those supreme court cases specifically approving the application of the (i)(7) aggravating circumstance to convictions of felony murder. Our supreme court has recently and specifically concluded that "pursuant to established precedent on this issue . . . the (i)(7) aggravating circumstance sufficiently narrows the pool of death-eligible defendants." *State v. Pruitt*, 415 S.W.3d 180, 227 (Tenn. 2013). Thus the defendant's is an invitation we must decline. *See generally Barger v. Brock*, 535 S.W.2d 337, 340 (Tenn. 1976) (holding that the adjudications of the supreme court "are final and conclusive upon all questions determined by it, subject only to review, in appropriate cases by the Supreme Court of the United States").

Finally, the defendant alleges that the (i)(13) aggravating circumstance, that "[t]he defendant knowingly mutilated the body of the victim after death," T.C.A. § 39-13-204(i)(13), is unconstitutionally vague. This court explained the (i)(13) aggravating circumstance in *State v. Price*. Although "the term 'mutilate' is not defined anywhere in our statutory code," we held that because the (i)(13) aggravating circumstance "specifically addresses itself to mutilation of a victim after death, the only logical conclusion to be drawn regarding the legislative intent underlying that section is that the General Assembly . . . meant to discourage corpse desecration." *State v. Price*, 46 S.W.3d 785, 827-28 (Tenn. Crim. App. 2000). The *Price* court utilized the definitions of the term "mutilate" found in Black's Law Dictionary and Webster's New International Dictionary:

> Black's Law Dictionary defines "mutilation" as follows: "2. Criminal law. The act of cutting off or permanently damaging a body part, especially an essential one." Black's Law Dictionary 1039 (7th ed. 1999). Webster's defines "mutilate" as: "1: to cut off or permanently destroy a limb or essential part of . . . . 2: to cut up or alter radically so as to make imperfect . . . ." Webster's New International Dictionary, 1493 (3d ed. 1993).

*Id.* at 827 (emphasis in Price). Our supreme court later approved this definition of the term. *State v. Jordan*, 325 S.W.3d 1, 71 (Tenn. 2010). Our supreme court has never declared this aggravating circumstance unconstitutional.

## 2. *Weighing of Aggravating and Mitigating Factors*

The defendant argues that Code section 39-13-204 is unconstitutional because it does not sufficiently direct the jury's discretion inasmuch as it permits the jury to "impose a death sentence no matter what mitigation is shown." He also complains that the language of Code section 39-13-204 deprives the jury of the power "to make the ultimate determination that death is appropriate" because it requires that the jury impose a sentence of death if it finds that the aggravating circumstances outweigh the mitigating circumstances beyond a reasonable doubt.

Code section 39-13-204(g)(1) provides:

The sentence shall be death, if the jury unanimously determines that:

(A) At least one (1) statutory aggravating circumstance or several statutory aggravating circumstances have been proven by the state beyond a reasonable doubt; and

(B) Such circumstance or circumstances have been proven by the state to outweigh any mitigating circumstances beyond a reasonable doubt.

T.C.A. § 39-13-204(g)(1). The plain language of the statute reveals the fallacy in the defendant's argument. The Code does not permit the imposition of a death sentence "no matter what mitigation is shown" but only permits the jury to impose a sentence of death when it concludes that the established aggravating circumstances "have been proven by the state to outweigh any mitigating circumstances beyond a reasonable doubt." *Id.* This language also does not mandate a sentence of death. *See State v. Howell*, 868 S.W.2d 238, 258 (Tenn. 1993). Moreover, as the defendant acknowledges, the Supreme Court has held that "complete jury discretion" in the consideration of aggravating and mitigating circumstances "is constitutionally permissible." *Buchanan v. Angelone*, 522 U.S. 269, 276 (1998). Our own supreme court has expressly approved of Code section 39-13-204(g), concluding that it did not interfere with the jury's discretion. *See Howell*, 238 S.W.2d at 258-59. The defendant is not entitled to relief on this issue.

## 3. *Mercy*

The defendant asserts that Code section 39-13-204 is unconstitutional because it does not permit the jury to impose a sentence of life out of mercy. Again, our supreme court has specifically rejected this argument, concluding that the ability to act out of mercy is incorporated into the jury's ability to find any non-statutory mitigating circumstance. *See State v. Melson*, 638 S.W.2d 342, 366 (Tenn. 1982) (observing that "the idea that 'mercy' could be extended to a defendant is incorporated in the instructions

on mitigating factors; and the admonition against being ruled by passion or prejudice runs throughout"); *see also e.g.*, *State v. Bigbee*, 885 S.W.2d 797, 814 (Tenn. 1994).

## 4. *Consequences of Deadlocked Jury*

The defendant also claims that Code section 39-13-204 is unconstitutional because it prohibits the trial court from instructing the jury that the consequence of its failure to reach a verdict is the automatic imposition of a life sentence. He argues that this "tilt[s] the scales in favor of the prosecution and make[s] it easier to obtain the unanimous verdict required for death." Our supreme court has rejected this argument. *See, e.g.*, *State v. Simon*, 635 S.W.2d 498, 505 (Tenn. 1982) ("Such instructions are specifically prohibited by statutes dealing with the death penalty.").

## 5. *Cruel and Unusual Punishment*

The defendant contends that the death penalty in general and lethal injection in particular violate state and federal prohibitions on cruel and unusual punishment. Both of these arguments have been considered and rejected by the United States Supreme Court, *see Baze v. Rees*, 553 U.S. 35, 47 (2008) (reaffirming that "capital punishment is constitutional" and upholding Kentucky's lethal injection protocol), and our supreme court, *see, e.g.*, *Keen v. State*, 398 S.W.3d 594, 600 n.7 (Tenn. 2012) ("This Court has held, and repeatedly affirmed, that capital punishment itself does not violate the state and federal constitutions."); *Banks*, 271 S.W.3d at 108 (rejecting specific claim that lethal injection is cruel and unusual); *Abdur'Rahman v. Bredesen*, 181 S.W.3d 292, 309 (Tenn. 2005) ("[W]e conclude that the petitioner has failed to establish that the lethal injection protocol is cruel and unusual punishment under the United States or Tennessee constitutions.").

## 6. *Arbitrary and Capricious Application*

The defendant argues that the death penalty in Tennessee has been implemented in an "arbitrary, capricious, and unconstitutional" manner.

He first claims that the "unlimited discretion" afforded to prosecutors to choose whether to seek the death penalty in a particular case violates his constitutional right to equal protection under the law, represents an improper delegation of judicial authority, and results in the usurping of legislative authority. "While Tennessee's district attorneys general have been entrusted with broad discretion in making charging decisions, it would be inaccurate to characterize their discretion as entirely unfettered." *Banks*, 271 S.W.3d at 154. Instead, their discretion is guided by the elements of the crime of first degree murder and the aggravating circumstances as defined by the legislature. "Furthermore, the United States Supreme Court has recognized that prosecutorial discretion provides a vehicle for

individualized justice." *Banks*, 271 S.W.3d at 155 (citing *McCleskey v. Kemp*, 481 U.S. 279, 311–12 (1987)). Our supreme court has "repeatedly rejected the argument that such discretion raises a constitutional problem." *Banks*, 271 S.W.3d at 155.

The defendant also claims that "almost all" those sentenced to death are indigent. He does not even attempt to explain why this "fact" undermines the constitutionality of the death penalty except to include it in his discussion of the arbitrary application of the death penalty. He is not entitled to relief on this issue.

The defendant next contends that the implementation of the death penalty is racially discriminatory, citing information that 85 percent of death row inmates executed following Furman have been convicted of killing white victims. The single study cited by the defendant, however, "falls far short of the sort of exceptionally clear proof that would enable the courts to conclude that the actions of the decision-makers in his case were motivated by an improper discriminatory purpose." *Banks*, 271 S.W.3d at 157.

The defendant claims that "various studies suggest" that the likelihood of receiving a sentence of death depends on the geographic location of the crime, noting that Washington County juries have imposed the same number of death sentences as Davidson County juries despite that Davidson County has a significantly larger population. The defendant does not explain how the geographic distribution of death sentences undermines the constitutionality of the death penalty and cites no authority for his claim. He is not entitled to relief on this issue.

He also claims sexual discrimination in the implementation of the death penalty without explanation or citation to authority. He is not entitled to relief on this issue.

The defendant also reiterates his earlier claims about the selection process for capital juries and the costs associated with implementing the death penalty, attempting to recast them as equal protection violations. We have already addressed these claims and will not do so again.

### 7. *Closing Arguments*

As his next assignment of error, the defendant claims that allowing the State to make the final closing argument to the jury during the penalty phase violated his right to due process of law and the effective assistance of his counsel. He argues that although the State has the burden of establishing the aggravating circumstances beyond a reasonable doubt, "[t]he real burden is on the defendant whose life hangs in the balance, and he should have the opportunity to argue last." Our supreme court has previously considered and rejected this argument. *See, e.g.*, *Sexton*, 368 S.W.3d at 428.

## 8. Proportionality Review

The defendant contends "that the proportionality review process in this [s]tate is deficient and unconstitutionally inadequate." The proportionality review process has been developed and approved by our supreme court, see *Pruitt*, 415 S.W.3d at 212-17 (providing a discussion of the development of the comparative proportionality review process and specifically approving the constitutionality of the current process), and, as such, this court is without the authority to alter it, *see Barger*, 535 S.W.2d at 340.

## 9. Grand Jury Review

The defendant challenges both the death notice in this case and the aggravating factors found by the jury on grounds that neither was submitted for grand jury review. "The Tennessee Supreme Court has consistently rejected this argument by holding that aggravating circumstances need not be pled in the indictment." *Banks*, 271 S.W.3d at 167 (citing *State v. Reid*, 164 S.W.3d 286, 312 (2005); *State v. Leach*, 148 S.W.3d 42, 59 (Tenn. 2004); *State v. Berry*, 141 S.W.3d 549, 562 (Tenn. 2004); *State v. Holton*, 126 S.W.3d 845, 863 (Tenn. 2004); *State v. Dellinger*, 79 S.W.3d 458, 467 (Tenn. 2002)). The supreme court has also repeatedly held "that the provisions of Rule 12.3 satisfy the constitutional requirements of notice" such that grand jury review is not constitutionally required for death notices. *Berry*, 141 S.W.3d at 562 (citing *State v. Odom*, 137 S.W.3d 572 n.13; *Dellinger*, 79 S.W.3d at 467; *State v. Bush*, 942 S.W.2d 489, 520 (Tenn. 1997); *State v. Johnson*, 762 S.W.2d 110, 117 (Tenn. 1988)).

## 10. Minimum Constitutional Standards

The defendant next asserts that the death penalty as implemented in this state fails to meet the minimum constitutional standards provided by the United States Supreme Court. In reality, the defendant's claim is another rehashing of his opposition to the process of death qualifying capital juries. We will not address this issue again.

## 11. Due Process and Equal Protection

The defendant claims that the death penalty as implemented in this state violates his constitutional rights to due process and equal protection "by cutting off a defendant's post-conviction ability to establish his actual innocence." He contends that the State effectively creates a statute of limitations for the presentation of an actual innocence claim by setting an execution date. We fail to see how the availability of a future postconviction claim undermines the constitutionality of the death penalty imposed in this case. This is the direct appeal of the defendant's convictions and sentences. He was afforded at trial the full and fair opportunity to defend himself against the charges.

Nothing more is required. That other defendants in other cases may have established their innocence does not alter this result.

## XVII. Victim Impact Evidence

Finally, the defendant contends that the presentation of victim impact evidence during the penalty phase violated his constitutional rights to due process and a fair trial.

Code section 39-13-204(c) provides that "[t]he court shall permit a member or members, or a representative or representatives of the victim's family to testify at the sentencing hearing about the victim and about the impact of the murder on the family of the victim and other relevant persons." T.C.A. § 39-13-204(c). Our supreme court has concluded that victim impact evidence is admissible in a capital sentencing hearing subject to the limitation that it "should be excluded if it 'threatens to render the trial fundamentally unfair or [if it] poses a danger of unfair prejudice.'" *Jordan*, 325 S.W.3d at 56 (quoting *State v. Nesbit*, 978 S.W.2d 872, 891 (Tenn. 1998)). The defendant makes no claim that the victim impact evidence admitted during the penalty phase in his case violated these tenets and instead makes only broad, conclusory allegations regarding the constitutionality of the presentation of such evidence. The constitutionality of presenting victim impact evidence in a capital sentencing hearing is a matter that has been settled by the state and federal supreme courts. *Payne v. Tennessee*, 501 U.S. 808, 827 (1991); *Nesbit*, 978 S.W.2d at 891.

[Deleted: *XVIII. Mandatory Review*]

[Deleted: *XIX. Merger*]

[Deleted: *Conclusion*]

Accordingly, the judgments of the trial court are affirmed.